## EXHIBIT A

**U.S. Patent No. 6,560,613**



US006560613B1

(12) **United States Patent**      (10) **Patent No.:**      **US 6,560,613 B1**

Gylfason et al.      (45) **Date of Patent:**      **May 6, 2003**

(54) **DISAMBIGUATING FILE DESCRIPTORS**

(75) Inventors: **Snorri Gylfason**, Mountain View, CA (US); **Xun Wilson Huang**, Mountain View, CA (US); **Rosen Sharma**, Mountain View, CA (US)

(73) Assignee: **Ensim Corporation**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/500,212**

(22) Filed: **Feb. 8, 2000**

(51) Int. Cl.[7] .......................... **G06F 12/00**; G06F 17/30

(52) U.S. Cl. .............................. **707/200**; 707/9; 707/10

(58) Field of Search ............................. 707/9, 10, 200, 707/1, 140

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,377,624 | A | 4/1968 | Nelson et al. | 711/152 |
| 4,177,510 | A | 12/1979 | Appell et al. | 364/200 |
| 5,212,793 | A | 5/1993 | Donica et al. | |
| 5,249,290 | A | 9/1993 | Heizer | |
| 5,263,147 | A | 11/1993 | Francisco et al. | 395/425 |
| 5,437,032 | A | 7/1995 | Wolf et al. | |
| 5,584,023 | A | * 12/1996 | Hsu | 707/204 |
| 5,603,020 | A | * 2/1997 | Hashimoto et al. | 707/200 |
| 5,636,371 | A | 6/1997 | Wu | 395/500 |
| 5,692,047 | A | 11/1997 | McManis | 380/4 |
| 5,706,097 | A | * 1/1998 | Schelling et al. | 345/723 |
| 5,706,453 | A | 1/1998 | Cheng et al. | |
| 5,708,774 | A | 1/1998 | Boden | |
| 5,761,477 | A | 6/1998 | Wahbe et al. | 395/406 A |
| 5,781,550 | A | 7/1998 | Templin et al. | 370/401 |
| 5,809,527 | A | * 9/1998 | Cooper et al. | 707/200 |
| 5,828,893 | A | 10/1998 | Weid et al. | 395/800 |
| 5,838,916 | A | * 11/1998 | Domenikos et al. | 345/753 |
| 5,842,002 | A | 11/1998 | Schnurer et al. | 395/500 |
| 5,845,129 | A | 12/1998 | Wendorf et al. | 395/726 |
| 5,860,004 | A | * 1/1999 | Fowlow et al. | 717/109 |

| | | | | |
|---|---|---|---|---|
| 5,913,024 | A | 6/1999 | Green et al. | 395/186 |
| 5,915,085 | A | 6/1999 | Koved | 395/186 |
| 5,918,018 | A | 6/1999 | Gooderum et al. | 395/200.55 |
| 5,937,159 | A | * 8/1999 | Meyers et al. | 713/201 |

(List continued on next page.)

OTHER PUBLICATIONS

Keshav, S., An Engineering Approach to Computer Networking: ATM Networks, the Internet, and the Telephone Network, Reading, MA, Addison–Wesley, 1997, pp. vii–xi, 85–115, 209–355, 395–444.

(List continued on next page.)

*Primary Examiner*—John Breene
*Assistant Examiner*—Leslie Wong
(74) *Attorney, Agent, or Firm*—Fenwick & West LLP

(57) **ABSTRACT**

File descriptors associated with specific file types are disambiguated from other file descriptors by maintaining and examining an indicator table containing indicators concerning file descriptors associated with a specific, desired file type. System calls that establish a descriptor of the specific, desired type are intercepted, and an indicator concerning the established file descriptor is added to the indicator table. To keep the indicator table current, system calls that make a copy of a file descriptor or that delete a file descriptor are intercepted. If a file descriptor associated with the desired type is copied or deleted, the indicator table is updated. Therefore, the indicator table preferably includes indicators concerning all file descriptors associated with files of the specific desired type. The indicator table is examined to determine whether or not a specific file descriptor is of the desired type. In one embodiment, system calls that access files via file descriptors are intercepted, and the system call wrapper examines the indicator table to determine whether the file being accessed is of the desired type. Only if the file is of the desired type does the system call wrapper continue to execute. If the file is not of the desired type, the default system call is made. Thus, system calls that access files are selectively intercepted based upon file type.

**21 Claims, 16 Drawing Sheets**



# US 6,560,613 B1
Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,956,481 A | | 9/1999 | Walsh et al. | 395/186 |
| 6,023,721 A | | 2/2000 | Cummings | 709/201 |
| 6,065,118 A | | 5/2000 | Bull et al. | 713/200 |
| 6,086,623 A | * | 7/2000 | Broome et al. | 703/26 |
| 6,108,759 A | * | 8/2000 | Orcutt et al. | 711/112 |
| 6,167,520 A | | 12/2000 | Touboul | 713/200 |
| 6,192,389 B1 | * | 2/2001 | Ault et al. | 709/101 |
| 6,192,512 B1 | | 2/2001 | Chess | 717/5 |

### OTHER PUBLICATIONS

Stevens, R. W., UNIX Network Programming vol. 1 Networking APIs: Sockets and XTI, Upper Saddle River, NJ, Prentice Hall, 1998, pp. v–xiv, 29–53, 85–110, 727–760.

Tanenbaum, A. S. and Woodhull, A. S., Operating Systems: Design and Implementation, Upper Saddle River, NJ, Prentice Hall, 1997, pp. vii–xiv, 1–46, 401–454.

Rubini, A., LINUX Device Drivers, Sebastopol, CA, O'Reilly & Associates, Inc., 1998, pp. v–x, 13–40.

Goyal, P., et al., "A Hierarchical CPU Scheduler for Multimedia Operating Systems," Proceedings of the Second Symposium on Operating Systems Design and Implementations (OSDI'96), Seattle, WA, Oct. 1996, 15 pages.

Laurie, B. and Laurie, P., Apache The Definitive Guide, Sebastopol, CA, O'Reilly & Associates, Inc., Feb. 1999, pp. v–viii, 43–74.

Aho, A. V. and Ullman J. D., Principles of Complier Design, Reading, MA, 1977, pp. vii–x, 359–362, 519–522.

Jonsson, J., "Exploring the Importance of Preprocessing Operations in Real–Time Multiprocessor Scheduling," Proc. of the IEEE Real–Time Systems Symposium—Work–in–Progress session, San Francisco, CA, Dec. 4, 1997, pp. 31–34.

Rusling, D. A., Processes, [online], [retrieved on Dec. 7, 1999]. Retrieved from the Internet: <URL: http://www.ce-baf.gov/~saw/linux/tlk–html/node44.html>.

Rusling, D. A., Linux Processes, [online], [retrieved on Dec. 7, 1999]. Retrieved from the Internet: <URL:http://www-.cebaf.gov/~saw/linux/tlk–html/node45.html>.

Rusling, D. A., Linux Processes, [online], [retrieved on Dec. 7, 1999]. Retrieved from the Internet: <URL: http://www-.cebaf.gov/~saw/linux/tlk–htm/node46.html>.

Rusling, D. A., Scheduling [online], [retrieved on Dec. 7, 1999]. Retrieved from the Internet: <URL: http://www.ce-baf.gov/~saw/linux/tlk–html/node47.html>.

Rusling, D. A., Scheduling in Multiprocessor Systems, [online], [retrieved on Dec. 7, 1999]. Retrieved from the Internet: <URL: http://www.cebaf.gov/~saw/linux/tlk–html/node48.html>.

Rusling, D. A., Files, [online], [retrieved on Dec. 7, 1999]. Retrieved from the Internet: >URL: http://ww.cebaf.gov/~saw/linux/tlk–html/node49.html>.

Plummer, D. C., An Ethernet Address Resolution Protocol—or—Converting Network Protocol Addresses to 48.bit Ethernet Address for Transmission on Ethernet Hardware, Nov. 1982, [online], [retrieved on Jan. 17, 2000]. Retrieved form the Internet: <URL: http://www.msg.net/kadow/answers/extras/rfc/rfc826.txt>.

Huang, X. W. et al., "The Entrapid Protocol Development Environment," Proceedings of IEEE Infocom'99, Mar. 1999, nine pages.

Duffield, N.G., et al., "A Flexible Model for Resource Management in Virtual Private Networks," Computer Communication Review Conference, Computer Communication, ACM SIGCOMM '99 Conference, Cambridge, MA, Aug. 30, 1999–Sep. 3, 1999, pp. 95–108.

Campbell, A. T. and Keshav, S., "Quality of Service in Distributed Systems," Computer Communications 21, 1998, pp. 291–293.

Bach, M. J., The Design of the Unix® Operating System, New Delhi, Prentice–Hall of India, 1989, pp. v–x, 19–37.

McDougall, R., et al., Resource Management, Upper Saddle River, NJ, Prentice Hall, 1999, pp. iii–xix, 135–191.

Rijinghani, A., RFC 1624, May 1994, [online], [retrieved Feb. 2, 2000]. retrieved from the internet: <URL:http://www.faqs.org/rfc1624.html>.

Mallory, T and Kullberg, A., RFC 1141, Jan. 1990 [online], [retrieved Feb. 2, 2000]. retrieved from the Internet: <URL:http://www.faqs.org/rfcs/rdc1141.html>.

Egevang, K. and Francis P., RFC 1631, May 1994 [online], [retrieved Feb. 2, 2000]. retrieved from the Internet: <URL: http://www.faqs.org/rfcs/rfc1631.html>.

Evans, D. and Twyman, A., "Flexible Policy–Directed Code Safety," Proc. of 1999 IEEE Symposium on Security and Privacy, Oakland, CA, May 9–12, 1999, pp. 1–14.

Fraser, T. et al., "Hardening COTS Software with Generic Software Wrappers," Proc. of 1999 IEEE Symposium on Security and Privacy, 1999, 15 pages.

Goldberg, I. et al., "A Secure Environment For Untrusted Helper Applications (Confining the Wily Hacker)," Proc. of the Sixthe USENIX UNIX Security Symposium, San Jose, CA, Jul. 1996, 14 pages.

Goldberg, R. P., "Survey of Virtual Machine Research," IEEE Computer, Jun. 1974, pp. 34–45.

Pandey, R. and Hashii, B., "Proving Fine–Grained Access Control For Mobile Programs Through Binary Editing," Technical Report TR98 08, University of California, Davis, CA, 1998, pp. 1–22.

Ritchie, D. M., "The Evolution of the Unix Time–Sharing System," AT&T Bell Laboratories Technical Journal 63, No. 6, Part 2, Oct. 1984, (originally presented 1979), 11 pages.

Saltzer, J., H. and Schroeder, M. D., The Protection of Information in Computer Systems, [online], 1973, [retrieved on Apr. 2, 2002]. Retrieved from the Internet: <URL: http://www.cs.virginia.edu~evans/cs551/saltzer/>.

Wahbe, R., et al., "Efficient Software–Based Fault Isolation," Proc. of the Symposium on Operating System Principles, 1993, 14 pages.

Goyal, P. et al., "Start–time Fair Queuing: A Scheduling Algorithm for Integrated Services Packet Switching Networks," Proceedings of ACM SIGCOMM '96, San Francisco, CA, Aug. 1996, 14 pages.

Jánosi, T., "Notes on 'Hierarchical CPU Scheduler for Multimedia Operating Systems' by Pawan Goyal, Xingang Guo and Harrick Vin," [online], [retrieved on May 8,2000]. Retrieved from the internet: <URL:http://cs.cornell.edu/Info/Courses/Spring–97/CS614/goy.html>.

Goyal, P., "Packet Scheduling Algorithms for Integrated Services Networks," PhD Dissertation, University of Texas, Austin, TX, Aug. 1997.

Pending United States patent application entitled "Providing Quality of Service Guarantees to Virtual Hosts," ser. No. 09/452,286, filing date Nov. 30, 1999.

**US 6,560,613 B1**

Page 3

Pending United States patent application entitled "Selective Interception of System Calls," serial No. 09/499,098, filing date Feb. 4, 2000.

Pending United States patent application entitled "Dynamic Scheduling of Task Streams in a Multiple–Resource System to Ensure Task Stream Quality of Service," serial No. 09/498,450, filing date Feb. 4, 2000.

Boehm, B., "Managing Software Producttivity and Reuse," IEEE Computer, vol. 32, No. 9, Sep. 1999, 3 pages.

Corbato, F. J. et al. "An Experimental Timesharing System," Proceedings of the American Federation Of Information Processing Societies Spring Joint Computer Conference, San Francisco, CA, May 1–3, 1962, pp. 335–344.

Deutsch, P. and Grant, C.A., "A Flexible Measurement Tool for Software Systems," Information Processing 71 (Proc. of the IFIP Congress), 1971, pp. 320–326.

Edjlali, G., et al., "History–based Access Control for Mobile Code," Fifth ACM Conference on Computer and Commu-nication Security, Nov. 3–5, 1998, 19 pages.

Erlingsson, U. and Schneider, F. B., "SASI Enforcement of Security Policies: A Retrospective," Proc. New Security Paradigms Workshop, Apr. 2, 1999, pp. 1–17.

* cited by examiner

U.S. Patent          May 6, 2003          Sheet 1 of 16          US 6,560,613 B1



FIG. 1



COMPUTER MEMORY 101
USER ADDRESS SPACE
103
201
File Descriptor Associated with Communication Channel
107
Process
OPERATING SYSTEM ADDRESS SPACE
105
OPERATING SYSTEM 117
203
System Calls that Establish a Communication Channel
116
Saved Copies of Pointers
115
System Calls
113
System Call Vector Table
Pointers to System Call Wrapper
Pointers to System Calls
118
114
System Call Wrapper
111
Indicator Table
Indicator that File Descriptor is Associated with Communication Channel
127
205
Kernel
109

200

FIG. 2

COMPUTER MEMORY 101
USER ADDRESS SPACE
103
File Descriptor Associated with File Stored on Media
301
Process
107
OPERATING SYSTEM ADDRESS SPACE
105
OPERATING SYSTEM 117
System Calls that Establish a File Stored on Media
303
Saved Copies of Pointers
116
System Calls
115
System Call Vector Table
113
Pointers to System Call Wrapper
118
Pointers to System Calls
114
System Call Wrapper
111
Indicator Table
127
Indicator that File Descriptor is Associated with File Stored on Media
305
Kernel
109
300

FIG. 3



COMPUTER MEMORY 101
USER ADDRESS SPACE
103
102
File Descriptor
107
Process
OPERATING SYSTEM ADDRESS SPACE
105
403
System Calls that Access File Via File Descriptor
116
Saved Copies of Pointers
115
System Calls
113
System Call Vector Table
Pointers to System Call Wrapper
Pointers to System Calls
118
114
400
OPERATING SYSTEM 117
111
System Call Wrapper
Indicator Table
Indicator that File Descriptor is Associated with Specific File Type
127
405
Kernel
109

FIG. 4

**U.S. Patent**    May 6, 2003    Sheet 5 of 16    US 6,560,613 B1



Intercept System Call that
Establishes a File Descriptor — 501

Store Indicator of
Associated File Type — 503

Examine Stored Indicator to
Determine with what File
Type it is Associated — 505

Execute Alternative Object
Code Based on File Type — 507

**FIG. 5A**



**FIG. 5B**



**FIG. 6A**



**FIG. 6B**



**FIG. 7A**



**FIG. 7B**

DataCloud Technologies, LLC v. Extreme Networks, Inc.                                        Page | A-13



**FIG. 7C**



**FIG. 7D**



**FIG. 8A**



**FIG. 8B**



**FIG. 8C**



**FIG. 8D**

US 6,560,613 B1

**1**

## DISAMBIGUATING FILE DESCRIPTORS

### BACKGROUND

#### Field of Invention

The present invention relates generally to disambiguating file types on a computer system, and specifically to disambiguating communication channel file descriptors from file descriptors that that are associated with files stored on physical media.

### BACKGROUND OF INVENTION

Operating systems such as UNIX® and Microsoft WINDOWS NT® are widely utilized in commercial computing systems. Among their many commercial uses, these operating systems are commonly deployed on Internet and other network server computers. With the popularity and success of the Internet, server computer operating systems are currently of great commercial importance.

Frequently, it is desirable to intercept system calls that pertain to accessing files. Although operating systems include various internal resources for accessing a file system, it is often desirable to customize or extend operating system functionality for a particular use. Such customization allows a computer programmer, a network administrator, or a webmaster to utilize the operating system in a specific manner beyond the default system capabilities provided by the manufacturer of the operating system. The interception of system calls is one such method of extending and expanding operating system functionality.

A system call is a subroutine, the object code of which is located in an operating system, such that the subroutine can be called by processes executing under the control of the operating system. When executed, a system call performs some system operation, such as the access of a system hardware or software resource. Examples of operations executed by system calls include reading data from a file, opening a network communication channel, and allocating computer memory to a specific process. Application programs (processes) executing under the control of the operating system make a system call in order to bring about the performance of these and other system operations.

System calls are accessed by the operating system, using a system call vector table. A system call vector table is an area in operating system address space. A system call vector table stores pointers to the actual executable code of the system calls. In order to make a system call, arguments are programmatically loaded into specific registers of the central processing unit of the computer on which the operating system is executing. One of these arguments identifies the specific system call that is being made. This argument is typically in the form of a number that is an offset into the system call vector table. The other loaded arguments include parameters to be passed to the system call.

Once the arguments have been loaded, a software interrupt is generated, signaling to the operating system that a process is requesting execution of a system call. The operating system reads the registers, and executes the requested system call with the specified parameters. The system call executes and performs the desired functionality. If the system call generates a return value, it places the generated return value (or a pointer thereto) in a pre-designated register where it can be accessed by the calling process.

In order to intercept a system call, a pointer in the system call vector table to the system call is replaced with a pointer

**2**

to alternative object code to be executed instead of the system call. Then, when the operating system reads the system call vector table in response to the system call being requested, the operating system will read the pointer to the alternative object code, and the alternative object code will execute instead of the system call. The alternative object code is typically known as a system call wrapper.

The interception of system calls providing access to the file system is useful to extend and customize operating system functionality. For example, the interception of system calls can be used to manipulate operating system access privileges to provide security beyond that which is provided by the operating system. Through the interception of system calls that provide access to the file system, processes can be prevented from deleting, modifying, creating, or even reading files. This is desirable, for example, when a user wishes to remotely execute a program residing on a web server, but does not want the remote program to be able to read or alter private data on the user's computer. Today, Java applets are commonly employed to provide such security. However, many programs that users wish to remotely execute are written in languages other than Java. System call interception has the potential to allow the safe execution of programs written in all languages.

The interception of system calls is known today, although it is an advanced systems programming technique. Nonetheless, a serious shortcoming limits the usefulness of intercepting system calls that provide access to the file system. That shortcoming is the inability to disambiguate between a file descriptor that is associated with a file stored on media (e.g. hard disk, optical disk, random access memory) and a file descriptor that is associated with a communication channel.

Many computer operating systems utilize file descriptors to provide access to file systems. Under such operating systems, a file is created by making a system call that creates a file and returns a file descriptor that is associated with the newly created file. Subsequently, the file is accessed via the file descriptor. Examples of file access operations include reading from a file, writing to a file, closing a file, and deleting a file. Such operations are typically conducted by making a designated system call, and passing the system call the file descriptor that is associated with the file being accessed.

Many commercially popular operating systems such as UNIX® and Microsoft WINDOWS NT® treat communication channels as files. In such an operating system, when a process makes a system call in order to establish a communication channel, the operating system returns a file descriptor. The communication channel is subsequently accessed via the file descriptor, in a similar manner as a file stored on media.

Commonly, the same system calls are made to perform the same access operations on both files stored on media and on communication channels. For example, under the UNIX® operating system, a read system call can be made in order to read data from either a file stored on media or from a communication channel. The system call itself has no information concerning with what file type a file descriptor is associated, that is whether the file descriptor refers to a communication channel or a file stored on media. The system call simply executes instructions to access a file in a specific manner via a file descriptor. For example, the read system call executes instructions to copy a specific number of bytes from a file to a buffer in memory. The read system call does not distinguish between a file on media and a

US 6,560,613 B1

3

communication channel, and in fact has no indication concerning from what file type it is reading data.

Because the system calls that access files via file descriptors do not distinguish between a file on media and a communication channel, a system call wrapper that executes when such a system call is intercepted has no mechanism for so distinguishing. For example, if the read system call is intercepted, the system call wrapper will execute whenever any process makes the system call to read data from any type of file. Thus, the system call wrapper will execute whenever a process attempts to read data from a file stored on media and also whenever a process attempts to read data from a communication channel.

Communication channels and files stored on media are inherently different, despite the fact that both are accessed via file descriptors. It is often desirable to intercept system calls that access a file stored on media, but not to intercept system calls that access a communication channel. Likewise, it is often desirable to intercept system calls that access a communication channel, but not to intercept system calls that access a file stored on media. Specifically, in the example given above concerning intercepting system calls to prevent processes from manipulating files, it is desirable only to intercept system calls that access files stored on media. The desired result is to prevent access to files stored on media, but not to prevent access to communication channels. For example, it may be desirable to prevent write access to the file system of a specific client computer. At the same time, it may be undesirable to prevent write access to the communication channels of the client computer, because it would be desirable for the computer to be able to receive communication responses from web servers. However, intercepting every write system call and executing a system call wrapper in its place to prevent write access would prevent write access to both communication channels and to files stored on media.

Likewise, it is often desirable to intercept system calls that pertain to access of communication channels, but not to intercept system calls that pertain to access of files stored on media. For example, it may be desirable to disallow remote communication requests made to a certain computer, but at the same time desirable to allow local access to files stored on media of the computer. Again, because the same system call is used to access communication channels and files stored on media, the one can not be prevented and yet the other allowed.

It is further desirable to be able to disambiguate file descriptors generally. Under some operating systems, entities other than communication channels and files stored on media are treated as files, and hence accessed via file descriptors. For example, under the UNIX® operating system, hardware devices are designated by file descriptors. For the same reasons that it is desirable to disambiguate communication channel file descriptors from file descriptors that are associated with files stored on media, it is further desirable to be able to disambiguate file descriptors that are associated with any type of file from those that are associated with any other type.

Accordingly, what is needed is a method to disambiguate file descriptors generally, and specifically to disambiguate file descriptors that that are associated with files stored on media from file descriptors that that are associated with communication channels. This would allow for the selective interception of system calls that access one type of file or another.

### SUMMARY OF INVENTION

The present invention allows disambiguation of file descriptors generally, and disambiguation of communication

4

channel file descriptors from file descriptors that are associated with files stored on media specifically. In order to so disambiguate, indicators concerning file descriptors that are associated with a specific file type are stored. When file descriptors are subsequently utilized to access files, the indicators are examined in order to determine the associated file type.

In one preferred embodiment, the indicators concerning communication channel file descriptors are stored in an indicator table. In order to maintain the table, system calls that establish a communication channel are intercepted. Pointers in the system call vector table to system calls that establish a communication channel are replaced with pointers to alternative object code (a system call wrapper), such that when the system calls are made, the system call wrapper executes instead. The system call wrapper first executes the system call, to allow the communication channel to be established. The system call wrapper then stores an indicator that the file descriptor returned by the system call is associated with a communication channel. Preferably, this indicator is stored in a table in operating system address space. In alternative embodiments indicators are stored in other data structures (for example a linked list) in either operating system address space or user address space as desired.

In order to keep the table complete, in one embodiment system calls that copy a file, copy a file descriptor, or copy an entire file descriptor table are intercepted. As with the interception of system calls that establish a communication channel, pointers in the system call vector table to system calls to be intercepted are replaced with pointers to a system call wrapper. The system call wrapper checks the stored indicators to determine whether any file descriptors to be copied are associated with a communication channel. If so, the system call wrapper first executes the system call, to allow the copy to be created. The system call wrapper then stores, for each created copy of a file descriptor that is associated with a communication channel, an indicator that the copy of the file descriptor is associated with a communication channel. If no file or file descriptor to be copied is associated with a communication channel, the system call wrapper simply makes the system call such that execution control returns to the calling process after the system call executes.

Additionally, in order to keep the table current, in one embodiment system calls that delete file descriptors are intercepted. Again, pointers in the system call vector table to system calls that delete file descriptors are replaced with pointers to a system call wrapper. The system call wrapper checks the stored indicators to determine whether a file descriptor to be deleted is associated with a communication channel. If so, the system call wrapper first executes the system call, to allow the file descriptor to be deleted. The system call wrapper then deletes the indicator that the file descriptor is associated with a communication channel. This is desirable because the file descriptor no longer exists, so the association is no longer accurate or relevant. If no file descriptor to be deleted is associated with a communication channel, the system call wrapper simply makes the system call such that execution control returns to the calling process after the system call executes.

To summarize, system calls that create a communication channel are intercepted, as are system calls that either copy or delete existing file descriptors. The system call wrapper that executes when these system calls are intercepted maintains a table of stored indicators concerning communication channel file descriptors. Thus, the table preferably includes an indicator for every existing communication channel file

US 6,560,613 B1

**5**

descriptor. The stored indicators can subsequently be examined by any process to disambiguate file descriptors. For example, because communication channel file descriptors are indicated in the table, any process can examine the table to determine whether or not a given file descriptor is a communication channel file descriptor. In an operating system in which every file descriptor either is a communication channel file descriptor or a descriptor of a file stored on media, the table of indicators concerning file descriptors can also be examined to determine if a given file descriptor is associated with a file stored on media. This is true because if the table does not contain an indicator for a given file descriptor, that file descriptor is not a communication channel file descriptor, and therefore is a descriptor of a file stored on media.

In another preferred embodiment of the present invention, system calls that create a file that is stored on media are intercepted, as opposed to system calls that establish a communication channel. Thus, the table of indicators comprises indicators of file descriptors that are associated with files stored on media. As with the previously described embodiment, system calls that copy or delete file descriptors are also intercepted, and an indicator table is maintained. The indicator table is then examined to determine whether or not a file descriptor is associated with a file stored on media.

Because the present invention allows any process to disambiguate file descriptors, the present invention can be utilized to selectively intercept system calls that access a file stored on media. Likewise, the present invention can be utilized to selectively intercept system calls that access a communication channel.

In order to selectively intercept system calls that access files, system calls that access a file via a file descriptor are initially intercepted. The system call wrapper that executes when such system calls are intercepted proceeds to examine the stored indicator table to determine the type of file with which the file descriptor is associated. If the file descriptor is associated with a desired file type, the system call wrapper continues to execute. Otherwise, the default system call is made and then execution control returns to the calling process.

For example, suppose it is desirable only to intercept system calls that pertain to communication channels, but not to intercept system calls that pertain to files stored on media. When a read system call is made, the system call wrapper examines the indicator table to determine whether the file descriptor from which the system call is to read data is associated with a communication channel. If so, the system call wrapper proceeds to execute as desired. If the file descriptor is not associated with a communication channel, the default system call is executed, such that execution control is returned to the calling process after the system call terminates.

It will be readily apparent to one skilled in the art that the present invention can be utilized to disambiguate any type of file descriptor. Thus, although disambiguating communication channel file descriptors from file descriptors that are associated with files stored on media is one function of the present invention, the present invention is by no means so limited. For example, the UNIX® operating system treats hardware devices as files, as noted above. Under UNIX®, the present invention can be utilized to create and maintain an indicator table concerning hardware device file descriptors. Then, the indicator table can be utilized to disambiguate hardware device file descriptors from other kinds.

It is to be understood that disambiguation by file type can be conducted at varying levels of specificity (in other words,

**6**

the term "file type" can be defined as broadly or narrowly as desired). For example, in one embodiment file descriptors that are associated with files stored on media are disambiguated from communication channel file descriptors, as described above. In another embodiment, file descriptors that are associated with files stored on media in a specific directory are disambiguated from files descriptors that are associated with other files stored on media. In yet another embodiment, file descriptors concerning files with specific attributes, such as system or read-only, are disambiguated from file descriptors concerning files without those attributes. In fact, files descriptors concerning a specific file can even be disambiguated from all other file descriptors.

It will also be apparent that the present invention can be utilized to disambiguate file descriptors by any process. Although file descriptor disambiguation by a system call wrapper to allow for selective system call interception is an embodiment of the present invention, it is by no means the only embodiment. The examination of the indicator table by any process for the purpose of file descriptor disambiguation is within the scope of the present invention. For example, suppose a user process executing on a web server has permission to write to communication channels of the server in order to make communication requests, but does not have permission to write to the file system of the web server. It would be both desirable and within the scope of the present invention for the process to examine the indicator table to determine if a specific file descriptor is or is not associated with a communication channel.

Further, one skilled in the art will readily comprehend that many combinations of indicator storage and examination to disambiguate file descriptors are possible. All such combinations are within the scope of the present invention. For example, to make a binary distinction between two types of file descriptors (for example, communication channel file descriptors and those that are associated with files stored on media), indicators concerning either type of file descriptor may be stored and examined to is determine if any file descriptor on the system is of one type or the other. If the indicator table comprises indicators concerning communication channel file descriptors, the table could be examined to determine if any given file descriptor is associated with a communication channel, or to determine if the file descriptor is associated with a file stored on media. Likewise, if the indicator table comprises indicators concerning file descriptors that are associated with files stored on media, the table could be examined to determine if any given file descriptor is associated with a file stored on media, or to determine if the file descriptor is associated with a communication channel.

Under an operating system that allows more than two types of file descriptors (for example, communication channel file descriptors, file descriptors that are associated with files stored on media, and hardware device file descriptors), an indicator table concerning any given file descriptor type can be maintained and subsequently examined to determine if a specific file descriptor is or is not associated with a file of the given type. Alternatively, an indicator table concerning multiple file descriptor types (or multiple indicator tables each concerning one or more types) could be maintained and examined to disambiguate file descriptors. All such embodiments are within the scope of the present invention.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a high level block diagram illustrating a system for disambiguating file descriptors according to one embodiment of the present invention.

US 6,560,613 B1

7

FIG. 2 is a block diagram illustrating a system for maintaining and utilizing an indicator table in order to disambiguate file descriptors that are associated with communication channels from those that are not, according to one embodiment of the present invention.

FIG. 3 is a block diagram illustrating a system for maintaining and utilizing an indicator table in order to disambiguate file descriptors that are associated with files stored one media from those that are not, according to one embodiment of the present invention.

FIG. 4 is a block diagram illustrating a system for selectively intercepting system calls that access files of a specific type, according to one embodiment of the present invention.

FIGS. 5A–B are flowcharts illustrating steps for performing an embodiment of the present invention.

FIGS. 6A–B are flowcharts illustrating steps for performing another embodiment of the present invention.

FIGS. 7A–D are flowcharts illustrating steps for performing another embodiment of the present invention.

FIGS. 8A–D are flowcharts illustrating steps for performing another embodiment of the present invention.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

I. System Overview

FIG. 1 illustrates a system 100 for disambiguating file descriptors 102 according to one embodiment of the present invention. A computer memory 101 includes user address space 103 and operating system address space 105. A process 107 executes in user address space 103. Although FIG. 1 illustrates only a single process 107 executing in user address space 103, it is to be understood that within a given computer memory 101, multiple processes 107 can execute simultaneously.

In order to disambiguate file descriptors 102, certain system calls 115 are intercepted. The interception of specific system calls 115 in order to disambiguate file descriptors 102 is described in detail below. In order to intercept system calls 115, techniques known in the art are utilized to insert a system call wrapper 111 into the operating system kernel 109, while the kernel 109 is active. In a preferred embodiment, a system call wrapper 111 is dynamically loaded into the operating system kernel 109, while the kernel 109 is active. The system call wrapper 111 is preferably in the form of object code, the functional features of which are described in detail below. Preferably, a single system call wrapper 111 that includes all of the code object described below is loaded into the operating system kernel 109. In alternative embodiments, multiple system calls wrappers 111 are loaded, each system call wrapper 111 including a subset of the object code.

Pointers 114 to system calls 115 are located in an operating system system call vector table 113. It is to be understood that the term "system call vector table" as used herein denotes an area in operating system address space 105 in which there are stored the addresses of system calls. In the UNIX® operating system, this part of the operating system is called the "system call vector table," and that term is used in this specification. Other operating systems employ different terminology to denote the same system component. A system call vector table by any other name is still within the scope of the present invention.

A copy 116 is made of a pointer 114 to each system call 115 to be intercepted. These copies 116 of pointers 114 are

8

preferably stored in operating system address space 105, but in an alternative embodiment are stored in user address space 103. Once the copies 116 have been made and saved, the pointers 114 in the system call vector table 113 to the system calls 115 to be intercepted are replaced with pointers 118 to the system call wrapper 111, such that when a system call 115 to be intercepted is made, the system call wrapper 111 executes instead. In one embodiment of the present invention, this copying, storing, and replacing of pointers is performed by the system call wrapper 111. In other embodiments, copying, storing, and replacing of pointers is performed by a pointer management module executing in either operating system address space 105 or user address space 103 as desired. The pointer management module can either be a stand alone program, or a component of a larger application program as desired.

Executing alternative code when a system call 115 is made comprises intercepting the system call 115. The steps of inserting a system call wrapper 111 into the operating system 117, making a copy 116 of an operating system pointer 114 to a system call 115, and replacing the operating system pointer 114 with a pointer 118 to the system call wrapper 111 facilitate interception of a system call 115. When a system call 115 to be intercepted is made, the operating system 117 uses the pointer 118 in the system call vector table 113 to the system call wrapper 111 to execute the system call wrapper 111.

It is to be understood that in the present invention, not all system calls 115 are intercepted. Only pointers 114 to system calls 115 to be intercepted are replaced with pointers 118 to the system call wrapper 111. Pointers 114 to system calls 115 which are not to be intercepted are not replaced. Thus, when a non-intercepted system call 115 is made, the system call 115 executes, not the system call wrapper 111.

Preferably, a data structure for storing indicators 129 is inserted into the operating system 117. In one embodiment, the data structure is an indicator table 127, but in other embodiments other data structures are utilized, for example a linked list. In a preferred embodiment, the indicator table 127 (or other data structure) is dynamically loaded into the operating system kernel 109, while the kernel 109 is active. In one alternative embodiment, the indicator table 127 is stored in user address space 103. Regardless, the system call wrapper 111 maintains the indicator table 127 so that the indicator table 127 includes, for each file descriptor 102 that is associated with a specific file type, an indicator 129 of the association. The maintenance and use of the indicator table 127 is discussed in detail below.

Processes 107 execute in user address space 103 under control of the operating system 117, and make system calls 115. When a process makes a system call 115 that is to be intercepted, the system call wrapper 111 executes.

II. Disambiguating Communication Channel File Descriptions

FIG. 2 illustrates a system 200 for maintaining and utilizing a table 127 of indicators 205 concerning communication channel file descriptors 201 in order to disambiguate file descriptors 201 that are associated with communication channels from file descriptors 102 that are not, according to one embodiment of the present invention.

It is to be understood that by the words "communication channel" it is meant a logical interface via which communication can be conducted. A communication channel is typically although not necessarily associated with both a network address and a port. Typically, separate communi-

US 6,560,613 B1

9

cation channels must be present at each end of a communication session. A communication channel is sometimes denoted by the words "communication channel end" or "communication channel end point." Communication channels include but are not limited to sockets.

In the embodiment of FIG. 2, system calls that establish a communication channel 203 are intercepted. Examples of system calls that establish a communication channel 203 are the UNIX® socket function and the UNIX® accept function. It is to be understood that the names of the system calls that establish a communication channel 203 vary from operating system 117 to operating system 117. The present invention is not limited to any specific operating system 117, or to any specific system call name. Some operating systems 117 include a single system call that establishes a communication channel 203. Other operating systems 117 include more than one system call that establishes a communication channel 203.

To prepare to intercept system calls that establish a communication channel 203, internal operating system pointers 114 in the system call vector table 113 to such system calls 203 are copied. The copies of the pointers 116 may be stored in operating system address space 105 or in user address space 103, as desired. The pointers 114 in the system call vector table 113 to system calls that establish a communication channel 203 are replaced with pointers 118 to the system call wrapper 111, such that when the system calls 203 are made, the system call wrapper 111 is executed instead.

When a system call that establishes a communication channel 203 is made, the operating system 117 uses the pointer 118 in the system call vector table 113 to execute the system call wrapper 111. The system call wrapper 111 first utilizes the saved copy of the pointer 116 to the system call 203 to make the system call 203. The system call 203 executes, thereby establishing the communication channel. After having established the communication channel, the system call 203 returns a file descriptor that is associated with the established communication channel 201. This file descriptor 201 is to be used by processes 107 in order to access the established communication channel. After the system call 203 terminates, the system call wrapper 111 stores (in the indicator table 127) an indicator 205 that the file descriptor 201 returned by the system call 203 is associated with a communication channel.

In order to keep the indicator table 127 current, system calls 115 that create a copy of a file, a copy of a file descriptor 102, or a copy of an operating system file descriptor 102 table are also intercepted. It is to be understood that a system call 115 that copies a file also copies a file descriptor 102, because when a new file (the copy of the original file) is created, a new file descriptor 102 is also created, the new file descriptor 102 being associated with the new file.

To prepare to intercept system calls 115 that create a copy of a file, a copy of a file descriptor 102, or a copy of an operating system file descriptor 102 table, copies 116 are made of internal operating system pointers 114 in the system call vector table 113 to such system calls 115. The pointers 114 in the system call vector table 113 to these system calls 115 are replaced with pointers 118 to the system call wrapper 111, such that when the system calls 115 are made, the system call wrapper 111 is executed instead.

Whenever any process 107 makes a system call 115 to copy a file, the system call wrapper 111 executes. First, the system call wrapper 111 checks the indicator table 127 to

10

determine whether the file descriptor 102 associated with the file to be copied is associated with a communication channel. If so, the copy of the file, and hence the copy of its associated file descriptor 201, will also be associated with a communication channel. The system call wrapper 111 utilizes the copy of the pointer 116 to execute the system call 115. The system call 115 executes and creates a copy of the file, and also a copy of its associated file descriptor 201 (in an alternative embodiment, the system call wrapper 111 creates the copies itself, rather than making the system call 115). After the system call 115 exits, the system call wrapper 111 stores an indicator 205 in the indicator table 127 that the file descriptor 201 associated with the copy of the file is associated with a communication channel. If the file to be copied is not associated with a communication channel, the system call wrapper 111 simply makes the system call 115 such that execution control returns to the calling process 107 after the system call 115 executes.

Some system calls 115 simply copy an existing file descriptor 102, without copying its associated file. These system calls 115 are also intercepted. When a communication channel file descriptor 201 is copied, the system call wrapper 111 stores an indicator 205 in the indicator table 127 that the copy of the file descriptor 201 is associated with a communication channel.

System calls 115 that copy an entire file descriptor 102 table are also intercepted. For each file descriptor 102 in the file descriptor 102 table, the system call wrapper 111 checks the indicator table 127 to determine whether the file descriptor 102 is associated with a communication channel. The system call wrapper 111 then utilizes the copy of the pointer 116 to execute the system call 115. The system call 115 executes and creates a copy of the file descriptor 102 table. After the system call 115 exits, the system call wrapper 111 stores, for each communication channel file descriptor 201 in the file descriptor 102 table, an indicator 205 that the created copy of the file descriptor 201 is associated with a communication channel.

In order to keep the indicator table 127 current, system calls 115 that delete a file descriptor 102 are also intercepted. Note that a system call 115 that deletes a file also deletes the associated descriptor 102 of the file. Thus, by the phrase "system calls 115 that delete a file descriptor 102," it is meant both system calls 115 that delete a file descriptor 102 only, and system calls 115 that delete a file and its associated descriptor 102.

Whenever a process 107 makes a system call 115 to delete a file descriptor 102, the system call wrapper 111 executes instead. The system call wrapper 111 checks the indicator table 127 to determine whether the file descriptor 102 to be deleted is associated with a communication channel. If so, the system call wrapper 111 utilizes the copy of the pointer 116 to execute the system call 115, which deletes the file descriptor 201 (in an alternative embodiment, the system call wrapper 111 deletes the file descriptor 201 itself, rather than making the system call 115). After the system call 115 exits, the system call wrapper 111 deletes the indicator 205 in the indicator table 127 that the file descriptor 201 is associated with a communication channel. This is appropriate, because the file descriptor 201 no longer exists. If the file descriptor 102 to be deleted is not associated with a communication channel, the system call wrapper 111 simply makes the system call 115 such that execution control returns to the calling process 107 after the system call 115 executes.

Thus, system calls that establish a communication channel 203 are intercepted. When these system calls 203 are

US 6,560,613 B1

11

made, the system call wrapper 111 executes and stores, in the indicator table 127, an indicator 205 that the file descriptor 201 of the established communication channel is a communication channel file descriptor 201. System calls 115 that copy or delete file descriptors 102 are also intercepted. If a file descriptor that is associated with a communication channel 201 is copied or deleted, the system call wrapper 111 updates the indicator table 127 appropriately. Thus, the indicator table 127 preferably includes an indicator 205 for every existing file descriptor that is associated with a communication channel 201.

Because the indicator table 127 includes indicators 205 for file descriptors that are associated with communication channels 201, the indicator table 127 can be utilized to determine whether or not a specific file descriptor 102 is associated with a communication channel. The indicator table 127 can be examined to determine if an indicator 205 concerning the specific file descriptor 102 is present. If so, the file descriptor 201 is associated with a communication channel. If no such indicator 205 is present, the file descriptor 102 is not associated with a communication channel.

In some operating systems 117, every file descriptor 102 is either associated with a file stored on media or with a communication channel. In embodiments of the present invention that execute under such operating systems 117, the indicator table 127 can be utilized to determine whether or not any specific file descriptor 102 is associated with a communication channel, and whether or not any specific file descriptor 102 is associated with a file stored on media. The indicator table 127 can be utilized to determine whether or not a file descriptor 102 is associated with a communication channel, as described above. Because file descriptors 102 that are not associated with communication channels are associated with files stored on media, the indicator table 127 can also be utilized to determine whether or not a specific file descriptor 102 is associated with a file stored on media. In order to so determine, the indicator table 127 is examined to determine if an indicator 205 concerning the specific file descriptor 102 is present. If not, the file descriptor 102 is associated with a file stored on media. If such an indicator 205 is present, the file descriptor 102 is not associated with a file stored on media.

### III. Disambiguating File Descriptors Concerning Files Stored on Media

FIG. 3 illustrates a system 300 for maintaining and utilizing a table 127 of indicators 305 concerning file descriptors that are associated with files stored on media 301 in order to disambiguate file descriptors that are associated with files stored on media 301 from file descriptors 102 that are not, according to one embodiment of the present invention.

In the embodiment of FIG. 3, system calls that establish a file stored on media 303 are intercepted. When a system call that establishes a file stored on media 303 is made, the operating system 117 uses the pointer 118 in the system call vector table 113 to execute the system call wrapper 111. The system call wrapper 111 first utilizes the saved copy of the pointer 116 to the system call 303 to make the system call 303. The system call 303 executes, thereby establishing the file stored on media. After having established the file stored on media, the system call 303 returns a file descriptor that is associated with the established file stored on media 301. This file descriptor 301 is to be used by processes 107 in order to access the established file stored on media.

After the system call 303 terminates, the system call wrapper 111 stores (in the indicator table 127) an indicator

12

305 that the file descriptor 301 returned by the system call 303 is associated with a file stored on media. Thus, whenever a system call that establishes a file stored on media 303 is made, the system call wrapper 111 executes and stores, in the indicator table 127, an indicator 305 that the file descriptor 301 of the established file stored on media is associated with a file stored on media.

In order to keep the indicator table 127 complete, system calls 115 that create a copy of a file, a copy of a file descriptor 102, or a copy of an operating system file descriptor 102 table are also intercepted, as in the embodiment of FIG. 2. Additionally, in order to keep the indicator table 127 current, system calls 115 that delete a file descriptor 102 are intercepted, as in the embodiment of FIG. 2. Thus, system calls 115 that copy or delete file descriptors 102 are intercepted. If a file descriptor that is associated with a file stored on media 301 is copied or deleted, the system call wrapper 111 updates the indicator table 127 appropriately. Therefore, the indicator table 127 preferably includes an indicator 305 for every existing file descriptor that is associated with a file stored on media 301.

Because the indicator table 127 includes an indicator 305 for file descriptors that are associated with files stored on media 301, the indicator table 127 can be utilized to determine whether or not a specific file descriptor 102 is associated with a file stored on media. The indicator table 127 can be examined to determine if an indicator 305 concerning the specific file descriptor 102 is present. If so, the file descriptor 301 is associated with a file stored on media. If no such indicator 305 is present, the filed descriptor 102 is not associated with a file stored on media.

As described above, in some operating systems 117, every file descriptor 102 is either associated with a file stored on media or with a communication channel. In embodiments of the present invention that execute under such operating systems 117, the indicator table 127 can be utilized to determine whether or not any specific file descriptor 102 is associated with a file stored on media, and whether or not any specific file descriptor 102 is associated with a communication channel. The indicator table 127 can be utilized to determine whether or not a file descriptor 102 is associated with a file stored on media, as described above. Because file descriptors 102 that are not associated with files stored on media are associated with communication channels, the indicator table 127 can also be utilized to determine whether or not a specific file descriptor 102 is associated with a communication channel. In order to so determine, the indicator table 127 is examined to determine if an indicator 305 concerning the specific file descriptor 102 is present. If not, the file descriptor 301 is associated with a communication channel. If such an indicator 305 is present, the file descriptor 102 is not associated with a communication channel.

It is to be understood that the present invention is not limited to utilizing indicators 205 concerning communication channel file descriptors 201 and indicators 305 concerning file descriptors associated with files stored on media 301 in order to disambiguate file descriptors 102. Other embodiments of the present invention utilize the above described steps to maintain indicator tables 127 including indicators concerning file descriptors 102 associated with other file types (for example, file descriptors 102 associated with hardware devices and file descriptors 102 associated with system resources). It is to be understood further that the term "file type" can be defined as broadly or narrowly as desired. Files that are stored on media are an example of a broad file type. Narrower file types include files stored on media in specific directories, files with a specific attribute such as read only, and even a specific file (a file type of one).

US 6,560,613 B1

13

In these alternative embodiments, the respective indicator tables **127** are examined to determine whether or not specific file descriptors **102** are associated with specific file types. In other embodiments, an indicator table **127** including indicators **129** concerning multiple file types (or multiple indicator tables **127** each concerning one or more types) is (are) maintained and examined to disambiguate file descriptors **102**. In some embodiments in which disambiguation concerns descriptors **102** of a narrow file type, when a system call **115** that establishes a file is intercepted, the system call wrapper **111** determines whether the established file is of the file type. For example, consider an embodiment in which file descriptors **102** that are associated with files stored on media in a specific directory are disambiguated from files descriptors that are associated with other files stored on media. All system calls that establish a file stored on media **303** are intercepted. The system call wrapper **111** determines if the file being established is to be stored in the specific directory. Only if so does the system call wrapper **111** store an indicator **129** that the file descriptor **102** is associated with the file type. System calls **115** that copy and delete file descriptors are also intercepted, and the table **127** is updated appropriately as files are copied to and deleted from the specific subdirectory.

IV. Selective Interception of System Calls that Access Files of a Specific Type

FIG. **4** illustrates a system **400** for utilizing an indicator table **127** to selectively intercept system calls **115** that access files of a specific type, according to one embodiment of the present invention. An indicator table **127** including indicators **405** concerning file descriptors **102** associated with the specific file type is maintained. In one embodiment the file type is communication channels. In another embodiment the file type is files stored on media. In yet another embodiment, the file type is hardware devices. Still other embodiments include other file types as desired. Regardless, system calls **115** that establish files of the specific file type are intercepted, and indicators **405** concerning file descriptors **102** associated with the specific file type are stored in the indicator table **127**, in the manner described in the embodiment of FIG. **2** and in the embodiment of FIG. **3**. In order to keep the indicator table **127** complete and current, system calls **115** that make a copy of a file descriptor **102** and that delete a file descriptor **102** are also intercepted in the manner described in the embodiment of FIG. **2** and in the embodiment of FIG. **3**. Whenever a file descriptor **102** associated with the specific file type is copied or deleted, the indicator table is updated appropriately. Thus, the indicator table **127** preferably includes an indicator **405** for every file descriptor **102** associated with the specific file type.

The indicator table **127** is then used to facilitate selective interception of system calls **115** that access a file of the specific file type. System calls that access a file via a file descriptor **403** are intercepted. Examples of system calls that access a file via a file descriptor **403** are the UNIX® read function and the UNIX® write function. It is to be understood that the names of the system calls that access a file via a file descriptor **403** can vary from operating system **117** to operating system **117**. The present invention is not limited to any specific operating system **117**, or to any specific system call name.

To prepare to intercept system calls that access a file via a file descriptor **403**, a copy **116** is made of internal operating system pointers **114** in the system call vector table **113** to such system calls **403**. The pointers **114** in the system call vector table **113** to system calls that access a file via a file

14

descriptor **403** are replaced with pointers **118** to the system call wrapper **111**, such that when the system calls **403** are made, the system call wrapper **111** is executed instead.

When a system call that accesses a file via a file descriptor **403** is made, the operating system **117** uses the pointer **118** in the system call vector table **113** to execute the system call wrapper **111**. The system call wrapper **111** examines the indicator table **127** to determine whether or not the file descriptor **102** is associated with the specific file type. If the file descriptor **102** is associated with the specific file type, the system call wrapper **115** continues to execute. If the file descriptor **102** is not associated with the specific file type, the system call **115** utilizes the saved copy of the pointer **116** to the system call **403** to make the system call **403**, such that when the system call **403** finishes executing, execution control returns to the calling process **107**.

Thus, system calls that access a file via a file descriptor **403** are selectively intercepted based on the file type. For example, suppose it is desirable only to intercept system calls that access communication channels **203**, but not to intercept system calls that access files stored on media **303**. When a system call that accesses a file via a file descriptor **403** is made (for example, a call to the read function), the system call wrapper **111** executes and examines the indicator table **127** to determine whether the file descriptor **102** that the system call **403** is attempting to access is associated with a communication channel. If so, the system call wrapper **111** proceeds to execute as desired. If the file descriptor **102** is not associated with a communication channel, the system call wrapper **111** makes the system call **115**, such that execution control is returned to the calling process after the system call **115** terminates. Of course, the present invention can also be used to selectively intercept system calls that access files stored on media, as well as any other specific file type.

In summary, the present invention facilitates the disambiguation of file descriptors associated with any file type. Such disambiguation of file descriptors allows the selective interception of system calls that access files of any specific file type via a file descriptor.

The execution of steps for performing various above described embodiments of the present invention are further illustrated by FIGS. **5A–8D**.

What is claimed is:

**1**. A method in a computer system for disambiguating file descriptors, the method comprising:

intercepting system calls that establish a file descriptor;

storing at least one indicator of a file type associated with an established file descriptor;

intercepting system calls that create a copy of at least one file descriptor;

storing at least one indicator concerning a created copy of a file descriptor; and

upon an attempt to access a file via a file descriptor, examining at least one stored indicator to determine with what file type the file descriptor is associated.

**2**. The method of claim **1** wherein intercepting a system call that creates a copy of at least one file descriptor comprises:

intercepting a system call that creates a copy of a file descriptor table.

**3**. A method in a computer system for disambiguating file descriptors, the method comprising:

intercepting system calls that establish a communication channel;

US 6,560,613 B1

| 15 | 16 |

storing at least one indicator that a file descriptor established by an intercepted system call is associated with a communication channel;

intercepting system calls that utilize a file descriptor to access a file, wherein intercepting a system call that utilizes a file descriptor to access a file comprises replacing a pointer to the system call with a pointer to alternative object code, such that making the system call causes the alternative object code to execute;

examining at least one indicator to determine with what file type the file descriptor of an intercepted system is associated; and

in response to a determination that the file descriptor is associated with a file stored on media, performing one of:

1) allowing the alternative object code to continue to execute; or

2) terminating execution of the alternative object code, and requesting execution of the system call.

**4**. A method in a computer system for disambiguating file descriptors, the method comprising:

intercepting system calls that establish a communication channel;

storing at least one indicator that a file descriptor established by an intercepted system call is associated with a communication channel;

intercepting system calls that utilize a file descriptor to access a file, wherein intercepting a system call that utilizes a file descriptor to access a file comprises replacing a pointer to the system call with a pointer to alternative object code, such that making the system call causes the alternative object code to execute;

examining at least one stored indicator to determine with what file type the file descriptor of an intercepted system is associated; and

in response to a determination that the file descriptor is not associated with a communication channel, performing one of:

1) allowing the alternative object code to continue to execute; or

2) terminating execution of the alternative object code, and requesting execution of the system call.

**5**. A method in a computer system for disambiguating file descriptors, the method comprising:

intercepting system calls that establish a communication channel;

storing at least one indicator that a file descriptor established by an intercepted system call is associated with a communication channel;

intercepting system calls that create a copy of at least one file descriptor;

storing at least one indicator concerning a created copy of a file descriptor; and

examining at least one stored indicator to determine with what file type a file descriptor is associated.

**6**. The method of claim **5** further comprising:

where a copied file descriptor is associated with a communication channel, storing an indicator that a created copy of the file descriptor is associated with a communication channel.

**7**. The method of claim **5** wherein:

intercepting a system call that creates a copy of at least one file descriptor comprises intercepting a system call that creates a copy of a file descriptor table.

**8**. A method in a computer system for disambiguating file descriptors, the method comprising:

intercepting system calls that establish a file stored on media;

storing at least one indicator that a file descriptor established by an intercepted system call is associated with a file stored on media, wherein storing an indicator that an established file descriptor is associated with a file stored on media further comprises storing the indicator in a table; and

examining at least one stored indicator to determine with what file type a file descriptor is associated.

**9**. A method in a computer system for disambiguating file descriptors, the method comprising:

intercepting system calls that establish a file stored on media;

storing at least one indicator that a file descriptor established by an intercepted system call is associated with a file stored on media; and

examining at least one stored indicator to determine with what file type a file descriptor is associated, wherein examining comprises, intercepting system calls that utilize a file descriptor to access a file, and examining at least one stored indicator to determine with what file type the file descriptor of an intercepted system call is associated, wherein intercepting a system call that utilizes a file descriptor to access a file comprises replacing a pointer to the system call with a pointer to alternative object code, such that making the system call causes the alternative object code to execute; and

in response to a determination that the file descriptor is associated with a file stored on media, performing one of:

1) allowing the alternative object code to continue to execute; or

2) terminating execution of the alternative object code, and requesting execution of the system call.

**10**. A method in a computer system for disambiguating file descriptors, the method comprising:

intercepting system calls that establish a file stored on media;

storing at least one indicator that a file descriptor established by an intercepted system call is associated with a file stored on media;

intercepting system calls that utilize a file descriptor to access a file, wherein intercepting a system call that utilizes a file descriptor to access a file comprises replacing a pointer to the system call with a pointer to alternative object code, such that making the system call causes the alternative object code to execute;

examining at least one stored indicator to determine with what file type the file descriptor of an intercepted system call is associated; and

in response to a determination that the file descriptor is not associated with a communication channel, performing one of:

1) allowing the alternative object code to continue to execute; or

2) terminating execution of the alternative object code, and requesting execution of the system call.

**11**. A method in a computer system for disambiguating file descriptors, the method comprising:

intercepting system calls that establish a file stored on media;

intercepting system calls that create a copy of at least one file descriptor;

US 6,560,613 B1

17

storing at least one indicator that a file descriptor established by an intercepted system call is associated with a file stored on media;

storing at least one indicator concerning a created copy of a file descriptor; and

examining at least one stored indicator to determine with what file type a file descriptor is associated.

**12**. The method of claim **11** further comprising:

where a copied file descriptor is associated with a communication channel, storing an indicator that a created copy of the file descriptor is associated with a communication channel.

**13**. The method of claim **11** wherein:

intercepting a system call that creates a copy of at least one file descriptor comprises intercepting a system call that creates a copy of a file descriptor table.

**14**. A computer program product for disambiguating file descriptors, the computer program product comprising:

program code for intercepting system calls that establish a file descriptor;

program code for storing at least one indicator of a file type associated with an established file descriptor;

program code for, upon an attempt to access a file via a file descriptor, examining at least one stored indicator to determine with what file type the file descriptor is associated;

program code for intercepting system calls that create a copy of at least one file descriptor;

program code for storing at least one indicator concerning a created copy of a file descriptor; and

a computer readable medium on which the program codes are stored.

**15**. A computer program product for disambiguating file descriptors, the computer program product comprising:

program code for intercepting system calls that establish a communication channel;

program code for storing at least one indicator that a file descriptor established by an intercepted system call is associated with a communication channel;

program code for examining at least one stored indicator to determine with what file type a file descriptor is associated;

program code for intercepting system calls that utilize a file descriptor to access a file;

program code for examining at least one stored indicator to determine with what file type the file descriptor of an intercepted system is associated;

program code for replacing a pointer to the system call with a pointer to alternative object code, such that making the system call causes the alternative object code to execute;

program code for, in response to a determination that the file descriptor is associated with a file stored on media, performing one of:

1) allowing the alternative object code to continue to execute; or

2) terminating execution of the alternative object code, and requesting execution of the system call; and

a computer readable medium on which the program codes are stored.

**16**. A computer program product for disambiguating file descriptors, the computer program product comprising:

program code for intercepting system calls that establish a communication channel;

18

program code for storing at least one indicator that a file descriptor established by an intercepted system call is associated with a communication channel;

program code for examining at least one stored indicator to determine with what file type a file descriptor is associated;

program code for intercepting system calls that utilize a file descriptor to access a file;

program code for examining at least one stored indicator to determine with what file type the file descriptor of an intercepted system is associated;

program code for replacing a pointer to the system call with a pointer to alternative object code, such that making the system call causes the alternative object code to execute;

program code for, in response to a determination that the file descriptor is not associated with a communication channel, performing one of:

1) allowing the alternative object code to continue to execute; or

2) terminating execution of the alternative object code, and requesting execution of the system call; and

a computer readable medium on which the program codes are stored.

**17**. A computer program product for disambiguating file descriptors, the computer program product comprising:

program code for intercepting system calls that establish a communication channel;

program code for storing at least one indicator that a file descriptor established by an intercepted system call is associated with a communication channel;

program code for examining at least one stored indicator to determine with what file type a file descriptor is associated;

program code for, intercepting system calls that create a copy of at least one file descriptor;

program code for storing at least one indicator concerning a created copy of a file descriptor; and

a computer readable medium on which the program codes are stored.

**18**. The computer program product of claim **17** further comprising:

program code for, where a copied file descriptor is associated with a communication channel, storing an indicator that a created copy of the file descriptor is associated with a communication channel.

**19**. A computer program product for disambiguating file descriptors, the computer program product comprising:

program code for intercepting system calls that establish a file stored on media;

program code for storing at least one indicator that a file descriptor established by an intercepted system call is associated with a file stored on media;

program code for examining at least one stored indicator to determine with what file type a file descriptor is associated;

program code for intercepting system calls that utilize a file descriptor to access a file;

program code for examining at least one stored indicator to determine with what file type the file descriptor of an intercepted system call is associated;

program code for replacing a pointer to the system call with a pointer to alternative object code, such that making the system call causes the alternative object code to execute;

US 6,560,613 B1

19

program code for, in response to a determination that the file descriptor is associated with a file stored on media, performing one of:

1) allowing the alternative object code to continue to execute; or

2) terminating execution of the alternative object code, and requesting execution of the system call; and

a computer readable medium on which the program codes are stored.

**20**. A computer program product for disambiguating file descriptors, the computer program product comprising:

program code for intercepting system calls that establish a file stored on media;

program code for storing at least one indicator that a file descriptor established by an intercepted system call is associated with a file stored on media;

program code for examining at least one stored indicator to determine with what file type a file descriptor is associated;

program code for intercepting system calls that utilize a file descriptor to access a file;

program code for examining at least one stored indicator to determine with what file type the file descriptor of an intercepted system call is associated;

program code for replacing a pointer to the system call with a pointer to alternative object code, such that making the system call causes the alternative object code to execute;

20

program code for, in response to a determination that the file descriptor is not associated with a communication channel, performing one of:

1) allowing the alternative object code to continue to execute; or

2) terminating execution of the alternative object code, and requesting execution of the system call; and

a computer readable medium on which the program codes are stored.

**21**. A computer program product for disambiguating file descriptors, the computer program product comprising:

program code for intercepting system calls that establish a file stored on media;

program code for storing at least one indicator that a file descriptor established by an intercepted system call is associated with a file stored on media;

program code for examining at least one stored indicator to determine with what file type a file descriptor is associated;

program code for intercepting system calls that create a copy of at least one file descriptor;

program code for storing at least one indicator concerning a created copy of a file descriptor; and

a computer readable medium on which the program codes are stored.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 6,560,613 B1                                          Page 1 of  1
DATED           : May 6, 2003
INVENTOR(S)     : Snorri Gylfason, Xun Wilson Huang and Rosen Sharma

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Title page,</u>
Item [56], OTHER PUBLICATIONS, please delete the duplicate listing of "Rusling, D.
A., Linux Processes, [online], [retrieved on Dec. 7, 1999]. Retrieved from the Internet:
<URL: http://www.cebaf.gov/~saw/linux/tlk-html/node45.html>" and replace with
-- Rusling, D. A., Indentifiers, [online], [retrieved on Dec. 7, 1999]. Retrieved from the
Internet: <URL: http://www.cebaf.gov/~saw/linux/tlk-html/node46.html> --

Signed and Sealed this

Twenty-sixth Day of August, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

## **EXHIBIT B**

**U.S. Patent No. 6,651,063**



US006651063B1

(12) **United States Patent**          (10) **Patent No.:**     **US 6,651,063 B1**
Vorobiev                               (45) **Date of Patent:**      **Nov. 18, 2003**

(54) **DATA ORGANIZATION AND MANAGEMENT SYSTEM AND METHOD**

(76) Inventor: **Andrei G. Vorobiev**, 639 S. Jackson St., Hinsdale, IL (US) 60531

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/493,911**

(22) Filed: **Jan. 28, 2000**

(51) Int. Cl.[7] ............................................. **G06F 17/30**
(52) U.S. Cl. ................................ **707/10**; 707/3; 707/9; 707/1
(58) Field of Search .............................. 707/1, 3, 10, 9; 705/14, 26

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,491,820 A | 2/1996 | Belove et al. |
| 5,559,957 A | 9/1996 | Balk |
| 5,604,490 A | 2/1997 | Blakley, III et al. |
| 5,675,507 A | 10/1997 | Bobo, II |
| 5,798,693 A | 8/1998 | Engellenner |
| 5,870,549 A | 2/1999 | Bobo, II |
| 5,964,835 A | 10/1999 | Fowler et al. |
| 5,979,757 A | 11/1999 | Tracy et al. |
| 5,995,943 A | 11/1999 | Bull et al. |
| 6,000,000 A | 12/1999 | Hawkins et al. |
| 6,052,667 A | * 4/2000 | Walker et al. ............... 705/15 |
| 6,055,519 A | * 4/2000 | Kennedy et al. ............... 705/80 |
| 6,108,639 A | * 8/2000 | Walker et al. ............... 705/26 |
| 6,249,805 B1 | 6/2001 | Fleming, III ............... 709/206 |
| 6,308,203 B1 | * 10/2001 | Itabashi et al. ............. 709/217 |
| 6,393,423 B1 | * 5/2002 | Goedken et al. ............. 707/10 |

OTHER PUBLICATIONS

"Outlook 2000 Tour," describing Microsoft Outlook 2000® program. Microsoft Outlook is understood to be on sale since 1997. Printed from http://www.microsoft.com/office/outlook/organize.htm.

* cited by examiner

*Primary Examiner*—Kim Vu
*Assistant Examiner*—Cam-Y T Truong
(74) *Attorney, Agent, or Firm*—Marshall, Gerstein & Borun LLP

(57) **ABSTRACT**

An information storage and management system precategorizes information in generic categories to which the information generally pertains, to facilitate organization of information with little or no effort on the part of the recipient. Providers send information to user data repositories associated with unique user destination addresses within the system. Identifiers associated with the information allow the recipient to easily assess the nature of the information and conduct further processing of the information if desired. At least one of the identifiers associated with the information is a category identifier, used to place the information in a location within the user data repository reserved for information in that given identified category. One of the ways in which the recipient can further process the information is to place the information in a custom location according to a custom category location within the user data repository. Such custom categorization can further be communicated to the provider or to a data processing station so that subsequent information from the same provider to the same recipient is automatically placed in the custom category location within the user data repository.

**5 Claims, 6 Drawing Sheets**



**U.S. Patent**     Nov. 18, 2003     Sheet 1 of 6     US 6,651,063 B1



Fig. 1



110
113
PHYSICIAN PRESCRIBE MEDICINE
114
PROVIDER = PHARMACY
INTERNET
116
112
RECIPIENT= CUSTOMER
PRESCRIBED DRUG ABC
PORTAL
AUTHORIZE USER
PROVIDE Rx
120
118
INFORMATION PACK FOR DRUG ABC
128
USER DATA REPOSITORY
138
PROVIDE UDA
PRIVATE AREA
140
$140_Z$
CUSTOM CATEGORY "MY MEDICINE"
CUSTOM CATEG m'
ACCESS UDR
122
136
FIREWALL / FILTER
AUTHORIZE, PLACE IN CUSTOM FOLDER
QUARANTINE AREA
CATEGORY "MEDICAL"
CATEG ..n
$132_E$
132
134
PROCESSING STATION
130
144
INTERNET
116
142
126
124
• STATIC INFORMATION
- FROM PHARMACIST (DOSAGE, REFILL, DATE, ETC.)
- FROM MANUFACTURER (CONTRAINDICATIONS, INSTRUCTIONS, EXPIRATION , ETC.)
- FROM PHYSICIAN (OPTIONAL)
• DYNAMIC INFORMATION
- FROM PHARMACIST (REORDERING, COMPATIBILITY ANALYSIS, ETC.)
- FROM MANUFACTURER (RESEARCH, RECALLS, ETC.)
- FROM PHYSICIAN (OPTIONAL)
• CATEGORY IDENTIFIER (MEDICAL)
• PROVIDER IDENTIFIER (NAME, ADDRESS, PHONE, E-MAIL,WEBSITE, ETC.)
MANUFACTURER OF DRUG ABC PROVIDES STATIC AND DYNAMIC INFORMATION FOR MEDICINE THAT IS SOLD TO PHARMACY.

Fig. 2



210
INTERNET
216
PORTAL
AUTHORIZE USER
229
238
228
USER DATA REPOSITORY
PRIVATE AREA
240X
240Y
CUSTOM CATEG SUPPLIERS
CUSTOM CATEG VENDORS
240
FIREWALL / FILTER
QUARANTINE AREA
NEW GENERIC CATEGORY "2001 TRADE SHOW"
232
234
PROCESSING STATION
230
212
RECIPIENT = VISITOR
REQUEST PRODUCT INFORMATION
215
PROVIDE VISITOR BADGE
ACCESS UDR
CREATE CUSTOM FOLDERS COMMUNICATE TO INFORMATION PROVIDERS
214a
PROVIDER = FIRST EXHIBITOR
PRODUCT B
PRODUCT A
READ UDA
GENERATE INFOPACK
218B
218A
INFORMATION PACK, PRODUCT B
INFORMATION PACK, PRODUCT A
220A
STATIC INFORMATION (FEATURES AND BENEFITS, PRICE LIST, ETC.)
DYNAMIC INFORMATION (UPDATES, INTERACTIVE PRODUCT CONFIGURING, MODELING, SOLUTIONS ETC.
CATEGORY IDENTIFIER (2001 TRADE SHOW)
PROVIDER IDENTIFIER (NAME OF BUSINESS, ADDRESS, PHONE, E-MAIL,WEBSITE, ETC.)
220B
222B
222A
226
224a
214b
220C
222C
PROVIDER = SECOND EXHIBITOR
218C
PRODUCT C
INFORMATION PACK, PRODUCT C
STATIC INFORMATION
DYNAMIC INFORMATION
CATEGORY IDENTIFIER
PROVIDER IDENTIFIER
INTERNET
216
226
224b

Fig. 3



310
312
314
NETWORK
RECIPIENT = CAR MANUFACTURER
SUPPLIER = CD PLAYER MANUFACTURER
PORTAL
AUTHORIZE USER
SELECT CD PLAYER MODELS TO INSTALL
ACCESS USER DATA REPOSITORY
CD MODEL 3
CD MODEL 2
CD MODEL 1
318A
USER DATA REPOSITORY
PRIVATE AREA
340X
CUSTOM CATEG "AUTOMOBILE MODEL ABC"
CREATE CUSTOM FOLDERS, COMMUNICATE BACK TO CD PLAYER MANUFACTURER
INFORMATION PACK FOR CD MODEL 3
INFORMATION PACK FOR CD MODEL 2
INFORMATION PACK FOR CD MODEL 1
STATIC INFORMATION (TECHNICAL FEATURES, DOCUMENTATION, INSTALLATION, CONSUMER DOCUMENTATION, FINANCIAL ARRANGEMENTS, WHOLESALE PRICE, USER MANUAL, WARRANTY, ETC.)
FIREWALL / FILTER
QUARANTINEAREA
CATEGORY CAR MUSIC ELECTRONICS
INFORMATION PACK FOR CD MODEL 1
320A
AUTHORIZE PASSAGE
322A
DYNAMIC INFORMATION (ORDERING, SHIPPING, ACCOUNT BALANCE, SALES PROGRAMS, ENGINEERING SOLUTIONS, ETC.)
REVIEW NEW INFORMATION
CATEGORY IDENTIFIER (CAR MUSIC ELECTRONICS)
326
PROVIDER IDENTIFIER (SUPPLIER OF CD PLAYERS, NAME OF BUSINESS, ADDRESS, CONTACT INFORMATION, ETC.)
PROCESSING STATION
324
NETWORK
344

Fig. 4



410
416
INTERNET
412
RECIPIENT = CUSTOMER
414
PROVIDER = CAR DEALER
PORTAL
PURCHASE AUTOMOBILE
AUTOMOBILE GHI
AUTOMOBILE DEF
AUTOMOBILE MODEL ABC
AUTHORIZE USER
ACCESS USER DATA REPOSITORY
528
DEALER USER DATA REPOSITORY
540
CUSTOM CATEG "MY MODEL ABC"
428
440
USER DATA REPOSITORY
CREATE CUSTOM FOLDER, COMMUNICATE TO INFORMATION PROVIDERS
418
INFORMATION PACK FOR MODEL ABC
PRIVATE AREA
CUSTOM CATEGORY "MY WHEELS"
STATIC INFORMATION (MANUAL, MAINTENANCE SCHEDULE, RECEIPT,DMVREGISTRATION FORMS, WARRANTY, ETC.)
FIREWALL / FILTER
420
QUARANTINE AREA
422
DYNAMIC INFORMATION (UPDATES, SERVICE CALLS, ETC.)
426
CATEGORY IDENTIFIER (AUTOMOBILES)
CATEGORY AUTOMOBILES
PROVIDER IDENTIFIER (NAME OF DEALERSHIP, ADDRESS, PHONE, E-MAIL,WEBSITE, ETC.)
424
432
434
PROCESSING STATION
312
PROVIDER = CAR MANUFACTURER
430
MODEL ABC
416
INFORMATION PACK
INTERNET
444
418

Fig. 5

610
612
RECIPIENT = CUSTOMER
614
PROVIDER = APPLIANCE VENDOR
INTERNET
PORTAL
PURCHASE, PROVIDE UDA
"SMART APPLIANCE"
ACCESS USER DATA REPOSITORY
AUTHORIZE USER
GENERATE AND SEND INFO PACK
RECEIVE AND SETUP APPLIANCE
628
USER DATA REPOSITORY
PRIVATE AREA
CUSTOM CATEG X
CUSTOM CATEG Y
CUSTOM CATEG ..m'
609
"SMART APPLIANCE"
APPLIANCE CONTROL MODULE
618
INFORMATION PACK FOR "SMART APPLIANCE"
620
STATIC INFORMATION (MANUAL, WARRANTY, RECEIPT, ETC.)
611
CUSTOM CATEGORY "MY SMART APPLIANCE"
INTERNET
616
622
DYNAMIC INFORMATION (READ INSTRUMENTS, CONTROL APPLIANCE, PERFORM TESTS, PROVIDE UPDATES, SCHEDULE MAINTENANCE, REPAIRS, ETC.)
FIREWALL / FILTER
COMMUNICATE WITH APPLIANCE VENDOR
QUARANTINE AREA
CATEG D
CATEG F
CATEG "HOME APPLIANCE"
626
CATEGORY IDENTIFIER (HOME APPLIANCES)
AUTHORIZE APPLIANCE VENDOR TO CONTROL "SMART APPLIANCE"
PROVIDER IDENTIFIER (NAME OF BUSINESS, SHORT SUMMARY OF INFORMATION PACK ADDRESS, PHONE, E-MAIL,WEBSITE, ETC.)
624
632
634
630
PROCESSING STATION
644
INTERNET

Fig. 6

US 6,651,063 B1

**1**

## DATA ORGANIZATION AND MANAGEMENT SYSTEM AND METHOD

### BACKGROUND

1. Field of the Invention

This invention relates generally to the organization of data and, more specifically, to a computerized system and method allowing providers of information to send information to potentially interested parties in a manner wherein the information is automatically organized by category for the interested parties, wherein the potentially interested parties selectively have some level of control over the placement of the data, and establishing a communication link between providers and recipients for their mutual benefit.

2. Description of the Prior Art

The proliferation of information and communication methods in the technological society in which we live has made it increasingly difficult for businesses and consumers to collect and organize information. Most businesses, as well as most households, whether inhabited by a single individual or an entire family, are constantly inundated with, and some even overwhelmed by, information taking various forms, such as product and service guides and updates, solicitations, mail (U.S., electronic, and voice), and the like. Businesses and consumers habitually store information in places that are not easily accessible, discard information for which they do not have a present use but almost always will have a later use, fail to transmit information to potentially interested third parties, or simply misplace information which cannot easily be reacquired. For example, warranty information or product manuals may be a very low priority to a retailer interested in a quick sale or to a consumer who first purchases and installs a new electronic item such as a stereo, television, video cassette recorder, DVD player, photocopier, telephone, or computer system. However, several days, weeks, or even years later, if the product has been updated, recalled, or malfunctions, or if questions arise as to its usage or compatibility, the warranty information or product manuals can become extremely useful. Unfortunately, many individuals lack a reliable, easy-to-use, centralized information storage system to keep track of such information.

The storage systems many rely upon to keep track of product and service information today generally are obsolete, cumbersome, decentralized and otherwise inefficient. For example, a filing cabinet or storage drawer, figureheads in every home and business, require categorization and re-categorization, are highly dependent on the accuracy of individuals' placement of the information in the correct file, and provide no convenient way for transmission of updates or communications. Also, most computer software systems that provide for the electronic storage of information are frequently cumbersome to initialize, requiring the user to create the separate categories of information, and, further, to place the information in the proper category, and decentralized, requiring the user to maintain several separate computer programs for the maintenance of relevant information. Moreover, most often it is the case that information desired to be stored is not provided to individuals in digital form, but, rather, in paper, card, or booklet form. Some sophisticated users may resort to existing scanning technology to convert their important documents into digital form for storage purposes, but they still must create their own categories of information and place the information into the proper categories.

**2**

### OBJECTS OF THE INVENTION

It is an object of the present invention to provide an information organization system and method wherein little or no effort is required on the part of a recipient of information in order to store and manage the information in an organized fashion. It is a further object of the present invention for the information organization system and method to have information already categorized, or already designated for association with a particular category, at the time the information is provided to the recipient.

It is a further object of the present invention for the information organization system and method to provide a means for the provider of information to have, in some instances, at least some level of continued access to the information provided to the user so that the provider of information can update the information as may be necessary.

Another object of the present invention is to create a single program by which all information desired to be electronically stored or accessed by users can be maintained and updated to simplify operations and processes.

An additional object of the invention is for the information organization system and method to include, after a recipient receives information from a particular provider, means to instruct the system to facilitate proper designation of further information from the same provider in a fashion desirable to the recipient. Another object of the present invention is to include a means within the system to process a refusal of delivery of information by an intended recipient, and optionally notifying the provider of information in the event a recipient refuses delivery of the information. The manner in which these and other objects of the invention are achieved will become clear through the following Summary of the Invention, the Drawings, and the Detailed Description of the Preferred Embodiments.

### SUMMARY OF THE INVENTION

The present invention places the burden on the provider of the information to specify the category to which the information corresponds, so that when the information is provided to the recipient, the information is automatically delivered to a proper location within the recipient's or user's personal information storage and retrieval area, or "User Data Repository." In this disclosure, the words "data" and "information" are considered synonymous and interchangeable. "Recipient" and "User" are also used interchangeably. For purposes of this disclosure of the invention, the following definitions are considered useful:

User Data Repository—Personal information storage and retrieval area, in which information is stored in a compartmentalized or categorized format, allowing the user to easily identify, retrieve, and otherwise manage the information stored in locations corresponding to the various categories therein.

Portal—A collection of User Data Repositories for all Users.

Provider—Any provider of information, such as a seller or distributor of goods or services (e.g., retailer, pharmacist, vendor, supplier, or a physician).

Manufacturer—A source or producer of information about a particular product.

Quarantine Area—An area in or associated with a User Data Repository, in which information is first received by the recipient before passing through a Firewall/Filter.

Firewall/Filter—A barrier that separates the Quarantine Area from a preferably secure or private area of the

US 6,651,063 B1

<table>
<tr><td>3</td><td>4</td></tr>
</table>

User Data Repository in which information is stored and managed.

Network—A communications system allowing the transmission of information between Providers and Recipients, e.g., the Internet.

Recipient (or User)—A person (or other entity) that receives information from various Providers.

Reverse Communication Link (or "Feedback")—The transmission of information or data back from a Recipient's User Data Repository to a Provider.

User Destination Address—A protocol, code, or other identifier uniquely associated with each individual Recipient, which is utilized by the Provider for sending information to the intended Recipients via the Network.

Dynamic Information—Information that a Provider or Manufacturer can revise or manipulate subsequent to delivery to Recipients.

Static Information—Information that, to protect the interests of the Recipients, cannot be revised or manipulated by a Provider or Manufacturer after it is sent to Recipients.

In the system and method of the present invention, a Recipient communicates his or her User Destination Address to the Provider. Using this User Destination Address, the Provider sends information to the Recipient's User Data Repository via the Network. The information is encoded, labeled, or tagged by the Provider, via an identification means, with a Provider Identifier that can list such information about the provider as, for example, its name, type of business, street address, phone number, e-mail address or website, and the date of a transaction between the Provider and Recipient, as well as a brief summary of the provided information. This Provider Identifier allows the Recipient to quickly assess the identity of the Provider and/or the nature of the information.

The information is additionally encoded, labeled, or tagged, via a categorization means, as relating to a particular category. The information, carrying both the identifier and the category coding, is transmitted via the Network to a User Data Repository associated with the Recipient's User Destination Address. Preferably, when the information is first received at the User Data Repository, it is stored in the Quarantine Area.

Using the Provider Identifier, the Recipient can then decide whether to allow the information through the Firewall/Filter to a Private Area of the Recipient's User Data Repository, to discard the information, or to keep it in the Quarantine Area. The Quarantine Area has locations to store information corresponding to a generic set of categories. While the Private Area is preferably initially provided with locations to store information corresponding to the same generic categories, the system of the present invention allows the User to modify the categorization of information in the Private Area, and create custom categories in the Private Area, as is explained in greater detail below.

The user can allow the information through the Firewall/Filter by an appropriate authorization means, such as clicking a mouse button, using a keyboard to type an answer to a query on a computer screen, e.g., "Allow? YES or NO", or by using a telephone keypad. Other computer input devices may be used to authorize the information through the Firewall/Filter, such as speech recognition devices. These authorization means are by way of example only.

When the information is placed in the User Data Repository, the information is automatically placed in a location already reserved for information in the category to which the information from the Provider relates, as designated by the Provider using the categorization means. Thus, the Recipient advantageously need not make any effort in categorizing the information or placing the information in an appropriate category.

It is recognized, however, that the user may prefer to place the information in additional or alternate categories to the category initially identified by the Provider. Thus, the present invention allows the user to reassign the information to a different category, or copy the information for storage in one or more additional categories.

Desirably, the system permits the Recipient to refuse to allow information from a particular provider through that Recipient's Firewall/Filter, and simply leave the information in the Recipient's Quarantine Area, or alternatively, instruct the system to discard or delete the information. At the Recipient's option, the system can be configured so that an instruction to the system to discard or delete information from a particular Provider is preserved by the system, and the system prevents all future information from that Provider from even reaching the Recipient's Quarantine Area. In this manner, the Recipient does not receive any further information from that Provider whose information has been refused. This configuration is preferably reversible, so that the Recipient can later elect to again be able to receive information from that Provider.

The present invention may also utilize Feedback means, if desired by the Recipient, to relay back to the Provider specifics as to the reassignment or additional categorization of information performed by the Recipient, so that subsequent information sent to the same Recipient using the same User Destination Address will be properly categorized in the Recipient's User Data Repository according to the Recipient's customized categorization system. Advantageously, by relaying back to the Provider, via Feedback means, such specifics as to any reassignment or additional categorization performed by the Recipient, the Provider can reliably supplement the information originally sent to the Recipient if necessary, and the recipient can be assured that all copies of the Information stored in the private or secure area of his or her User Data Repository are updated with the appropriate supplement.

More preferably, the system of the present invention can be configured so that the specifics as to the reassignment or additional categorization of information performed by the Recipient pertaining to information from each particular Provider is relayed to a data storage and processing unit within the system, but remote from the Providers. Most preferably, this data storage and processing unit is associated directly with the Recipient's Firewall/Filter. In this manner, all subsequent information transmitted from the Providers can still be properly categorized in each Recipients' User Data Repository according to the individual Recipient's customized categorization system, by first passing through the data storage and processing unit. Advantageously, the information is correctly categorized in each Recipient's User Data Repository without informing the Provider as to any information as to the Recipients' further processing of the information, and without the Provider having to update its own records for each Recipient to whom it sends information.

It is recognized that one possible form of the information provided to the Recipient may be a link to, for example, a specific page or area of an Internet website, with or without interactive features, controlled by the Provider or by a Manufacturer. This is one example of Dynamic Information

US 6,651,063 B1

5

a Provider or Manufacturer may furnish to Recipients. In this manner, the storage requirements for each Recipient's User Data Repository are relatively small and the Provider or Manufacturer is able to update information for all Recipients by simply updating the website within its own control, rather than having to notify each Recipient of a particular update.

Alternatively, the information may more desirably be Static Information—that is, to protect the interests of the recipients, the information can be delivered to the Recipient's User Data Repository in a manner which prevents later revision by the Provider or Manufacturer, i.e. so as to preserve the original text of the information. If further desired, such Static Information may be accompanied by a link for the Recipients to locate Dynamic Information from the Provider or Manufacturer, such as updates or supplements.

DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram of possible configurations of a preferred embodiment of the data organization and management system of the present invention;

FIG. 2 is a schematic diagram of an example of the system and method of the present invention demonstrating its use in the organization and management of prescription drug information from a drug manufacturer, a physician, and a pharmacy;

FIG. 3 is a schematic diagram of an example of the system and method of the present invention demonstrating its use in the organization and management of information about various products from multiple exhibitors at a trade show;

FIG. 4 is a schematic diagram of an example of the system and method of the present invention demonstrating its use in a business-to-business application, for the organization and management of information about various models of compact disk players supplied to an automobile manufacturer;

FIG. 5 is a schematic diagram of an example of the system and method of the present invention demonstrating its use as a hybrid of a business-to-business application and a consumer application, for the organization and management of information about an automobile supplied by the automobile manufacturer and the car dealer; and

FIG. 6 is a schematic diagram of an example of the system and method of the present invention demonstrating its use for the organization and management of information relating to the remote control of externally controllable home appliances.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

In a preferred embodiment of the information storage and management system 10 of the present invention, a Recipient 12, such as a customer (which customer can be either private, or commercial), of a retailer, distributor, wholesaler, dealer, or manufacturer, or a patient of a physician, supplies a Provider 14 with the Recipient's User Destination Address via some communication means. The User Destination Address can be provided at any mutually convenient time, such as at the time of purchase, or upon check-in, or at any other time as may become the standard accepted practice or custom in a particular setting. The means of communicating the User Destination Address to the Provider 14 can take various forms, including the Recipient 12 simply orally telling the Provider 14 his or her User Destination Address, e-mailing the Provider 14 his or her User Destination

6

Address, having the User Destination Address encoded onto a bar code that is placed on a card carried by the Recipient 12 and read by the Provider's computer using a bar code reader as an input device, having the User Destination Address encoded directly into the magnetic strip of the Recipient's credit card or debit card, so that the User Destination Address is automatically communicated to the Provider's computer at the time of purchase, having the User Destination Address be the same as the Recipient's unique credit card number so that it can be transmitted during telephone or on-line purchases, portable computers interlinked with other computers (as described in U.S. Pat. No. 6,000,000) or by transmitting the User Destination Address via wireless means, such as via a personal organizer, portable computer, or portable telephone carried by the Recipient 12 with the capability of remotely transmitting data, such as by radio waves, analog or digital cellular means, or infrared light, to a reader associated with the Provider's computer. These various means of communicating the User Destination Address to the Provider 14 are intended to be exemplary, and not exclusive.

Referring to FIG. 1, the system 10 utilizes a Network 16, such as the Internet, for communicating information from the Provider to the Recipient. The User Destination Address may be an e-mail address, or some other identifier uniquely associated with the particular Recipient.

The Provider 14 sends information to the desired Recipient's User Destination Address in an Information Pack 18, consisting of Static Information 20 and/or Dynamic Information 22, a First Identifier 24, also called a Provider Identifier 24, used to identify the Provider 14 of the information contained in the Information Pack 18, and a Category Identifier 26 used to identify a generic category to which the information contained in the Information Pack 18 pertains. The system also includes address means for the Provider 14 to connect or associate the desired User Destination Address with the Information Pack 18. The system further includes means for the Provider 14 to associate the Provider Identifier 24 with the Information Pack 18. Alternatively the system may include means for automatically associating the Provider Identifier 24 with any Information Pack 18 coming from a given Provider 14, such as recognition means that allows the system to recognize each Provider 14, and in response to any Provider 14 sending an Information Pack 18, the recognition means associates the appropriate Provider Identifier 24 with the Information Pack 18.

At some point before, during, or after passing through the Network 16, with these various alternate configurations being represented by broken lines in FIG. 1, the Information Pack 18 preferably passes first through a Processing Station 30, where any or all of the User Destination Address, Provider Identifier 24, and the Category Identifier 26 associated with the Information Pack 18 can be analyzed.

The Information Pack 18 is delivered to the intended Recipient's User Data Repository 28 by reading the User Destination Address associated with the Information Pack 18, and delivering the Information Pack 18 to the appropriate User Data Repository 28 associated with that particular User Destination Address. Such reading of the User Destination Address can be performed at the Processing Station 30, which preferably has its own data storage means and data processing means for analyzing the User Destination Address associated with any given Information Pack 18 and matching it to the proper corresponding User Data Repository 28.

In addition to reading the User Destination Address, the present invention advantageously includes means for read-

US 6,651,063 B1

7

ing the Category Identifier 26 associated with a given Information Pack 18, and for automatically placing at least the Static Information 20 and/or Dynamic Information 22 stored inside the Information Pack 18 in a location of the User Data Repository 28 that is reserved for information in the category to which the Static Information 20 and/or Dynamic Information 22 pertains, as identified by the Category Identifier 26.

Preferably, there are a plurality of generic categories, namely "Category D", "Category E", . . . , "Category n", used in the system of the present invention. Locations 32 in each Recipient's User Data Repository 28 are initially reserved for each of these generic categories. Alternatively, to save to accommodate future generic categories, to avoid the need for Recipients to look in multiple empty categories for information, and for other considerations that are understood by those of ordinary skill in the art, the system can be configured to only create a location 32 in a given Recipient's User Data Repository 28 for a particular category, "Category E" for example, when an Information Pack 18 is first delivered to that User Data Repository 28 with information pertaining to that category. In other words, once an Information Pack 18 is delivered to that User Data Repository 28 with a Category Identifier 26 indicating "Category E", a location $32_E$ is created within the User Data Repository 28 for information pertaining to "Category E".

When an Information Pack 18 is received in the User Data Repository 28, the Information is preferably in a Quarantine Area 34 of the User Data Repository 28. It is recognized that the Information Pack 18 may be placed in the appropriate location within the User Data Repository 28 corresponding to the Category Identifier 26 either when the Information Pack 18 is first delivered to the User Data Repository 28, or alternatively, after the Recipient 12 has authorized the information to pass through the Firewall/Filter 36. Recipient 12 preferably has the ability to further process the information stored in the Information Pack 18. First, the Recipient 21 has the ability to review the Provider Identifier 24 and decide whether the Information Pack 18 should be accepted or refused.

Another example of the Recipient's ability to further process the information stored in the Information Pack 18 is the ability to forward the Information Pack 18, or portions of the information stored therein, to the User Destination Addresses of other Recipients. For example, a purchaser of a gift may receive in his or her User Data Repository 28 an Information Pack 18 from a Provider 14 which is a retailer that sold him or her the gift, the Information Pack 18 including warranty information about the gift. Although that purchaser is a Recipient 12, the person for whom the gift was purchased should have the warranty information. Thus, the system of the present invention advantageously allows the purchaser to forward the Information Pack 18 to the User Data Repository 28 associated with a User Destination Address of the person for whom he or she purchased the gift. Alternatively, it is recognized that the Recipient 12 could e-mail the Information Pack 18, or at least some contents thereof (such as Dynamic Information 22 and Provider Identifier 24 only, so that the Recipient does not see static information 20 that would include the price of the gift) to the person to whom the gift is given.

Turning back to the first processing means available to a Recipient 12, a refusal to allow the Information Pack 18 is either sent to the Provider, or more preferably, to the Processing Station 30. The system can be configured so that a refusal by a particular intended Recipient 12 to allow a single Information Pack 18 from a particular Provider 14

8

will establish a block, preventing all future Information Packs 18 from being sent by that Provider 14 to that Recipient 12, until the Recipient 12 sends instructions to remove the block. One manner in which such a block could operate is as follows: Upon delivery of a given Information Pack 18 from a given Provider 14 to the User Data Repository of a particular Recipient 12, the Recipient 12 has an opportunity to review at least minimal descriptive information about the Information Pack 18 to facilitate the Recipient 12 in deciding whether to allow or refuse the Information Pack 18.

The Provider Identifier 24 associated with the Information Pack 18 may be sufficient, but the Recipient 12 may, if desired, also be permitted to review additional information associated with the Information Pack 18, such as the Category Identifier 26. Additional identifiers (not shown), such as a short title, may be placed in the Information Pack 18 by the Provider to further assist the Recipient 12 in readily determining the nature of the substantive information included in the Information Pack 18. In the event the Recipient 12 refuses to accept the Information Pack 18, the Information Pack 18 is deleted or removed from the Recipient's User Data Repository.

If the system is configured to block the Recipient from receiving any future Information Packs from a Provider 14 upon the Recipient's refusal of an Information Pack 18 from that Provider, such refusal is echoed back, with the Provider Identifier 24, either to the Provider (for example via a reverse communication link 44, discussed in greater detail below) or more preferably, to a data storage and processing location remote from the Provider, such as the Processing Station 30. If the location to which the refusal is echoed is remote from the Recipient's User Data Repository 28, then the Recipient's User Destination Address is also echoed back with the refusal and the Provider Identifier 24. Thus, such a Processing Station 30 could centrally store refusal information for all Recipients as to all Providers.

Alternatively, the refusal information can be stored locally for each Recipient, such as in an Analyze Information step 31, where a record is stored of refusals of any Providers in association with each Recipient's User Data Repository, and an Authorize Passage step 33 can allow an Information Pack 33 into the User Data Repository 28, or even through the Firewall/Filter 36, in accordance with the Recipient's instructions (it is recognized that the Analyze Information step 31 and Authorize Passage step 33 can occur in the Processing Station 30). This would eliminate the need for sending the User Destination Address back from the User Data Repository, and lowers risk that a memory loss at the Processing Station 30 would detrimentally globally effect the future operation of the system.

Regardless of where the refusal information is stored, i.e. whether in association with the Provider, in association with the Recipient's User Data Repository, at the Processing Station 30, or somewhere in between, a block can then be established. Upon any subsequent attempt by the Provider 14 to send an Information Pack 18 to that Recipient 12 using the Recipient's User Destination Address, an authorization means analyzes the Provider Identifier 24 and/or the User Destination Address associated with the Information Pack 18 to determine whether any information from that Provider 14 has previously been refused by that Recipient 12, and if so, the Information Pack 18 is prevented from being delivered to the Recipient's User Data Repository 28. Preferably, the Recipient should have the ability to instruct the system to remove the block from a particular Provider, if desired.

In the event the Recipient 12 does not refuse to accept the Information Pack 18, the Recipient 21 may selectively allow

US 6,651,063 B1

9                                                                  10

the Information Pack 18, or any portion of the information in the Information Pack 18, to pass through the Firewall/Filter 36, into a Private Area 38 of the Recipient's User Data Repository 28. The Private Area 38 can be protected by conventional protection means, such as passwords or encryption, to avoid tampering with any information contained therein. Advanced data processing features permit the Recipient 12 to further manipulate the placement of the information in the Information Pack 18, if desired. For example, once the Information Pack 18 is allowed through the Firewall/Filter 36, the Recipient may re-assign the Information Pack 18 to a different generic category, or to a custom category. It is recognized that the custom categorization may also take place in the Quarantine Area 34.

A plurality of custom category locations 40 in the Recipient's User Data Repository 28 are reserved for each of the custom categories, namely "Custom Category X", "Custom Category Y", . . . , "Custom Category m". If desired, these custom categories could be further broken down by subcategories (not shown). As with the locations 32, the system can be configured to only create a custom location 40 in a given Recipient's User Data Repository 28 for a particular custom category, "Category Y" for example, when an Information Pack 18 is reassigned by the Recipient 12 to a new custom category, i.e. when a Recipient first reassigns an Information Pack 18 to "Custom Category Y", a custom location $40_Y$ is created within the User Data Repository 28 for information pertaining to "Custom Category Y".

The present invention advantageously allows for the Recipient's custom categorization of the Information Pack 18 to be communicated, with the User Destination Address, either by Feedback means to the Provider 14, or by echo means to the Processing Station 30. If the custom categorization is communicated by echo means to the Processing Station 30, then in addition to the Recipient's custom categorization and User Destination Address, the Provider Identifier is also sent to the Processing Station 30. The user 12 preferably accesses his or her User Data Repository 28 via a network 16, such as the Internet or an intranet, and preferably an authorization step 29 must be satisfied before the user 12 can access the contents of the User Data Repository 28.

All subsequent Information Packs 18 from the same Provider 14 to that Recipient 12 can then advantageously be automatically delivered directly to the proper custom category, by scanning the Information Pack 18 to determine whether the intended recipient has created custom categorization for an Information Pack 18 from that Provider 14 on a previous occasion, and if so, modifying the Category Identifier 24 or adding an additional Custom Category Identifier (not shown) to the Information Pack 18 before placement into the Recipient's User Destination Repository 28, to instruct the system as to where the Information Pack 18 is to be automatically placed in the User Data Repository 28. Just as with the block discussed above, the custom categorization of a given Information Pack 18 can instead echo a Custom Category Identifier and the Provider Identifier 24 to a storage and processing area closely associated with the User Data Repository, so that the User Destination Address need not be communicated to the Provider 14 or the Processing Station 30.

The custom locations 40 may be located in the Private Area 38 of the Recipient's User Data Repository 28, or in an area of the User Data Repository 28 not protected by the Firewall/Filter 36. While the Quarantine Area 34, Firewall/Filter 36, and Private Area 38 are considered to be desirable features, they are not necessary in all embodiments of the inventive system and method.

One form of information within an Information Pack 18 can be a link to an Internet address. The Provider then has the ability to modify or update the content of information that may be of importance to its Recipients without having to send each Recipient the entire information. In this sense, the information provided to each Recipient is considered Dynamic Information 22, even though the actual link or Internet address does not change, because the Provider has the ability to manipulate the content of the information being provided to the Recipient.

In the inventor's preferred embodiment, all Providers would be registered with a centralized authority, agency, or company before having the ability to utilize the system to send information to intended Recipients. This centralized overseer would prevent abuses, and the registration requirement would advantageously provide some level of quality assurance to Recipients 12. The registration process can be straightforward, and could be performed at any time prior to sending of an Information Pack 18. However, depending on the manner in which the User Destination Address is communicated by the Recipient 12 to the Provider 14, it may take some time to equip the Provider 14 with means to read the User Destination Address, as well as with means to create an Information Pack 18 (such as loading appropriate software on the Provider's computer system). In a preferred embodiment, when the Information Pack 18 passes through the Processing Station 30 prior to delivery to any User Data Repository 28, the Processing Station verifies that the Provider 14 is an authorized, properly registered provider, and verifies that the Information Pack 18 is properly formatted in accordance with the parameters of the system.

It is recognized that it will often be desirable to send information to Users that is not generated by the Providers 14, such as retailers or service providers, but rather, is generated by, for example, the original source of the goods such as a Manufacturer 42 of a television or automobile. Thus, the First Identifier 24 may identify a Manufacturer 42 or other source of information as opposed to, or in addition to, the Provider 14, or one or more additional or alternate identifiers (not shown) may be associated with the Information Pack 18 to identify these alternate sources of information.

An advantageous feature of the system and method of the present invention is the reverse communication link 44, which can lead back to the Provider 14, or even to alternate sources of information. Instead of requiring the Recipient 12 to generate his or her own Information Pack 18, and send it to a User Destination Address associated with a given Provider 14, the system and method preferably automatically establishes a reverse communication link 44 once the Information Pack 18 is delivered to the User Data Repository 28. The reverse communication link 44 can be used for such purposes as confirming receipt of the Information Pack 18, requesting additional information of the provider, sending details to the provider concerning a block or a custom category 40 assigned to the Information Pack 18, or sending periodic updates to the Provider 14 concerning the products purchased by the recipient 12, to name just a few. Another advantageous use of the reverse communication link 44 is to automatically communicate back to the provider 14 certain information residing in, or accessible from, the recipient's User Data Repository 28, which can be used to provide better service, improved quality, or continued maintenance to the recipient. This is sometimes referred to in the art as "pull" technology, whereas the sending of information to recipients is sometimes referred to in the art as "push" technology. If desired by the Recipient 12, the system and

US 6,651,063 B1

11

method of the present invention can be configured so that some or all the static information 20 associated with all prior information packs 18 stored in a given category location 32 within the Quarantine Area 34 of the Recipient's User Data Repository 28 may be communicated via the reverse communication link 44 back to the Provider 14.

Preferably, an authorized provider 14 has access only to one specific custom category location 32 within the Quarantine Area 34 of the User Data Repository 28 in a push information scenario. While it is recognized that it may be desirable in certain applications to grant a provider 14 access to one or more locations 40 in the Private Area 38, it is generally preferable that if a user authorizes a provider to pull information from a certain location within the User Data Repository 28, then the information to be communicated to the provider is already located in, or first moved to, the Quarantine Area 34.

The benefits and manner of operation of the system and method of the present invention are demonstrated in greater detail in the following examples. In each of the examples, corresponding elements and steps are enumerated with corresponding reference numbers, increased by a factor of one-hundred.

## EXAMPLE 1

Turning to FIG. 2, the system and method of the present invention works well in the dissemination and control of information concerning prescription drugs. The manufacturer 142 of a particular drug, say "Drug ABC", provides information about the drug to a pharmacy 114 at or near the time of a purchase by that pharmacy 114 of some quantity of Drug ABC. It is recognized that there may be intermediate steps between the manufacturer 142 and the pharmacy 114, but for simplification of the example, it is assumed that the drugs are sold directly by the manufacturer to the pharmacy for sale to the general public, in a manner consistent with laws governing dispensing of pharmaceuticals.

The pharmacy 114 generates an Information Pack 118 containing Static Information 120, such as the name of the medication, expiration dates, and size of the tablets, and Dynamic Information 122 from the manufacturer 142 about the drug, such as contraindications (i.e., drug compatibility), warnings concerning activities that should be avoided after taking the medication, and instructions for storage of the drugs. The Information Pack 118 may also have a Provider Identifier 124 indicating the name of the pharmacy 114 and, if desired, the name of the manufacturer 142 of the drug, as well as generic Category Identifier 126, such as "Medical." It is recognized that the Information Pack 118 could instead have originated at the manufacturer 142, with the pharmacy 114 having the ability to supplement or modify the Information Pack 118 with its own information.

When the pharmacy 114 fills a prescription provided by a physician 113, the physician's name, dosage instructions, and refill allowances may be added by the pharmacy as further Static Information to the Information Pack 118. Preferably, the pharmacist's software concerning prescriptions, dosages, and the like is integrated with the means for generating or modifying the Information Pack 118, such that the information provided in the physician's prescription can be automatically stored in the Information Pack 118 as Static Information 120 automatically while the pharmacist fills the prescription and makes the appropriate labels for the pill bottles. The Information Pack 118 is also provided with a generic Category Identifier 126, such as "Medical."

12

At the time of purchase, the customer 112 provides the pharmacy 114 with the customer's user destination address, which may be encoded on the magnetic strip of the customer's credit card, or provided on the customer's health insurance card provided to the pharmacy. Notably, if the physician 113 also has the ability to send information to the pharmacy 114 through the system, the prescription itself may be transmitted in the form of an Information Pack 118 from the physician 113 to the pharmacy 114, with certain Static Information 120 already associated with the Information Pack 118 provided to the pharmacy 114, and the patient's user destination address could even already be associated with the Information Pack 118 sent by the physician 113 to the pharmacy 114.

The Information Pack 118 generated by the pharmacy 114 could therefore be a combination of separate Information Packs received from the physician and from the drug manufacturer. This type of operation, in which multiple providers contribute to a single Information Pack, is described in more detail in Example 3. Various other possibilities are also recognized, such as the drug manufacturer sending information packs to physicians instead of pharmacists, and the physicians in turn provide the Information Pack to the pharmacist with the prescription for forwarding to the patient, or alternatively, the physician can forward the information pack directly to the patient.

When the pharmacy 114 transmits the Information Pack 118 to the user destination address, the Information Pack 118 travels over a network such as the Internet 116. The Information Pack 118 is analyzed at a processing station 130 to determine whether the Information Pack 118 is authorized by reviewing the Provider Identifier 124 and the user destination address to which the Information Pack 118 is being sent. The Category Identifier 126 "Medical" can also be analyzed by the processing station 130, so that when the Information Pack 118 is placed in the User Data Repository 128 associated with the customer's user destination address, the Information Pack 118 is placed in a particular location $132_E$ of the User Data Repository reserved for medical information.

As shown in FIG. 2, the Information Pack 118 is first delivered to a Quarantine Area 132 of the User Data Repository 128, from which the customer 112 can, upon accessing his or her user data repository 128, further process the Information Pack 118 by, for example, allowing the Information Pack 118 to pass through a Firewall/Filter 136 of the User Data Repository. If desired, the customer 112 can create a custom category location $140_Z$ in his or her Private Area 138 of the User Data Repository 128 for the Information Pack 118, such as "My Medicine". This can be particularly advantageous for families who may share a single User Destination Address, but can still have custom categories 140 of information for particular family members.

Advantageously, the system 110 can be configured such that the placement of an Information Pack 118 in a Custom Category location $140_Z$ sends a signal to the processing station 130 to direct further Information Packs to that same Custom Category location $140_Z$, as opposed to a generic category location 132. It is recognized that the Provider Identifier 124 may be insufficient for the system to automatically accurately determine into which custom category location a new Information Pack from the same pharmacy 114 should be placed. For example, while a first Information Pack 118 from the pharmacy 114 may be placed in Custom Category location $140_Z$ "My Medicine", a subsequent Information Pack from the pharmacy 114 may be intended for another household family member who shares the same user

US 6,651,063 B1

13

destination address. This problem can be overcome by using multiple data fields to decide whether an Information Pack is to be directed to a Custom Category, such as an Original Provider Identifier (not shown) which could identify the physician 113, and another Provider Identifier 124 which would identify the pharmacy 114, assuming none of the family members share both the same physicians and pharmacies.

One of the advantageous components of the system 110 is the option to configure the system so that the successful delivery of an Information Pack 118 to a customer's User Data Repository 128 results in a reverse communication link 144 back to the pharmacy 114. As shown in FIG. 2, the reverse communication link 144 may be directly from a category location 132$_E$ within the user's quarantine area. As such, the system 110 can automatically, upon delivery of the Information Pack 118 concerning Drug ABC, communicate all, or at least authorized portions of, the contents of the customer's category location 132$_E$ entitled "Medicine" back to the pharmacy. Because people may change pharmacies from time-to-time, it cannot always be assumed that the pharmacy's computer system will have all the data concerning a customer's prior prescriptions to accurately detect a drug incompatibility problem.

Advantageously, the reverse communication link 144 can facilitate the automatic transmission of static information 120 such as the names and dosages of all medicines already prescribed to the customer 112 (provided all other prescribed medications the customer 112 is taking were also similarly accompanied by information packs previously delivered to the customer's custom category location 132$_E$ of his or her User Data Repository 128, even if purchased from different pharmacies). This static information can be used to screen for contraindications, i.e. to verify drug compatibility for the particular patient, and if any incompatibilities are found, the customer can be notified by the pharmacy. Depending on the speed of the system 110, such verification and, if necessary, notification of drug incompatibility can take place even before the customer 112 leaves the pharmacy 114.

Preferably, this reverse communication link 144 would only send information back to the pharmacy 114 from category locations 132 in the Quarantine Area 134 of the User Data Repository 128, to protect the privacy of the customer 112, unless otherwise instructed by the customer 112. The customer 112 in certain instances may prefer that the system 110 be configured such that the reverse communication link 144 sends information back to the pharmacy 114 from one or more Custom Category locations 140 in the Private Area 138, instead of from the category locations 132$_E$ in the Quarantine Area 134, such as if medications for different family members are placed in different custom category locations 140.

### EXAMPLE 2

Another example demonstrating the advantages of the present invention is shown in FIG. 3. When business people attend trade shows, they are often inundated with such information as business cards and literature about the exhibitors and products displayed at the show. By the time the visitors return home, they may have lost the information, or simply forgotten which products were presented by particular exhibitors. As shown in FIG. 3, the system and method of the present invention facilitate an orderly, organized way to provide information to the visitor 212, with the benefits of reduced paper, and reliable storage so that the visitor 212 can later locate the information in his or her own User Data Repository 228.

14

Upon visiting an exhibitor, namely First Exhibitor 214$a$, at a trade show, the visitor 212 may request information about one or more particular products on display at that exhibitor's booth, say Products A and B. The visitor 212 can communicate his or her user destination address by any appropriate manner, such as having the user destination address encoded on a bar code on the visitor badge 213 and providing the First Exhibitor 214$a$ with the opportunity to scan the user destination address encoded on the visitor badge 215 using a bar code reader. The First Exhibitor 214$a$ can generate an Information Pack 218$_A$, 218$_B$ for each of the products in which the visitor 212 expresses an interest, e.g. Product A and Product B.

The Information Packs 218$_A$, 218$_B$ include Static Information 220$_A$, 220$_B$, such as a description of features and benefits of the product, a price list, and a name of the salesperson with whom the visitor may have spoken at the trade show. Dynamic Information 222$_A$, 222$_B$ may also be provided, such as information regarding latest updates, interactive product configurations, modeling, particular solutions that may have been discussed to tailor the product to the needs of the visitor 212 or his or her company, and the like. A Provider Identifier 224$_A$ is also placed in association with each of the Information Packs 218$_A$, 218$_B$.

The Information Packs are transmitted to the User Data Repository 228 associated with the Visitor's User Destination Address provided on the visitor badge 215 by means of a network such as the Internet 216. When the Information Packs 218$_A$, 218$_B$ are delivered to the User Data Repository 228 associated with the Visitor's User Destination Address, a processing station 230 reviews the Category Identifier 226 and places the Information Packs 218$_A$, 218$_B$ in a corresponding location 232 within the Quarantine Area 234 of the User Data Repository 228.

The Category Identifier 226 relates to a generic category, e.g. an industry to which Products A and B relate. It is recognized that at the trade show, all exhibitors can be instructed to provide a common category identifier in association with any information packs sent by any of the exhibitors based on contacts initiated at the trade show. In this manner, the processing station 230 associated with each visitor's User Data Repository 228 can be configured such that, even if a corresponding location 232 did not already exist in the User Data Repository 228, upon the delivery of a first Information Pack 218$_A$ from any of the exhibitors, a new generic category location 232 is created in the visitor's Quarantine Area 234. The existence of the same Category Identifier 226 in any subsequent information packs sent from any exhibitors at the trade show to the User Data Repository 228 of the same Visitor 212 result in those information packs, if authorized by the visitor 212, being automatically placed in the same category location 232.

Advantageously, the visitor 212 can preferably access his or her User Data Repository 228 remotely, via the Internet 216, so he or she can create any desired custom category locations 240 in the Private Area 238 of his or her User Data Repository 228 without even leaving the trade show.

Further, the same visitor 212 may request product information from a Second Exhibitor 214$_b$ at the same trade show. In order for the Second Exhibitor 214$_b$ to provide an Information Pack 218$_C$ about its Product C, the Second Exhibitor 214$_b$ reads the User Destination Address from the visitor badge 215 of the visitor 212 in the same manner as the First Exhibitor 214$_a$, e.g. using a bar code reader. The Second Exhibitor 214$_b$ generates an Information Pack 218$_C$ for Product C, which contains appropriate Static Information

US 6,651,063 B1

15

16

$220_a$, Dynamic Information $222_c$, a Category Identifier 226 and a Provider Identifier $224_b$.

The Information Pack $218_c$ is transmitted to the same User Destination Address 228 of the visitor 212 by the Internet, and the processing station 230 reviews certain of the items associated with the Information Pack $218_c$, such as the Provider Identifier $224_b$ to see if it is an authorized provider, and the Category Identifier 226. So long as there is not a block preventing information from the Second Exhibitor $214_b$ from entering the visitor's User Data Repository 228 (and it is recognized that a similar authorization procedure can occur for the Information Packs $218_A$, $218_B$ from the First Exhibitor 214a), the Information Pack $218_c$ is placed in the appropriate location 232 in the Quarantine Area 234 of the User Data Repository 228.

As explained above, the visitor 212 can have access to his or her own user data repository 228 through various means, such as the Internet 216. A verification means 229 may be provided in order for the user to gain authorization to access his or her user data repository, such as password identification. Once the visitor 212 gains access to his or her user data repository 228, he or she can perform various tasks with the Information Packs $218_A$, $218_B$, $218_C$, such as authorize one or more of them to pass through a firewall/filter 236 to a Private Area 238 of the user data repository 228, and forward copies of the Information Packs $218_A$, $218_B$, $218_C$ to user data repositories of others, such as co-workers.

Another important function the visitor 212 can perform is creating one or more custom categories 240 for one or more of the Information Packs $218_A$, $218_B$, $218_C$. The visitor 212 can create a custom category location $240_X$ entitled "Suppliers" for all the Information Packs $218_A$, $218_B$, received from any of the exhibitors at the trade show who deal in, for example, components or parts in which the Visitor 212 expresses an interest, and another custom category location $240_Y$ entitled "Vendors" for other Information Packs 218 received from exhibitors who deal in, for example, raw materials in which the Visitor 212 expresses an interest.

The system 210 can advantageously be configured to send a signal upon the placement in the custom category location 240 of any of the Information Packs $218_A$, $218_B$, $218_C$ to the Processing Station 230, so that all subsequent information packs from those same providers, namely First Exhibitor $214_a$ or Second Exhibitor $214_b$, will automatically be authorized to pass through the Firewall/Filter 236 of the User Data Repository 228, and be placed in the appropriate custom category location 240.

EXAMPLE 3

As shown in FIGS. 4 and 5, the systems 310, 410 can be effectively used with business-to-business transactions, and can be integrated with business-to-customer transactions, for seamless distribution of reliably organized information among suppliers, manufacturers, retailers, and customers. Turning first to FIG. 4, a car stereo supplier 314 sells to a car manufacturer 312 three models of CD players (Model 1, Model 2, and Model 3).

Suppose the car manufacturer 312 elects to install a "Model 1" CD player as a standard feature in an automobile model ABC. The car stereo supplier 314 prepares an Information Pack $318_A$ for the Model 1 CD player and incorporates information (Static Information $320_A$ and Dynamic Information $322_A$) for the Model 1 CD player into that Information Pack $318_A$. The Static Information $320_A$ could include technical features, documentation, installation instructions, financial arrangements, and wholesale price for

use by the Car Manufacturer 312, as well as consumer documentation, warranty information, and user manual on the Model 1 CD player, and the like. The Dynamic Information $322_A$ could include: ordering, shipping, account balance, sales programs, and engineering solutions information, and could be in the form of a link to the CD manufacturer's website, featuring advertising or promotions directed toward eventual purchasers of cars in which the Model 1 CD players are installed, and recall information concerning the Model 1 CD player.

Relevant portions of the Static Information $320_A$ and Dynamic Information $322_A$ of the CD manufacturer would later be fully integrated with Static Information 420 and Dynamic Information 422 (see FIG. 5) of the manufacturer 312, such that when a purchaser 412 of the model ABC automobile follows a dynamic information link provided in an Information Pack 418 relating to a purchased model ABC automobile, he or she will be able to see a link specifically to content, e.g. troubleshooting tips or reminders as to how to utilize features of the CD player, provided by the manufacturer of the Model 1 CD player, since the CD player is an integral component of the model ABC automobile.

Furthermore, the car manufacturer 312 has an option to communicate, via a reverse communication link, to the car stereo manufacturer 314 that a Model 1 CD player is being installed into the model ABC automobile. The system 310 is preferably configured such that this communication, i.e. by the car manufacturer 312 placing the Information Pack $318_A$ for the Model 1 CD player in a custom category location $340_X$ of the manufacturer's User Data Repository 328 reserved for information concerning the "automobile model ABC," for example. The new custom category location $340_X$ of the Information Pack is communicated back to the car-stereo vendor utilizing the reverse communication link 344.

This communication allows the car stereo manufacturer 314 to know in how many models of automobiles this car manufacturer installs a "Model 1" CD player. The car stereo manufacturer 314 even has the option, if desired, to tailor supplements to the Information Pack $318_A$ for the Model 1 CD player for each model of automobile where it is installed, and the system 310 can be configured such that, by means of specific Category Identifiers 326, such supplements, if authorized by the car manufacturer 312, would automatically be delivered to the appropriate custom category locations 340 for the respective car models to which the supplements relate.

In short, the system 310 has the capability to treat the car manufacturer 312 as any other Recipient, with the car manufacturer's own User Destination Address and associated User Data Repository, for the purpose of receiving business-to-business Information Packs 318 from its vendors 314. Further, as shown in FIG. 5, the system 410, which can be fully integrated with the system 310, has the ability to treat the manufacturer 312 as a Provider of Information Packs to other Recipients, including the dealer.

In the dealer-to-customer transaction, a customer 412 who has a valid User Destination Address buys an automobile model ABC from a car dealer 414. Sometime during this purchase, the customer 412 provides his or her User Destination Address, which is encoded on the magnetic strip of his or her credit card, to the dealer 414. The dealer's point of sale and computer system preferably detects the User Destination Address while swiping the card through a credit card reader. Preferably, the dealer 414 is registered with a registrar or overseer of the system 410, and complies with the accepted protocol of the system 410.

US 6,651,063 B1

17                                                                          18

Sometime before this car purchasing transaction, the dealer **414** received an Information Pack **418** from the manufacturer for each model of automobiles that is sold in the dealership. These same Information Packs **418** are then manipulated by the dealer (as is explained in greater detail below), or alternatively, new Information Packs may be generated by the dealer, before being sent to a User Data Repository **428** associated with the User Destination Address of the Customer **412**.

A majority the Static Information **420** and Dynamic Information **422** content of the Information Packs **418** is provided by the car manufacturer, such as car manuals, warranty information, maintenance schedules, vehicle owner registration forms, accessories catalogs, and the like. A generic Category Identifier **426**, such as "automobiles", is appended to the Information Pack **418** by categorization means performed either by the car manufacturer, or by a Processing Station **430** that recognizes the Provider Identifier **424** of the car manufacturer (or the car dealer) as corresponding to the generic category "automobiles," and automatically appends the appropriate Category Identifier **424** to the Information Pack **418**.

Additionally, the manufacturer **312** incorporates into the Information Pack **418** portions of the Static Information **320**$_A$ and Dynamic Information **322**$_A$ contents of Information Packs **318**$_A$ from the component vendors, such as the Model 1 CD Player, the tires, the cellular telephone, and so on. The Static Information **420** component is essentially a set documents that a customer **412** receives with a purchase of an automobile preferably only in an electronic format. The Dynamic Information **422** component is preferably a web address link, also referred to herein as an information link, to an Internet website where the manufacturer maintains and updates information relevant only for the specific model of car, and as described above, can include integral links to information from the car manufacturer's various relevant vendors, such as from the car stereo manufacturer **314**.

Considering now the manipulation of the Information Pack **418** in greater detail, the dealer **414** receives the Information Pack **418** for the ABC model of automobile from the car manufacturer **312** when the Information Pack **418** is delivered to the dealer's User Data Repository **528**. As indicated by broken lines of the drawing, some details of the communication of the Information Pack **418** from the car manufacturer **312** to the User Data Repository **528** of the car dealer **414** have been omitted for clarity, and to avoid repetition. The car dealer **414** creates a custom category location **540**X entitled "My ABC model" (for example) and either adds on to this Information Pack **418**, or generates a new Information Pack **418** incorporating relevant Static Information **420** and Dynamic Information **422** from the manufacturer and the dealership, such as services offered for this particular model of the automobile, sales receipt, financing balance, DMV registration, and applied promotions.

Advantageously, the dealer has an option, or at least the capability, to communicate the custom category location **540**$_X$ back to the car manufacturer and allow the manufacturer and all other subsequent vendors to maintain relevant portions of the Information Pack **418**. The dealer's name is preferably substituted into (or appended to) the Information Pack **418** as the Provider Identifier **424**, in place of (or in addition to) the manufacturer's name, which was previously associated with the Information Pack **418** as the Provider Identifier when the manufacturer **312** sent the Information Pack **418** to the User Data Repository **528** associated with the dealer's User Destination Address.

Upon purchase of an automobile, the dealer's computer system automatically sends the modified or newly generated Information Pack **418** to the purchaser's User Data Repository **428**, using the purchaser's User Destination Address. A Processing Station **430** analyzes the Provider Identifier **424** and, so long as there is not a block established by the purchaser **412** to prevent Information Packs from the dealer **414**, the Processing Station **430** authorizes the Information Pack **418** to be delivered Quarantine Area **434** of the User Data Repository **428**, in a location **432** reserved for information corresponding to the appropriate category, namely "automobiles," as provided by the Category Identifier **426**.

If a Category Identifier **426** has not already been associated with the Information Pack **418** provided by the dealer, then in the manner described above, the Processing Station **430** can be configured to recognize the dealer's name in the Provider Identifier **424** and append an appropriate generic Category Identifier **426** to the Information Pack **418**.

The next time that the purchaser **412** accesses his or her User Data Repository **428** using the Internet **416** or some other User Data Repository access means, a new message associated with "automobile" category appears on the screen, or is otherwise communicated to the purchaser. The Provider Identifier **424** allows the User **412** to quickly evaluate the Information Pack **418** and make a decision about what to do with its contents. Options may include assigning a custom category location **440**$_X$, such as "my new wheels" for the Information Pack, forwarding the Information Pack **418** to another person's User Destination Address, discarding the Information Pack **418**, and establishing a block to prevent all future Information Packs from the particular provider **414**. Of course, this list is not exclusive.

The Processing Station **430** can receive a signal when there is a placement by the purchaser **412** of an Information Pack **418** into a Customized Category, and thereafter append a Customized Category Identifier (not shown) to subsequent Information Packs from the same dealer or provider, so that the Information Pack can be placed into the purchaser's User Data Repository **428** in the custom category location **440**$_X$ that purchaser has already customized as a preferred location for all information packs from that particular Provider, namely the dealer (for example, "my new wheels"). This advantageously allows the purchaser to passively locate all subsequent maintenance records for that particular ABC automobile in the customized location for the automobile. Also, if the dealer wanted to send a reminder that the car is due for a maintenance visit, the dealer would simply send a new Information Pack and the Processing Station would automatically place the reminder in the Customized Location.

In this example, the purchaser creates a new folder "my new wheels" in the private area, allows direct passage through the Firewall/Filter for any future Information Packs from this particular provider (dealer), and deposits the Information Pack **18** into the new "my new wheels" location. The placement of the Information Pack can advantageously cause a signal to be sent, such as an e-mail message, announcing this action and containing the Custom Category Identifier of the new posted Information Pack **18**. From the purchaser's perspective, all necessary and relevant to the new information is available in that custom location and is easily accessible. Additionally, the purchaser will have a direct communication link, via the reverse communication link **444**, to the car dealer **414**, as well as to the car manufacturer **312** and the car manufacturer's vendors **314**.

From the perspective of the car manufacturer **312**, this reverse communication link **444** provides a link with the

US 6,651,063 B1

19

20

owner of an ABC model purchased from the particular dealer, and it is up to the purchaser to optionally disclose any additional information to the manufacturer. However, important information from the manufacturer 312, such as recall notices, can reliably reach an appropriate location within the purchaser's User Data Repository 428.

If necessary, the recall notices can travel in Information Packs sent first to the dealer, so that in case proper placement in Customized Locations in the purchaser's User Data Repository is based on the Provider Identifier, the recall notice will still come from the appropriate Provider and be assigned the correct Custom Category Identifier. Alternative means for assuring proper placement are within the scope of the present invention, such as appending multiple Provider Identifiers to a given Information Pack, so that subsequent Information Packs from any one of the Providers will be recognized and placed in the same proper Custom Category Location 440$_X$.

EXAMPLE 4

As demonstrated in FIG. 6, one format that the Static Information 620 and/or the Dynamic Information 622 can take is that of executable computer files, for example diagnostic computer programs. A provider, such as an Appliance Vendor 614 can, if desired by a Recipient 612, send diagnostic programs and maintenance programs for so-called "smart appliances" 609 as part of an Information Pack 618, and using the Category Identifier 626, the diagnostic programs can be sent automatically to locations of the Recipient's User Data Repository 628 that correspond with that category.

The Information Pack 618 is preferably analyzed at a processing station 630 remote from the User Data Repository, where certain authorization tasks may be performed. These authorization tasks may include verifying the format of the Information Pack 618, verifying the Appliance Vendor 614 as being an authorized provider of information packs by analyzing the Provider Identifier 624 and comparing it to a list of authorized providers stored in a data storage portion of the Processing Station 630, and identifying the appropriate category to which the information in the Information Pack 618 relates by analyzing the Category Identifier 626 to determine the proper Category location 632 in the Quarantine Area 634 of the User Data Repository 628 in which to place the Information Pack 618.

In this example, it is envisioned that the Recipient's "smart appliance" 609 has an appliance control module 611, which is in communication with the User Data Repository 628 by such communication means as the Internet 616, an intranet, or direct cable connection. The diagnostic programs and maintenance programs can be sent to the User Data Repository 628 using the user destination address provided at the time of purchase, communicate with the appliance control module 611 by the communication means, and advantageously perform appropriate functions on the smart appliance 609 without any action on the part of the Recipient 612. Additional smart appliances (not shown) can communicate with the programs received in the User Data Repository 628 in a similar manner, such that an entire household of appliances can be remotely diagnosed and maintained by a single appliance vendor 614.

Advantageously, the reverse communication link 644 is established upon delivery of the Information Pack 614 to the User Data Repository 628. The reverse communication link 644 sends, for example, data from the diagnostic programs, or from the appliance control module 611 within the smart appliance 609, back to the Provider 614. This transmission of data regarding the customer's smart appliance 609 allows the Appliance Vendor 614 to easily assess performance of individual appliances, detect problems, and if need be, contact the customer 612 to schedule a convenient appointment for repairs.

While the present invention has been disclosed with respect to certain preferred embodiments and particular examples, it is not intended to be limited thereto. It is recognized that many variations and equivalents are possible, and are intended to be within the scope of the appended claims.

I claim:

1. A system for providing information to one or more users, said system comprising:

means for each of said one or more users to provide to one or more information providers a user destination address associated with at least one of said users;

categorizing means for each of said one or more information providers to associate with information to be provided to said one or more users an identification of a category to which said information relates;

means for said information provider to send said information to at least one of a multiplicity of user data repositories, each of said user data repositories being associated with at least one of said users, and said means for sending information including utilizing said user destination address to communicate said information to the user data repository associated with at least one of said users;

wherein said information is stored in an information pack while being transmitted from said provider to one of said multiplicity of user data repositories, further comprising identification means for associating a provider identifier with said information pack prior to delivery of said information pack to any of said multiplicity of user data repositories;

wherein after said information pack is received in said user data repository, an authorization means allows the user to review said provider identifier associated with the information pack and to selectively permit the information pack to remain in the user data repository or reject the information pack;

wherein in the event said user rejects said information pack, said information pack is automatically removed from the user data repository associated with said user;

wherein upon said user rejecting said information pack from said provider, a blocking means automatically prevents further information packs from said provider from reaching the user data repository of said user;

wherein said blocking means comprises, upon said user rejecting said information pack, communicating a rejection signal from said user data repository to a processing station between said provider and said multiplicity of user data repositories, said processing station including a data storage means and a data processing means, said data storage means storing provider identifiers for which rejection signals have been received and further storing, together with each of said provider identifiers for which rejection signals have been received, each of the user destination addresses associated with the user data repositories from which said rejection signals have been communicated, and said processing means analyzing the provider identifier and user destination address associated with each information pack sent from said provider and comparing

US 6,651,063 B1

21

said provider identifier and said user destination address to the provider identifiers and the user destination addresses stored in said storage means each time said information pack is sent from said provider to one of said multiplicity of user data repositories, and in the event of a match of said provider identifier and user destination address associated with the information pack and one of said provider identifiers and said user destination addresses stored together in said storage means, preventing said information pack from being communicated to said user destination address associated with the information pack;

means for determining with which category said information has been identified by said categorization means; and

means for placing said information in a location within the user data repository of said user reserved for information of the identified category, whereby said information is automatically stored in said location within the user data repository reserved for information of the identified category.

2. A system for providing information to one or more users, said system comprising:

means for each of said one or more users to provide to one or more information providers a user destination address associated with at least one of said users;

categorizing means for each of said one or more information providers to associate with information to be provided to said one or more users an identification of a category to which said information relates;

means for said information provider to send said information to at least one of a multiplicity of user data repositories, each of said user data repositories being associated with at least one of said users, and said means for sending information including utilizing said user destination address to communicate said information to the user data repository associated with at least one of said users;

wherein said information is stored in an information pack while being transmitted from said provider to one of said multiplicity of user data repositories, further comprising identification means for associating a provider identifier with said information pack prior to delivery of said information pack to any of said multiplicity of user data repositories;

wherein after said information pack is received in said user data repository, an authorization means allows the user to review said provider identifier associated with the information pack and to selectively permit the information pack to remain in the user data repository or reject the information pack;

wherein in the event said user rejects said information pack, said information pack is automatically removed from the user data repository associated with said user;

wherein upon said user rejecting said information pack from said provider, a blocking means automatically prevents further information packs from said provider from reaching the user data repository of said user;

wherein said blocking means comprises, upon said user rejecting said information pack, communicating a rejection signal from said user data repository to a processing station associated with said provider, said processing station including a data storage means and a data processing means, said data storage means storing each of the user destination addresses associ-

22

ated with the user data repositories from which said rejection signals have been communicated, and said data processing means analyzing the user destination address associated with each information pack sent from said provider and comparing said user destination address to each user destination addresses stored in said storage means each time said information pack is sent from said provider to one of said multiplicity of user data repositories, and in the event of a match of said user destination address associated with the information pack and one of said user destination addresses stored in said storage means, preventing said information pack from being communicated to said user destination address associated with the information pack;

means for determining with which category said information has been identified by said categorization means; and

means for placing said information in a location within the user data repository of said user reserved for information of the identified category, whereby said information is automatically stored in said location within the user data repository reserved for information of the identified category.

3. A system for providing information to one or more users, said system comprising:

means for each of said one or more users to provide to one or more information providers a user destination address associated with at least one of said users;

categorizing means for each of said one or more information providers to associate with information to be provided to said one or more users an identification of a category to which said information relates;

means for said information provider to send said information to at least one of a multiplicity of user data repositories, each of said user data repositories being associated with at least one of said users, and said means for sending information including utilizing said user destination address to communicate said information to the user data repository associated with at least one of said users;

wherein said information is stored in an information pack while being transmitted from said provider to one of said multiplicity of user data repositories, further comprising identification means for associating a provider identifier with said information pack prior to delivery of said information pack to any of said multiplicity of user data repositories;

wherein after said information pack is received in said user data repository, an authorization means allows the user to review said provider identifier associated with the information pack and to selectively permit the information pack to remain in the user data repository or reject the information pack;

wherein in the event said user rejects said information pack, said information pack is automatically removed from the user data repository associated with said user;

wherein upon said user rejecting said information pack from said provider, a blocking means automatically prevents further information packs from said provider from reaching the user data repository of said user;

wherein said blocking means comprises, upon said user rejecting said information pack, storing said provider identifier in a storage means of a processing station associated with said user destination address of the user, said processing station further including a data

US 6,651,063 B1

23

processing means, said data storage means storing each of the provider identifiers associated with the information packs which said user rejects, and prior to said information pack being communicated to the user data repository associated with said user destination address, said data processing means analyzing the provider identifier associated with each information pack received by the user destination address from said provider and comparing said provider identifier to each of the provider identifiers stored in said storage means, and in the event of a match of said provider identifier associated with the information pack and one of said provider identifiers stored in said storage means, preventing said information pack from being communicated to said user data repository associated with the user destination address;

means for determining with which category said information has been identified by said categorization means; and

means for placing said information in a location within the user data repository of said user reserved for information of the identified category, whereby said information is automatically stored in said location within the user data repository reserved for information of the identified category.

**4**. A method for providing information to one or more users of a system comprising the steps of:

storing information to be provided in an information pack;

associating with said information pack at least a user destination address associated with one of a multiplicity of user data repositories each of said user data repositories associated with at least one of said users and a category identifier;

associating with said information pack a provider identifier;

communicating said information pack by means of a network to said user data repository associated with the user destination address;

locating said information pack in a location of said user data repository associated with the user destination address reserved for information corresponding to a category to which said category identifier corresponds; and

further comprising, after said step of communicating the information pack to said user data repository associated with the user destination address, the steps of:

creating a custom location in said user data repository;

placing said information pack in said custom location;

associating a custom category identifier with said information pack;

sending a custom category signal to a processing station uniquely associated with said user data repository including a data storage means and a data processing means, said data storage means storing together said custom category identifier and said provider identifier, and said data processing means

24

analyzing the provider identifier of subsequent of said information packs, comparing said provider identifier of said subsequent information packs with said provider identifier stored in said storage means and in the event of a match between the provider identifier of one of said subsequent information packs and the provider identifier stored in said storage means, placing said one of the subsequent information packs in said custom location.

**5**. A method for providing information to one or more users of a system comprising the steps of:

storing information to be provided in an information pack;

associating with said information pack at least a user destination address associated with one of a multiplicity of user data repositories, each of said user data repositories associated with at least one of said users, and a category identifier;

associating with said information pack a provider identifier;

communicating said information pack by means of a network to said user data repository associated with the user destination address;

locating said information pack in a location of said user data repository associated with the user destination address reserved for information corresponding to a category to which said category identifier corresponds; and

further comprising, after said step of communicating the information pack to said user data repository associated with the user destination address, the steps of:

creating a custom location in said user data repository;

placing said information pack in said custom location;

associating a custom category identifier with said information pack;

sending a custom category signal to a processing station associated with all of said multiplicity of user data repositories including a data storage means and a data processing means, said data storage means storing together said user destination address, said custom category identifier and said provider identifier, and said data processing means analyzing the user destination address and provider identifier of subsequent of said information packs, comparing said user destination address and provider identifier of said subsequent information packs with said provider identifier and user destination address stored in said storage means and in the event of a match between both the provider identifier and user destination address of one of said subsequent information packs and both the provider identifier and user destination address stored in said storage means, placing said one of the subsequent information packs in said custom location of the user data repository associated with said user destination address.

*   *   *   *   *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 6,651,063 B2                                        Page 1 of  1
DATED           : November 18, 2003
INVENTOR(S)     : Andrei G. Vorobiev

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 24,</u>
Line 15, replace "repositories" with -- repositories, --
Line 17, replace "users" with -- users, --

Signed and Sealed this

Third Day of February, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

## **EXHIBIT C**

**U.S. Patent No. 8,370,457**



US008370457B2

(12) **United States Patent**       (10) Patent No.:       **US 8,370,457 B2**
Campbell et al.                       (45) Date of Patent:       *Feb. 5, 2013

(54) **NETWORK COMMUNICATION THROUGH A VIRTUAL DOMAIN**

(75) Inventors: **Douglas A. Campbell**, Henderson, NV (US); **Alan B. Hamor**, Pennington, NJ (US); **Mike D. Helton**, Las Vegas, NV (US)

(73) Assignee: **Darmate Glassworks LLC**, Las Vegas, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1304 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/717,911**

(22) Filed: **Mar. 13, 2007**

(65) **Prior Publication Data**

US 2007/0162590 A1       Jul. 12, 2007

**Related U.S. Application Data**

(62) Division of application No. 09/542,858, filed on Apr. 4, 2000, now Pat. No. 7,209,959.

(51) **Int. Cl.**
*G06F 15/16*       (2006.01)

(52) **U.S. Cl.** .......................... **709/219**; 709/203; 709/223

(58) **Field of Classification Search** .................. 709/201, 709/203, 204, 207, 219, 225, 245, 223, 227
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,636,371 | A | * | 6/1997 | Yu ...................................... 703/26 |
| 5,708,654 | A | * | 1/1998 | Arndt et al. ................... 370/242 |
| 5,805,820 | A | * | 9/1998 | Bellovin et al. ............... 709/225 |

| | | | | |
|---|---|---|---|---|
| 5,926,549 | A | | 7/1999 | Pinkas |
| 5,931,912 | A | | 8/1999 | Wu et al. |
| 5,961,593 | A | | 10/1999 | Gabber et al. |
| 6,003,083 | A | * | 12/1999 | Davies et al. ................. 709/226 |
| 6,014,660 | A | | 1/2000 | Lim et al. |
| 6,014,698 | A | | 1/2000 | Griffiths |
| 6,026,445 | A | | 2/2000 | Kephart et al. |
| 6,052,736 | A | * | 4/2000 | Ogle et al. ................... 709/244 |
| 6,091,951 | A | * | 7/2000 | Sturniolo et al. ....... 455/432.2 |
| 6,092,100 | A | * | 7/2000 | Berstis et al. ................. 709/203 |
| 6,098,111 | A | | 8/2000 | Maegawa et al. |
| 6,119,171 | A | | 9/2000 | Alkhatib |
| 6,182,148 | B1 | | 1/2001 | Tout |
| 6,185,626 | B1 | | 2/2001 | Chivi et al. |
| 6,189,030 | B1 | | 2/2001 | Kirsch et al. |
| 6,195,691 | B1 | * | 2/2001 | Brown .......................... 709/219 |
| 6,201,962 | B1 | * | 3/2001 | Sturniolo et al. ....... 455/432.2 |
| 6,205,489 | B1 | | 3/2001 | Kapoor |
| 6,249,801 | B1 | * | 6/2001 | Zisapel et al. ............... 718/105 |
| 6,256,664 | B1 | * | 7/2001 | Donoho et al. ............... 709/204 |
| 6,256,739 | B1 | | 7/2001 | Skopp et al. |
| 6,262,976 | B1 | | 7/2001 | McNamara |
| 6,272,540 | B1 | * | 8/2001 | Yadav et al. ................. 709/223 |

(Continued)

OTHER PUBLICATIONS

International Search Report Dated Aug. 28, 2001, for International Application No. PCT/US01/08637, 7 pages.

(Continued)

*Primary Examiner* — Van Nguyen
(74) *Attorney, Agent, or Firm* — Turocy & Watson, LLP

(57) **ABSTRACT**

The present invention is an apparatus, system and method for communicating to a network through an ad hoc virtual domain. The present invention contains a deceiver, a controller, and a forwarder through which a client communicates through. The deceiver, controller, and forwarder collectively establish the domain in which the ad hoc virtual namespace will exist. This invention allows clients to interact over a network in a fashion that is anonymous and unique to the session which the client is engaging in.

**24 Claims, 4 Drawing Sheets**

|  | Source Address | Destination Address | Data Field |
|---|---|---|---|
| ① | 192.168.1.101 Port: 1234 | 192.168.1.104 Port: 0053 | www.edrtech.com |
| ② | 192.168.1.104 Port: 0053 | 192.168.1.105 Port: 1234 | www.edrtech.com |
| ③ | 192.168.1.105 Port: 1234 | 192.168.1.102 | www.edrtech.com |
| ④ | 192.168.1.102 Port: 1234 | 192.168.1.105 Port: 1234 | 192.168.1.106 |
| ⑤ | 192.168.1.105 Port: 1234 | 192.168.1.104 Port: 0053 | 192.168.1.106 |
| ⑥ | 192.168.1.104 Port: 0053 | 192.168.1.101 Port: 1234 | 192.168.1.106 |
| ⑦ | 192.168.1.101 Port: 1234 | 192.168.1.106 Port: 0060 | Data (00101101) |
| ⑧ | Forwarder query for valid user / website destination | | |
| ⑨ | Controller response to Forwarder query | | |
| ⑩ | 192.168.1.106 Port: 0060 | 192.168.1.103 Port: 0080 | Data (00101101) |
| ⑪ | 192.168.1.103 Port: 0080 | 192.168.1.106 Port: 0060 | Data (00101101) |
| ⑫ | 192.168.1.106 Port: 0060 | 192.168.1.101 Port: 1234 | Data (00101101) |

**US 8,370,457 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,317,775 | B1 * | 11/2001 | Coile et al. | 709/201 |
| 6,338,082 | B1 | 1/2002 | Schneider | |
| 6,353,850 | B1 | 3/2002 | Wies et al. | |
| 6,370,584 | B1 * | 4/2002 | Bestavros et al. | 709/238 |
| 6,442,687 | B1 | 8/2002 | Savage | |
| 6,449,657 | B2 * | 9/2002 | Stanbach et al. | 709/245 |
| 6,493,765 | B1 | 12/2002 | Cunningham et al. | |
| 6,496,931 | B1 | 12/2002 | Rajchel et al. | |
| 6,502,135 | B1 * | 12/2002 | Munger et al. | 709/225 |
| 6,507,585 | B1 * | 1/2003 | Dobson | 370/420 |
| 6,510,464 | B1 | 1/2003 | Grantges et al. | |
| 6,549,516 | B1 * | 4/2003 | Albert et al. | 370/236 |
| 6,594,254 | B1 * | 7/2003 | Kelly | 370/352 |
| 6,606,315 | B1 * | 8/2003 | Albert et al. | 370/352 |
| 6,628,654 | B1 * | 9/2003 | Albert et al. | 370/389 |
| 6,629,149 | B1 * | 9/2003 | Fraser et al. | 709/245 |
| 6,633,560 | B1 * | 10/2003 | Albert et al. | 370/351 |
| 6,674,743 | B1 * | 1/2004 | Amara et al. | 370/351 |
| 6,704,317 | B1 * | 3/2004 | Dobson | 370/401 |
| 6,718,359 | B2 * | 4/2004 | Zisapel et al. | 718/105 |
| 6,751,677 | B1 | 6/2004 | Ilnicki et al. | |
| 6,779,039 | B1 * | 8/2004 | Bommareddy et al. | 709/238 |
| 6,785,705 | B1 | 8/2004 | Kocherlakota | |
| 6,823,454 | B1 * | 11/2004 | Hind et al. | 713/168 |
| 6,880,089 | B1 * | 4/2005 | Bommareddy et al. | 726/11 |
| 6,891,887 | B1 * | 5/2005 | Dobson | 375/220 |
| 6,910,180 | B1 | 6/2005 | Cui et al. | |
| 6,931,434 | B1 * | 8/2005 | Donoho et al. | 709/207 |
| 7,472,200 | B1 * | 12/2008 | Taylor et al. | 709/238 |
| 7,801,080 | B2 * | 9/2010 | Kim et al. | 370/331 |

### OTHER PUBLICATIONS

RFC 1034, "Domain Names—Concepts and Facilities," Network Working Group, P. Mockapetris, ISI, Nov. 1987; pp. 1-37.

RFC 1035, "Domain Names—Implementation and Specification," Network Working Group, P. Mockapetris, ISI, Nov. 1987; pp. 1-38.

* cited by examiner

Case 1:20-cv-00764-LPS   Document 17-1   Filed 11/13/20   Page 56 of 108 PageID #: 281



Figure 1

Source Address
Destination Address
Data Field
1
192.168.1.101
Port: 1234
192.168.1.104
Port: 0053
www.edrtech.com
2
192.168.1.104
Port: 0053
192.168.1.105
Port: 1234
www.edrtech.com
3
192.168.1.105
Port: 1234
192.168.1.102
Port: 1234
www.edrtech.com
4
192.168.1.102
Port: 1234
192.168.1.105
Port: 1234
192.168.1.106
5
192.168.1.105
Port: 1234
192.168.1.104
Port: 0053
192.168.1.106
6
192.168.1.104
Port: 0053
192.168.1.101
Port: 1234
192.168.1.106
Source Address
Destination Address
Data Field
7
192.168.1.101
Port: 1234
192.168.1.106
Port: 0060
Data (00101101)
8
Forwarder query for valid user / website destination
9
Controller response to Forwarder query
10
192.168.1.106
Port: 0060
192.168.1.103
Port: 0080
Data (00101101)
11
192.168.1.103
Port: 0080
192.168.1.106
Port: 0060
Data (00101101)
12
192.168.1.106
Port: 0060
192.168.1.101
Port: 1234
Data (00101101)

Figure 2



401
Configure client (101) browser and related appliications
402
Client (101) logs in to start a session for a predetermined time
403
Resolver is queried by client (101) to resolve domain name and routes packet to Deceiver (104)
404
Deceiver (104) forwards query to Controller (106)
405
Controller (104) queries DNS (105) for IP of website server (108), establishes client (101) location and determines a TTL
406
Controller (104) establishes contact with a valid Forwarder (107)
407
Deceiver (104) stores to the Controller (106):
(1) The client's IP
(2) The destination website IP
(3)The Forwarder IP
(4) The TTL value
408
Deceiver (104) returns to the Client (101) the Forwarder (107) IP as the destination website (108) IP
409
The Client (101) forwards the data to the Forwarder (107) through a known port
410
The Forwarder (107) queries the Controller (106) to determine: (1) validity of Client (101), (2) the destination website (108) IP, and (3) if TTL has expired
411
If query is not valid, or if TTL has expired, Forwarder (107) aborts communication
412
If query is valid, Forwarder (107) communicates with destination website (108), using the Forwarder's (107) IP as the source

Figure 3



**413** Reply data from the destination website **(108)** are routed through the Forwarder **(107)**

**414** The Forwarder determines the Client's **(101)** IP from previous query in **(408)**

**415** The Forwarder **(107)** forwards back reply data from destination website **(108)** to the Client **(101)**

# Figure 4

DataCloud Technologies, LLC v. Extreme Networks, Inc.

US 8,370,457 B2

**1**

**NETWORK COMMUNICATION THROUGH A VIRTUAL DOMAIN**

CROSS REFERENCE TO RELATED APPLICATION

The present application is a divisional of U.S. patent application Ser. No. 09/542,858, filed Apr. 4, 2000, now U.S. Pat. No. 7,209,959, which is incorporated herein by reference in its entirety.

SCOPE OF THE INVENTION

This invention relates generally to networks and network systems, and more specifically to a system and method for enabling anonymous network activity, while establishing virtual namespaces for clients.

BACKGROUND

The proliferation and expansion of computer systems, networks, databases, the Internet, and particularly the World Wide Web (WWW), has resulted in a vast and diverse collection of information and means of communication. The current Internet infrastructure involves millions of computers linked together on a computer network. This network allows all of the computers to communicate with one another. Clients are typically linked to the Internet via Internet Service Providers (ISP's), which in turn connect to larger ISP's. This allows numerous clients to communicate to each other through their various connections.

In general, all the machines on the Internet can be categorized into two types: servers and clients. Typically, machines that provide services (like Web servers, FTP servers, Email servers, etc.) are servers. Servers are loaded with the appropriate software in order to allow them to perform their intended services. Machines that request information from servers are typically called clients. In order to differentiate between machines on the network, each machine is given a unique address called an IP address.

The IP address is a thirty-two bit number that is normally expressed as 4 octets in a dotted decimal number (e.g., 192.168.1.101). Each of the octets can have values between 0 and 255 ($2^8$ possibilities per octet). When a client connects to the Internet, the client is assigned an IP address through their Internet Service Provider (ISP) for the duration of the connection. Conversely, the IP addresses of servers are relatively static, and do not change very often.

Because it is difficult for clients to remember IP addresses, and because IP addresses need to change, most servers on the Internet possess domain names (e.g., "www.whoknow-z.com") to help users reach their intended servers without remembering strings of numbers. Name servers, used in the domain name system (DNS), map the human-readable names into IP addresses to help clients reach their destinations. When a client enters a domain name, the browser (via a resolver) extracts the domain name and passes it to a name server, which will return the correct IP address to the associated site. The Domain Name System is comprised of a distributed database and name servers that access that database.

One of the main problems with the current utilization of IP addresses and domain names on the World Wide Web (WWW) is that the WWW is based largely on the hypertext transport protocol ("HTTP-protocol"). The nature of HTTP-protocol allows information, such as a client's e-mail address, web sites that were visited, and information on the client's software and host computer, to be recorded and traced by the

**2**

server. This opens up the user to a range of privacy threats including unwanted e-mails, solicitations, and "cookies" (data that is stored on the client's machine by a server and subsequently used for identification). Furthermore, clients that wish to cloak themselves from such intrusions are forced into systems that simply provide alternate account identities for the client; while the client is protected, the alternate account identity becomes the object of the unwanted e-mails, "cookies", etc. instead. The effect of this is similar to the client manually creating a new user account in which to browse the WWW.

One of the solutions available is to route the client through a proxy server in order to substitute IP information being sent by the client. When a client desires to visit a web server, the packets sent from client's computer are routed through a proxy server. At the proxy server, the server executes algorithms to extract information that would identify the client, and replaces the information with predetermined substitutes. Afterwards, the proxy server routes the packet out to the web server. Once the web server receives the packet, all of the information points back to the proxy server, and not to the client. This in effect "hides" the client from the web server.

However, a drawback to such systems is that, as mentioned before, the client is obtaining protection merely through the use of an alternate identity that is ultimately assigned back to the same client. Furthermore, current systems do not have any added flexibility designed in the system to take advantage of anonymous client group browsing or multiple group association. In order to fully take advantage of ad hoc identity browsing, additional features need to be added in order to create a "community-like" environment among numerous anonymous clients.

SUMMARY OF THE INVENTION

To address the above-discussed deficiencies in existing systems, the present invention involves the use of three algorithms, known collectively as DNS Misdirection and individually as the deceiver, the controller, and the forwarder. The deceiver communicates with clients and with the controller. The deceiver provides name resolution for clients. The routine works the same as a standard name server, except when a query is received from a client, the deceiver allows the controller to supply the information. The controller communicates with the deceiver and the forwarder. The controller determines the address, "time to live" (TTL), and other DNS result fields and returns them to the deceiver. The controller is queried by the forwarder for the site address that the client intended to reach.

One advantage of the invention deals with isolating client activity on the Internet. Another important feature of the invention is that the DNS Misdirection system allows for the creation of virtual namespaces. Through these namespaces, the isolated clients can anonymously browse the Internet while being part of a virtual community. By utilizing virtual namespaces and generated root domain names (e.g., "car-lover", "winetaster", "stockpicker"), the community activities would be inaccessible to all but intended clients. Furthermore, since virtual namespaces would create a domain through which clients could identify themselves and communicate through, network administrators could establish ad hoc software applications as well as domain-specific identifiers that could be assigned to a user or groups of users.

BRIEF DESCRIPTION OF THE DRAWINGS

The following drawings illustrate certain embodiments of the present invention.

US 8,370,457 B2

3

FIG. **1** schematically shows the system architecture of an exemplary network on which one embodiment of the invention may be implemented.

FIG. **2** illustrates the packet contents as they are routed through the network.

FIG. **3** generally provides a flowchart representation of a client sending a packet to be resolved, and the subsequent misdirection of the client to a destination website via the present invention.

FIG. **4** generally provides a flowchart representation when the website server responds back to the client through the invention.

DETAILED DESCRIPTION

FIG. **1** illustrates an embodiment of the system architecture that contains at least one client (**101**). This client consists of a personal computer, which contains an interface to a computer network, such as a modem, network interface card, etc. The client (**101**) may also be generalized as any client application. Loaded in the client computer (**101**) are an Internet browser and a resolver (not shown). When the client (**101**) wishes to connect to a site on the Internet, the client (**101**) will typically enter a destination site domain name into the computer's Internet browser (e.g., "www.whoknowz.com"). In FIG. **1**, the destination site is a web server (**108**). The Internet browser will typically be connected through an ISP (not shown). The domain name can be embedded in a URL (via hyperlink), or can be explicitly entered by the client.

If the client (**101**) is to reach the web server (**108**), the client needs to obtain the web server's (**108**) IP address, shown in FIG. **1** (all of the hypothetically disclosed IP addresses in the invention are shown in the figure). With the architecture used in existing systems, the IP address must be resolved into a 32 bit (IPv4)/128 bit (IPv6) IP address. Normally, the ISP will furnish the clients with a DNS (**105**), which is accessed through the client's resolver. The resolver is typically predisposed with two IP addresses, which represent the primary and secondary name servers that may be accessed. The name of the server may be entered manually, or may be provided by using Dynamic Host Configuration Protocol (DHCP). The process of resolving domain names, and the operation of DNS servers is addressed further in detail in RFC 1034 ("Domain Names—Concepts and Facilities"—last update: Nov. 17, 1999), and RFC 1035 ("Domain Names—Implementation and Specification"—last update: Nov. 17, 1999).

Under the current invention, when an unresolved packet is sent from client (**101**), the packet is processed through the deceiver (**104**). A more detailed representation of the packet, as well as exemplary port connections, is shown in FIG. **2**. It should be pointed out that the term "packet" may mean an IP packet, an UDP datagram, or other transmitted data. When the packet (**1**) is transmitted, the packet will be transparently addressed to the deceiver (**104**). Upon receipt of the packet, the deceiver (**104**) will recognize the source of the packet (**1**) through the IP source address, shown in FIG. **2**. The fields in which the IP source and destination addresses function are described in greater detail in RFC 791 ("DARPA Internet Program Protocol Specification"). By parsing the data field through the controller (**106**), the deceiver will determine the intended domain name that the client (**101**) wants to reach.

From this point, the deceiver (**104**) queries the controller (**106**) to initiate a name resolution. The controller (**106**) then sends the packet (**2**) where the IP destination address of the DNS (**105**) is now placed in the packet (**2**), and is transmitted onward. In the meantime, the controller (**106**) stores the client's (**101**) IP location, and determines a name-to-IP address

4

time-to-live (TTL). The TTL is the time period in which the client (**101**) may assume a valid name-to-IP address. The TTL of the name-to-IP address may be established through the use of cache, or any other suitable memory available. Typically, the TTL field is a 32 bit integer that represents units of seconds, and is primarily used by resolvers when they cache network resource records. The TTL describes how long a resource record can be cached before it should be discarded. The TTL may be assigned by the administrator for the zone where the data originates. Under the present invention, once the TTL expires, the client must perform another query in order to establish a connection with an IP address.

Upon receipt of the packet (**2**), the controller (**106**) determines the source of the packet, and subsequently proceeds to process the domain name resolution request, and queries the DNS name server (**105**) in packet (**3**) to obtain the website server (**108**) IP address. When the destination website IP address is resolved in the DNS (**105**), it is transmitted back to the controller (**106**) in packet (**4**). When the controller (**106**) obtains the IP address of the destination website server (**108**), the controller (**106**) then proceeds to establish connection with a forwarder (**107**) through which to communicate through. Once connected, the controller (**106**) then records the IP address of the forwarder (**107**). The forwarder's (**107**) address is then used by the controller (**106**) to create a valid session for the client (**101**), by correlating the forwarder address with the TTL of the client (**101**) and the destination website server (**108**). As long as the client's name-to-IP-address has not expired (i.e., the TTL has not run out), the controller (**107**) will associate the established forwarder (**107**) with the session. After connecting with a forwarder (**107**), the controller (**106**) then proceeds to store the client (**101**) IP address, the destination website (**108**) IP address, the IP address of the forwarder (**107**), and the determined TTL. The stored elements (**200**) are disclosed in FIG. **1**.

After storing the pertinent information, the controller (**106**) then returns the forwarder (**107**) IP address back to the deceiver (**104**) via packet (**5**). The contents of packet (**5**) are shown in FIG. **2**. After the packet (**5**) is routed through the deceiver (**104**), the packet (**6**) is then transmitted to the client (**101**), along with the TTL. Upon receipt of the packet (**6**), the client will be "deceived" into thinking that the forwarder (**107**) IP address is actually the destination website server (**108**). At this point, any communication between the client (**101**) and the website server (**108**) will be taking place in a virtual domain, since both the client (**101**) and the website server (**108**) do not technically exist to each other—the client is isolated from the destination sites of his or her data packets, and the destination sites are isolated from the clients that are accessing the site.

One advantage of this configuration is that the virtual namespaces allow system administrators and clients to create a virtually endless string of identities for clients and their target website server(s). For example, a virtual namespace may be set up as ".bank", thus identifying a bank classification. If a client wishes to visit a server that is known to be related to banks, the client could type "wellsfargo.bank" and be routed to "wellsfargo.com" via the system described in FIG. **1**. Alternately, a client could enter "*.bank" and receive an HTML page with all registered entries. Furthermore, the client could customize the identification used on the Internet (e.g., "wellsfargo.doug"). Names could be created ad hoc or could be associated with groupware (e.g., "mother.birthday.card"; "smith.family.reunion.newyork"). The variations are virtually endless.

Some of the implementations of the virtual namespaces and underlying domains include, but are not limited to:

US 8,370,457 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

(1) creating unique environments for marketing, branding, advertising and promotion purposes;

(2) allowing for personalized Web identities for individuals, corporations, organizations, etc.;

(3) providing anonymous browsing, searching and e-mailing;

(4) creating environments for users to establish groups for collaborative communication or application purposes;

(5) cataloguing domain names under intuitive categories or functions (e.g. "bestbuy.shop", "amazon.shop", etc.)

(6) creating a search index which allows the user(s) to locate all members of a specific category and identifying distinct products, goods, services, content, or information provided by any ember of any category and/or identification.

(7) creating directories that contain telephone, Internet, fax, wireless, page, cellular, e-mail, instant messaging and/or similar data under one or more human readable formats addressable by a communication device.

When the client makes a transmission to the website server (108), the packet (7) is now routed to the forwarder (107). The client (101) will typically connect to the forwarder (107) through a well-known port. After receiving the packet from the client (101), the forwarder (107) proceeds to query the controller (106) (shown as packet (8)) to determine: (1) whether the client (101) is valid; (2) if the TTL has not expired; and (3) if the IP address of the website server (108) that the client wishes to connect to is valid. If everything is confirmed, the controller (106) then sends back the relevant information via packet (9). The forwarder (107) then extracts the needed information including the website server (108) IP address, and forwards the packet on to it's intended destination.

It should be understood that the deceiver (104), the controller (106), and the forwarder (107) are applications. The website server (108) may be generalized as any server application. Furthermore, the deceiver (104), the controller (106), and the forwarder (107) can all be on a single computer, or separate computers. Also, the deceiver (104) and the controller (105) can be on the client's computer.

FIG. 3-4 represent a flowchart representation of the invention as previously disclosed in FIG. 1-2. In step (401), the client configures software/hardware on the client computer, and establishes a session by signing on or logging into a network for a predetermined time (402). When the client wishes to transmit data onto the network, or otherwise communicate with other computers or servers, one option available for the client is to query the resolver in order to retrieve an intended destination site (403). In (403), the resolver query is routed to the deceiver. After receiving the contents of the resolver, the deceiver then forwards the query to the controller in (404).

When the controller receives the query packet, the controller next records the location of the client, determines the TTL for the client session, and further queries a DNS name server, and receives back the IP address of the website which the client wishes to contact (405). In (406), the controller then establishes contact with an available forwarder through which the client session may be transmitted through, and subsequently records the IP address. While it is not displayed in the flowchart, if the controller determines that: (1) a TTL has expired; (2) an invalid client is sending the query; (3) a valid forwarder is unavailable; or (4) a desired website destination is invalid, or any combination thereof, the controller aborts the remainder of the process and transmits the appropriate message or subroutine to the client. If everything is determined to be valid, then the controller proceeds to store into memory the client's IP address, the destination website IP address, the forwarder IP address, and the TTL (407).

In step (408), the controller sends back to the deceiver the forwarder IP address, that is masquerading as the destination website IP address. The deceiver in turn sends the data back to the client (409), where the client then connects with the forwarder through a known port. The forwarder next queries the controller to determine the validity of the client, the status of the TTL, and the IP address of the website which the client is trying to reach (410). Just like the controller, if the forwarder determines at this point that: (1) a TTL has expired; (2) an invalid client is sending the query; or (3) a desired website destination is invalid, or any combination thereof, the forwarder aborts the remainder of the process, and transmits the appropriate message or subroutine back to the client (411). If everything is determined to be valid, the forwarder will proceed to transmit the client's data to the destination website server (412).

Once the destination website receives the data from the client, the server will only recognize the forwarder as the source, and thus would only communicate back to the client via the forwarder. Accordingly, if the website server requires to communicate back to the client, the data is routed through the forwarder (413). When data is received by the forwarder, the forwarder, in principle, reverses the process disclosed in (410) to determine the source client which is intended to receive the website server's data (414). The data may be of any kind including, but not limited to, text, programs, applets, video, audio, etc. Once the forwarder determines the client's proper IP address, the forwarder then transmits the reply data back to the client (415).

Although the present invention has been described in detail, it is to be understood that various changes, alterations, and substitutions can be made without departing from the spirit and scope of the invention. More particularly, it should be apparent to those skilled in the pertinent art that the above described invention is algorithmic and is executable by a suitable conventional computer system or network. Alternate embodiments of the present invention may also be suitably implemented, at least in part, in firmware or hardware, or some suitable combination.

We claim:

**1**. A system comprising:

a processor; and

a non-transitory computer-readable storage medium storing computer executable components and communicatively coupled to the processor to facilitate operation of the computer executable components, the computer executable components, comprising:

a controller configured to associate a destination internet protocol (IP) address with a forwarder IP address, and further configured to indicate transmission of a first data request from a client IP address to the destination IP address is to be via the forwarder IP address based on a pre-defined combination of the client IP address and the destination IP address being within the first data request, wherein the forwarder IP address, the client IP address and the destination IP address are distinct.

**2**. The system of claim **1**, wherein the computer-executable components further comprise a domain name system (DNS) server configured to receive a second data request containing a destination domain name from the client IP address, wherein the DNS server is further configured to provide a destination IP address based upon the destination domain name.

**3**. The system of claim **2**, wherein the computer-executable components further comprise a deceiver configured to trans-

US 8,370,457 B2

7

mit the forwarder IP address to a client having the client IP address in response to receipt of the second data request, wherein the forwarder IP address replaces the destination IP address.

**4.** The system of claim **2**, wherein the computer-executable components further comprise a forwarder having the forwarder IP address.

**5.** The system of claim **4**, wherein the controller is configured to associate the forwarder IP address with the destination IP address contained in the second data request.

**6.** The system of claim **5**, wherein a client creates the first data request including the client IP address and the forwarder IP address is received from a client device.

**7.** The system of claim **1**, wherein the forwarder IP address is employed for a pre-determined amount of time-to-live (TTL) time.

**8.** The system of claim **7**, wherein, in response to expiration of the pre-determined amount of TTL time, the controller is further configured to generate a new forwarder IP address for a pre-defined combination of client IP address and destination IP address, wherein the forwarder IP address, the client IP address and the destination IP address are distinct.

**9.** A method comprising:

establishing a forwarding internet protocol (IP) address for a pre-defined combination of a client IP address and a destination IP address;

identifying, in a data request received from the client IP address, the pre-defined combination; and

in response to the identifying of the pre-defined combination, forwarding the data request via the forwarding IP address to the destination IP address.

**10.** The method of claim **9**, further comprising:

elapsing a time of a pre-determined duration between the establishing and the forwarding.

**11.** The method of claim **10**, further comprising, in response to the elapsing of the time, re-establishing the forwarding IP address for the pre-defined combination of the client IP address and the destination IP address.

**12.** The method of claim **9**, further comprising:

receiving data at the client IP address from the destination IP address, based upon the pre-defined combination, via the forwarding IP address.

**13.** The method of claim **9**, further comprising:

associating a plurality of client IP addresses with the destination IP address.

**14.** The method of claim **9**, wherein the establishing includes establishing the forwarding IP address for a pre-defined combination of an IP address of a client and a domain name.

8

**15.** The method of claim **14**, further comprising requesting the destination IP address of the domain name.

**16.** The method of claim **15**, further comprising receiving the forwarding IP address, where the forwarding IP address is masquerading as the destination IP address.

**17.** A non-transitory computer readable storage medium comprising computer-executable instructions that, in response to execution, cause a computing system to perform operations, comprising:

establishing a forwarding internet protocol (IP) address for a pre-defined combination of a client IP address and a destination IP address;

identifying, in a data request received from the client IP address, the pre-defined combination; and

in response to the identifying of the pre-defined combination, forwarding the data request via the forwarding IP address to the destination IP address.

**18.** The computer readable storage medium of claim **17**, the operations further comprising:

elapsing a time of a pre-determined duration between the establishing and the forwarding.

**19.** The computer readable storage medium of claim **18**, the operations further comprising, in response to elapsing of the time, re-establishing the forwarding IP address for the pre-defined combination of client IP address and destination IP address.

**20.** The computer readable storage medium of claim **17**, the operations further comprising:

receiving data at the client IP address from the destination IP address, based upon the pre-defined combination, via the forwarding IP address.

**21.** The computer readable storage medium of claim **17**, the operations further comprising:

associating a plurality of client IP addresses with the destination IP address.

**22.** The computer readable storage medium of claim **17**, wherein the establishing includes establishing the forwarding IP address for a pre-defined combination of an IP address of a client and a domain name.

**23.** The computer readable storage medium of claim **22**, the operations further comprising requesting the destination IP address of the domain name.

**24.** The computer readable storage medium of claim **23**, the operations further comprising receiving the forwarding IP address, where the forwarding IP address is masquerading as the destination IP address.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 8,370,457 B2                                                Page 1 of 1
APPLICATION NO.   : 11/717911
DATED                  : February 5, 2013
INVENTOR(S)       : Campbell et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Drawings

In Fig. 3, Sheet 3 of 4, for Tag "401", in Line 2, delete "appliications" and insert -- applications --, therefor.

In the Specifications

In Column 4, Line 30, delete "controller (107)" and insert -- controller (106) --, therefor.

In Column 5, Line 10, delete "etc.)" and insert -- etc.); --, therefor.

In Column 5, Lines 14-15, delete "identification." and insert -- identification; --, therefor.

In Column 5, Lines 39-40, delete "controller (105)" and insert -- controller (106) --, therefor.

In Column 5, Line 41, delete "FIG. 3-4" and insert -- FIGS. 3-4 --, therefor.

In Column 5, Line 42, delete "FIG. 1-2." and insert -- FIGS. 1-2. --, therefor.

Signed and Sealed this
Eighteenth Day of March, 2014

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

## **EXHIBIT D**

**U.S. Patent No. 8,762,498**

US008762498B2

(12) **United States Patent**  (10) **Patent No.:**  **US 8,762,498 B2**
Campbell et al.  (45) **Date of Patent:**  ***Jun. 24, 2014***

(54) **APPARATUS, SYSTEM, AND METHOD FOR COMMUNICATING TO A NETWORK THROUGH A VIRTUAL DOMAIN**

(71) Applicant: **Darmate Glassworks LLC**, Las Vegas, NV (US)

(72) Inventors: **Douglas A. Campbell**, Henderson, NV (US); **Alan B. Hamor**, Pennington, NJ (US); **Mike D. Helton**, Las Vegas, NV (US)

(73) Assignee: **Darmate Glassworks LLC**, Las Vegas, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/731,731**

(22) Filed: **Dec. 31, 2012**

(65) **Prior Publication Data**

US 2013/0159464 A1  Jun. 20, 2013

**Related U.S. Application Data**

(60) Continuation of application No. 11/717,911, filed on Mar. 13, 2007, now Pat. No. 8,370,457, which is a division of application No. 09/542,858, filed on Apr. 4, 2000, now Pat. No. 7,209,559.

(51) **Int. Cl.**
*G06F 15/16*  (2006.01)

(52) **U.S. Cl.**
USPC ............................. **709/219**; 709/203; 709/223

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,636,371 A | 6/1997 | Yu | |
| 5,708,654 A | 1/1998 | Arndt et al. | |
| 5,805,820 A | 9/1998 | Bellovin et al. | |
| 5,926,549 A | 7/1999 | Pinkas | |
| 5,931,912 A | 8/1999 | Wu et al. | |
| 5,961,593 A | 10/1999 | Gabber et al. | |
| 6,003,083 A | 12/1999 | Davies et al. | |
| 6,014,660 A | 1/2000 | Lim et al. | |
| 6,014,698 A | 1/2000 | Griffiths | |
| 6,026,445 A | 2/2000 | Kephart et al. | |
| 6,052,736 A | 4/2000 | Ogle et al. | |
| 6,061,743 A * | 5/2000 | Thatcher et al. .............. 719/328 |
| 6,091,951 A | 7/2000 | Sturniolo et al. | |
| 6,092,100 A | 7/2000 | Berstis et al. | |
| 6,098,111 A | 8/2000 | Maegawa et al. | |
| 6,119,171 A | 9/2000 | Alkhatib | |

(Continued)

OTHER PUBLICATIONS

"Darpa Internet Program Protocol Specification," Internet Protocol, Sep. 1981; pp. 1-45.

(Continued)

*Primary Examiner* — Van Nguyen

(74) *Attorney, Agent, or Firm* — Amin, Turocy & Watson, LLP

(57) **ABSTRACT**

The present invention is an apparatus, system and method for communicating to a network through an ad hoc virtual domain. The present invention contains a deceiver, a controller, and a forwarder through which a client communicates through. The deceiver, controller, and forwarder collectively establish the domain in which the ad hoc virtual namespace will exist. This invention allows clients to interact over a network in a fashion that is anonymous and unique to the session which the client is engaging in.

**20 Claims, 4 Drawing Sheets**



**US 8,762,498 B2**

Page 2

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,182,148 | B1 | 1/2001 | Tout |
| 6,185,626 | B1 | 2/2001 | Chivi et al. |
| 6,189,030 | B1 | 2/2001 | Kirsch et al. |
| 6,195,691 | B1 | 2/2001 | Brown |
| 6,201,962 | B1 | 3/2001 | Sturniolo et al. |
| 6,205,489 | B1 | 3/2001 | Kapoor |
| 6,249,801 | B1 | 6/2001 | Zisapel et al. |
| 6,256,031 | B1 * | 7/2001 | Meijer et al. .................. 715/854 |
| 6,256,664 | B1 | 7/2001 | Donoho et al. |
| 6,256,739 | B1 | 7/2001 | Skopp et al. |
| 6,262,976 | B1 | 7/2001 | McNamara |
| 6,272,540 | B1 | 8/2001 | Yadav et al. |
| 6,317,775 | B1 | 11/2001 | Coile et al. |
| 6,338,082 | B1 | 1/2002 | Schneider |
| 6,353,850 | B1 | 3/2002 | Wies et al. |
| 6,370,584 | B1 | 4/2002 | Bestavros et al. |
| 6,442,687 | B1 | 8/2002 | Savage |
| 6,449,657 | B2 | 9/2002 | Stanbach et al. |
| 6,493,765 | B1 | 12/2002 | Cunningham et al. |
| 6,496,931 | B1 | 12/2002 | Rajchel et al. |
| 6,502,135 | B1 | 12/2002 | Munger et al. |
| 6,507,585 | B1 | 1/2003 | Dobson |
| 6,510,464 | B1 | 1/2003 | Grantges et al. |
| 6,549,516 | B1 | 4/2003 | Albert et al. |
| 6,594,254 | B1 | 7/2003 | Kelly |
| 6,606,315 | B1 | 8/2003 | Albert et al. |
| 6,628,654 | B1 | 9/2003 | Albert et al. |
| 6,629,149 | B1 | 9/2003 | Fraser et al. |
| 6,633,560 | B1 | 10/2003 | Albert et al. |
| 6,674,743 | B1 | 1/2004 | Amara et al. |
| 6,704,317 | B1 | 3/2004 | Dobson |
| 6,718,359 | B2 | 4/2004 | Zisapel et al. |
| 6,751,677 | B1 | 6/2004 | Ilnicki et al. |
| 6,779,039 | B1 | 8/2004 | Bommareddy et al. |
| 6,785,705 | B1 | 8/2004 | Kocherlakota |
| 6,823,454 | B1 | 11/2004 | Hind et al. |
| 6,880,089 | B1 | 4/2005 | Bommareddy et al. |
| 6,891,887 | B1 | 5/2005 | Dobson |
| 6,910,180 | B1 | 6/2005 | Cui et al. |
| 6,931,434 | B1 | 8/2005 | Donoho et al. |
| 7,209,959 | B1 * | 4/2007 | Campbell et al. ............. 709/219 |
| 7,472,200 | B1 | 12/2008 | Taylor et al. |
| 7,801,080 | B2 | 9/2010 | Kim et al. |
| 8,370,457 | B2 * | 2/2013 | Campbell et al. ............. 709/219 |

OTHER PUBLICATIONS

RFC 1034, "Domain Names—Concepts and Facilities,"Network Working Group, P. Mockapetris, ISI, Nov. 1987; pp. 1-37.
RFC 1035, "Domain Names—Implementation and Specification," Network Working Group, P. Mockapetris, ISI, Nov. 1987; pp. 1-38.
International Search Report dated Aug. 28, 2001, for International Application No. PCT/US01/08637, 7 pages.
OA dated Feb. 11, 2004 for U.S. Appl. No. 09/542858, 8 pages.
OA dated Jan. 12, 2005 for U.S. Appl. No. 09/542858, 8 pages.
OA dated Sep. 30, 2005 for U.S. Appl. No. 09/542858, 8 pages.
OA dated May 18, 2006 for U.S. Appl. No. 09/542858, 8 pages.
OA dated Jul. 9, 2010 for U.S. Appl. No. 11/717911, 51 pages.
OA dated Dec. 23, 2010 for U.S. Appl. No. 11/717911, 18 pages.
OA dated Apr. 12, 2012 for U.S. Appl. No. 11/717911, 34 pages.
OA dated Sep. 17, 2012 for U.S. Appl. No. 11/717911, 11 pages.

* cited by examiner



Figure 1

U.S. Patent          Jun. 24, 2014          Sheet 2 of 4          US 8,762,498 B2

| | Source Address | Destination Address | Data Field |
|---|---|---|---|
| ① | 192.168.1.101 Port: 1234 | 192.168.1.104 Port: 0053 | www.edrtech.com |
| ② | 192.168.1.104 Port: 0053 | 192.168.1.105 Port: 1234 | www.edrtech.com |
| ③ | 192.168.1.105 Port: 1234 | 192.168.1.102 Port: 1234 | www.edrtech.com |
| ④ | 192.168.1.102 Port: 1234 | 192.168.1.105 Port: 1234 | 192.168.1.106 |
| ⑤ | 192.168.1.105 Port: 1234 | 192.168.1.104 Port: 0053 | 192.168.1.106 |
| ⑥ | 192.168.1.104 Port: 0053 | 192.168.1.101 Port: 1234 | 192.168.1.106 |

| | Source Address | Destination Address | Data Field |
|---|---|---|---|
| ⑦ | 192.168.1.101 Port: 1234 | 192.168.1.106 Port: 0060 | Data (00101101) |
| ⑧ | Forwarder query for valid user / website destination | | |
| ⑨ | Controller response to Forwarder query | | |
| ⑩ | 192.168.1.106 Port: 0060 | 192.168.1.103 Port: 0080 | Data (00101101) |
| ⑪ | 192.168.1.103 Port: 0080 | 192.168.1.106 Port: 0060 | Data (00101101) |
| ⑫ | 192.168.1.106 Port: 0060 | 192.168.1.101 Port: 1234 | Data (00101101) |

Figure 2

401
Configure client (101) browser and related appliications
402
Client (101) logs in to start a session for a predetermined time
403
Resolver is queried by client (101) to resolve domain name and routes packet to Deceiver (104)
404
Deceiver (104) forwards query to Controller (106)
405
Controller (104) queries DNS (105) for IP of website server (108), establishes client (101) location and determines a TTL
406
Controller (104) establishes contact with a valid Forwarder (107)
407
Deceiver (104) stores to the Controller (106): (1) The client's IP (2) The destination website IP (3)The Forwarder IP (4) The TTL value
408
Deceiver (104) returns to the Client (101) the Forwarder (107) IP as the destination website (108) IP
409
The Client (101) forwards the data to the Forwarder (107) through a known port
410
The Forwarder (107) queries the Controller (106) to determine: (1) validity of Client (101), (2) the destination website (108) IP, and (3) if TTL has expired
411
If query is not valid, or if TTL has expired, Forwarder (107) aborts communication
412
If query is valid, Forwarder (107) communicates with destination website (108), using the Forwarder's (107) IP as the source

Figure 3



**413** Reply data from the destination website **(108)** are routed through the Forwarder **(107)**

**414** The Forwarder determines the Client's **(101)** IP from previous query in **(408)**

**415** The Forwarder **(107)** forwards back reply data from destination website **(108)** to the Client **(101)**

# Figure 4

US 8,762,498 B2

1

# APPARATUS, SYSTEM, AND METHOD FOR COMMUNICATING TO A NETWORK THROUGH A VIRTUAL DOMAIN

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 11/717,911, entitled "NETWORK COMMUNICATION THROUGH A VIRTUAL DOMAIN", filed Mar. 13, 2007 (issued as U.S. Pat. No. 8,370,457 on Feb. 5, 2013), which is a divisional of U.S. patent application Ser. No. 09/542,858, entitled "APPARATUS, SYSTEM, AND METHOD FOR COMMUNICATING TO A NETWORK THROUGH A VIRTUAL DOMAIN PROVIDING ANONYMITY TO A CLIENT COMMUNICATING ON THE NETWORK", filed Apr. 4, 2000 (issued as U.S. Pat. No. 7,209,959 on Apr. 24, 2007), the entireties of which are incorporated herein by reference.

## SCOPE OF THE INVENTION

This invention relates generally to networks and network systems, and more specifically to a system and method for enabling anonymous network activity, while establishing virtual namespaces for clients.

## BACKGROUND

The proliferation and expansion of computer systems, networks, databases, the Internet, and particularly the World Wide Web (WWW), has resulted in a vast and diverse collection of information and means of communication. The current Internet infrastructure involves millions of computers linked together on a computer network. This network allows all of the computers to communicate with one another. Clients are typically linked to the Internet via Internet Service Providers (ISP's), which in turn connect to larger ISP's. This allows numerous clients to communicate to each other through their various connections.

In general, all the machines on the Internet can be categorized into two types: servers and clients. Typically, machines that provide services (like Web servers, FTP servers, Email servers, etc.) are servers. Servers are loaded with the appropriate software in order to allow them to perform their intended services. Machines that request information from servers are typically called clients. In order to differentiate between machines on the network, each machine is given a unique address called an IP address.

The IP address is a thirty-two bit number that is normally expressed as 4 octets in a dotted decimal number (e.g., 192.168.1.101). Each of the octets can have values between 0 and 255 (2 8 possibilities per octet). When a client connects to the Internet, the client is assigned an IP address through their Internet Service Provider (ISP) for the duration of the connection. Conversely, the IP addresses of servers are relatively static, and do not change very often.

Because it is difficult for clients to remember IP addresses, and because IP addresses need to change, most servers on the Internet possess domain names (e.g., "www.whoknowz.com") to help users reach their intended servers without remembering strings of numbers. Name servers, used in the domain name system (DNS), map the human-readable names into IP addresses to help clients reach their destinations. When a client enters a domain name, the browser (via a resolver) extracts the domain name and passes it to a name server, which will return the correct IP address to the associ-

2

ated site. The Domain Name System is comprised of a distributed database and name servers that access that database.

One of the main problems with the current utilization of IP addresses and domain names on the World Wide Web (WWW) is that the WWW is based largely on the hypertext transport protocol ("HTTP-protocol"). The nature of HTTP protocol allows information, such as a client's e-mail address, web sites that were visited, and information on the client's software and host computer, to be recorded and traced by the server. This opens up the user to a range of privacy threats including unwanted e-mails, solicitations, and "cookies" (data that is stored on the client's machine by a server and subsequently used for identification).

Furthermore, clients that wish to cloak themselves from such intrusions are forced into systems that simply provide alternate account identities for the client; while the client is protected, the alternate account identity becomes the object of the unwanted e-mails, "cookies", etc., instead. The effect of this is similar to the client manually creating a new user account in which to browse the WWW.

One of the solutions available is to route the client through a proxy server in order to substitute IP information being sent by the client. When a client desires to visit a web server, the packets sent from client's computer are routed through a proxy server. At the proxy server, the server executes algorithms to extract information that would identify the client, and replaces the information with predetermined substitutes.

Afterwards, the proxy server routes the packet out to the web server. Once the web server receives the packet, all of the information points back to the proxy server, and not to the client. This in effect "hides" the client from the web server.

However, a drawback to such systems is that, as mentioned before, the client is obtaining protection merely through the use of an alternate identity that is ultimately assigned back to the same client. Furthermore, current systems do not have any added flexibility designed in the system to take advantage of anonymous client group browsing or multiple group association. In order to fully take advantage of ad hoc identity browsing, additional features need to be added in order to create a "community-like" environment among numerous anonymous clients.

## SUMMARY OF THE INVENTION

To address the above-discussed deficiencies in existing systems, the present invention involves the use of three algorithms, known collectively as DNS Misdirection and individually as the deceiver, the controller, and the forwarder. The deceiver communicates with clients and with the controller. The deceiver provides name resolution for clients. The routine works the same as a standard name server, except when a query is received from a client, the deceiver allows the controller to supply the information. The controller communicates with the deceiver and the forwarder. The controller determines the address, "time to live" (TTL), and other DNS result fields and returns them to the deceiver. The controller is queried by the forwarder for the site address that the client intended to reach.

One advantage of the invention deals with isolating client activity on the Internet. Another important feature of the invention is that the DNS Misdirection system allows for the creation of virtual namespaces. Through these namespaces, the isolated clients can anonymously browse the Internet while being part of a virtual community. By utilizing virtual namespaces and generated root domain names (e.g., "carlover", "winetaster", "stockpicker"), the community activities would be inaccessible to all but intended clients. Further-

US 8,762,498 B2

**3**

more, since virtual namespaces would create a domain through which clients could identify themselves and communicate through, network administrators could establish ad hoc software applications as well as domain-specific identifiers that could be assigned to a user or groups of users.

### BRIEF DESCRIPTION OF THE DRAWINGS

The following drawings illustrate certain embodiments of the present invention.

FIG. **1** schematically shows the system architecture of an exemplary network on which one embodiment of the invention may be implemented.

FIG. **2** illustrates the packet contents as they are routed through the network.

FIG. **3** generally provides a flowchart representation of a client sending a packet to be resolved, and the subsequent misdirection of the client to a destination website via the present invention.

FIG. **4** generally provides a flowchart representation when the website server responds back to the client through the invention.

### DETAILED DESCRIPTION

FIG. **1** illustrates an embodiment of the system architecture that contains at least one client (**101**). This client consists of a personal computer, which contains an interface to a computer network, such as a modem, network interface card, etc. The client (**101**) may also be generalized as any client application. Loaded in the client computer (**101**) are an Internet browser and a resolver (not shown). When the client (**101**) wishes to connect to a site on the Internet, the client (**101**) will typically enter a destination site domain name into the computer's Internet browser (e.g., "www.whoknowz.com"). In FIG. **1**, the destination site is a web server (**108**). The Internet browser will typically be connected through an ISP (not shown). The domain name can be embedded in a URL (via hyperlink), or can be explicitly entered by the client.

If the client (**101**) is to reach the web server (**108**), the client needs to obtain the web server's (**108**) IP address, shown in FIG. **1** (all of the hypothetically disclosed IP addresses in the invention are shown in the figure). With the architecture used in existing systems, the IP address must be resolved into a 32 bit (IPv4)/128 bit (IPv6) IP address. Normally, the ISP will furnish the clients with a DNS (**105**), which is accessed through the client's resolver. The resolver is typically predisposed with two IP addresses, which represent the primary and secondary name servers that may be accessed. The name of the server may be entered manually, or may be provided by using Dynamic Host Configuration Protocol (DHCP). The process of resolving domain names, and the operation of DNS servers is addressed further in detail in RFC 1034 ("Domain Names—Concepts and Facilities"—last update: Nov. 17, 1999), and RFC 1035 ("Domain Names—Implementation and Specification"—last update: Nov. 17, 1999).

Under the current invention, when an unresolved packet is sent from client (**101**), the packet is processed through the deceiver (**104**). A more detailed representation of the packet, as well as exemplary port connections, is shown in FIG. **2**. It should be pointed out that the term "packet" may mean an IP packet, an UDP datagram, or other transmitted data. When the packet (**1**) is transmitted, the packet will be transparently addressed to the deceiver (**104**). Upon receipt of the packet, the deceiver (**104**) will recognize the source of the packet (**1**) through the IP source address, shown in FIG. **2**. The fields in which the IP source and destination addresses function are

**4**

described in greater detail in RFC 791 ("DARPA Internet Program Protocol Specification"). By parsing the data field through the controller (**106**), the deceiver will determine the intended domain name that the client (**101**) wants to reach.

From this point, the deceiver (**104**) queries the controller (**106**) to initiate a name resolution. The controller (**106**) then sends the packet (**2**) where the IP destination address of the DNS (**105**) is now placed in the packet (**2**), and is transmitted onward. In the meantime, the controller (**106**) stores the client's (**101**) IP location, and determines a name-to-IP address time-to-live (TTL). The TTL is the time period in which the client (**101**) may assume a valid name-to-IP address. The TTL of the name-to IP address may be established through the use of cache, or any other suitable memory available. Typically, the TTL field is a 32 bit integer that represents units of seconds, and is primarily used by resolvers when they cache network resource records. The TTL describes how long a resource record can be cached before it should be discarded. The TTL may be assigned by the administrator for the zone where the data originates. Under the present invention, once the TTL expires, the client must perform another query in order to establish a connection with an IP address.

Upon receipt of the packet (**2**), the controller (**106**) determines the source of the packet, and subsequently proceeds to process the domain name resolution request, and queries the DNS name server (**105**) in packet (**3**) to obtain the website server (**108**) IP address. When the destination website IP address is resolved in the DNS (**105**), it is transmitted back to the controller (**106**) in packet (**4**). When the controller (**106**) obtains the IP address of the destination website server (**108**), the controller (**106**) then proceeds to establish connection with a forwarder (**107**) through which to communicate through. Once connected, the controller (**106**) then records the IP address of the forwarder (**107**). The forwarder's (**107**) address is then used by the controller (**106**) to create a valid session for the client (**101**), by correlating the forwarder address with the TTL of the client (**101**) and the destination website server (**108**). As long as the client's name-to-IP-address has not expired (i.e., the TTL has not run out), the controller (**107**) will associate the established forwarder (**107**) with the session. After connecting with a forwarder (**107**), the controller (**106**) then proceeds to store the client (**101**) IP address, the destination website (**108**) IP address, the IP address of the forwarder (**107**), and the determined TTL. The stored elements (**200**) are disclosed in FIG. **1**.

After storing the pertinent information, the controller (**106**) then returns the forwarder (**107**) IP address back to the deceiver (**104**) via packet (**5**). The contents of packet (**5**) are shown in FIG. **2**. After the packet (**5**) is routed through the deceiver (**104**), the packet (**6**) is then transmitted to the client (**101**), along with the TTL. Upon receipt of the packet (**6**), the client will be "deceived" into thinking that the forwarder (**107**) IP address is actually the destination website server (**108**). At this point, any communication between the client (**101**) and the website server (**108**) will be taking place in a virtual domain, since both the client (**101**) and the website server (**108**) do not technically exist to each other—the client is isolated from the destination sites of his or her data packets, and the destination sites are isolated from the clients that are accessing the site.

One advantage of this configuration is that the virtual namespaces allow system administrators and clients to create a virtually endless string of identities for clients and their target website server(s). For example, a virtual namespace may be set up as ".bank", thus identifying a bank classification. If a client wishes to visit a server that is known to be related to banks, the client could type "wellsfargo.bank" and

US 8,762,498 B2

5

be routed to "wellsfargo.com" via the system described in FIG. **1**. Alternately, a client could enter "*.bank" and receive an HTML page with all registered entries. Furthermore, the client could customize the identification used on the Internet (e.g., "wellsfargo.doug"). Names could be created ad hoc or could be associated with groupware (e.g., "mother.birthday-.card"; "smith.family.reunion.newyork"). The variations are virtually endless.

Some of the implementations of the virtual namespaces and underlying domains include, but are not limited to:

(1) creating unique environments for marketing, branding, advertising and promotion purposes;

(2) allowing for personalized Web identities for individuals, corporations, organizations, etc.;

(3) providing anonymous browsing, searching and e-mailing;

(4) creating environments for users to establish groups for collaborative communication or application purposes;

(5) cataloguing domain names under intuitive categories or functions (e.g. "bestbuy.shop", "amazon.shop", etc.);

(6) creating a search index which allows the user(s) to locate all members of a specific category and identifying distinct products, goods, services, content, or information provided by any member of any category and/or identification;

(7) creating directories that contain telephone, Internet, fax, wireless, page, cellular, email, instant messaging and/or similar data under one or more human readable formats addressable by a communication device.

When the client makes a transmission to the website server (**108**), the packet (**7**) is now routed to the forwarder (**107**). The client (**101**) will typically connect to the forwarder (**107**) through a well-known port. After receiving the packet from the client (**101**), the forwarder (**107**) proceeds to query the controller (**106**) (shown as packet (**8**)) to determine: (1) whether the client (**101**) is valid; (2) if the TTL has not expired; and (3) if the IP address of the web site server (**108**) that the client wishes to connect to is valid. If everything is confirmed, the controller (**106**) then sends back the relevant information via packet (**9**). The forwarder (**107**) then extracts the needed information including the website server (**108**) IP address, and forwards the packet on to its intended destination.

It should be understood that the deceiver (**104**), the controller (**106**), and the forwarder (**107**) are applications. The website server (**108**) may be generalized as any server application. Furthermore, the deceiver (**104**), the controller (**106**), and the forwarder (**107**) can all be on a single computer, or separate computers. Also, the deceiver (**104**) and the controller (**105**) can be on the client's computer.

FIG. **3-4** represent a flowchart representation of the invention as previously disclosed in FIG. **1-2**. In step (**401**), the client configures software/hardware on the client computer, and establishes a session by signing on or logging into a network for a predetermined time (**402**). When the client wishes to transmit data onto the network, or otherwise communicate with other computers or servers, one option available for the client is to query the resolver in order to retrieve an intended destination site (**403**). In (**403**), the resolver query is routed to the deceiver. After receiving the contents of the resolver, the deceiver then forwards the query to the controller in (**404**).

When the controller receives the query packet, the controller next records the location of the client, determines the TTL for the client session, and further queries a DNS name server, and receives back the IP address of the website which the client wishes to contact (**405**). In (**406**), the controller then

6

establishes contact with an available forwarder through which the client session may be transmitted through, and subsequently records the IP address. While it is not displayed in the flowchart, if the controller determines that: (1) a TTL has expired; (2) an invalid client is sending the query; (3) a valid forwarder is unavailable; or (4) a desired website destination is invalid, or any combination thereof, the controller aborts the remainder of the process and transmits the appropriate message or subroutine to the client. If everything is determined to be valid, then the controller proceeds to store into memory the client's IP address, the destination website IP address, the forwarder IP address, and the TTL (**407**).

In step (**408**), the controller sends back to the deceiver the forwarder IP address, that is masquerading as the destination website IP address. The deceiver in turn sends the data back to the client (**409**), where the client then connects with the forwarder through a known port. The forwarder next queries the controller to determine the validity of the client, the status of the TTL, and the IP address of the website which the client is trying to reach (**410**). Just like the controller, if the forwarder determines at this point that: (1) a TTL has expired; (2) an invalid client is sending the query; or (3) a desired website destination is invalid, or any combination thereof, the forwarder aborts the remainder of the process, and transmits the appropriate message or subroutine back to the client (**411**). If everything is determined to be valid, the forwarder will proceed to transmit the client's data to the destination website server (**412**).

Once the destination web site receives the data from the client, the server will only recognize the forwarder as the source, and thus would only communicate back to the client via the forwarder. Accordingly, if the website server requires to communicate back to the client, the data is routed through the forwarder (**413**). When data is received by the forwarder, the forwarder, in principle, reverses the process disclosed in (**410**) to determine the source client which is intended to receive the website server's data (**414**). The data may be of any kind including, but not limited to, text, programs, applets, video, audio, etc. Once the forwarder determines the client's proper IP address, the forwarder then transmits the reply data back to the client (**415**).

Although the present invention has been described in detail, it is to be understood that various changes, alterations, and substitutions can be made without departing from the spirit and scope of the invention. More particularly, it should be apparent to those skilled in the pertinent art that the above described invention is algorithmic and is executable by a suitable conventional computer system or network. Alternate embodiments of the present invention may also be suitably implemented, at least in part, in firmware or hardware, or some suitable combination.

What is claimed is:

**1**. A method, comprising:

determining, by a controller device comprising a processor, a destination internet protocol (IP) address from a plurality of categories for virtual names based on a virtual namespace destination address specified by request data received from a device, wherein a category of the plurality of categories is related to the virtual namespace destination address;

establishing a correlation between the destination IP address and a forwarder IP address of a forwarder device; and

instructing the forwarder device to send the request data to the destination IP address.

**2**. The method of claim **1**, wherein the virtual namespace destination address comprises a domain name extension.

US 8,762,498 B2

7

**3**. The method of claim **1**, wherein the plurality of categories for virtual names comprises respective human-readable words.

**4**. The method of claim **1**, wherein the determining the destination IP address comprises sending, by the controller device, a query to a server device to initiate a name resolution for the virtual namespace destination address.

**5**. The method of claim **1**, further comprising:

establishing a name-to-IP-address time-to-live (TTL) parameter of the device, wherein the name-to-IP-address TTL parameter defines a time duration for which the correlation is valid.

**6**. The method of claim **1**, further comprising initiating a sending of a data packet comprising the forwarder IP address to the device.

**7**. The method of claim **5**, further comprising:

receiving, from the forwarder device, a request to confirm at least one of a validity of the device or a status of the name-to-IP-address TTL parameter of the device; and

in response to the receiving the request, sending a response to the forwarder device confirming at least one of the validity of the device or the status of the name-to-IP-address TTL parameter of the device.

**8**. A system, comprising:

a processor, coupled to a memory, configured to execute or facilitate execution of computer-executable instructions to perform operations, comprising:

identifying a destination internet protocol (IP) address corresponding to a category, of a plurality of categories for virtual names, related to a virtual namespace destination address represented in a data request from a device;

establishing a correlation between a forwarder IP address of a forwarder device and the destination IP address; and

sending an instruction to the forwarder device to forward the data request to the destination IP address.

**9**. The system of claim **8**, wherein the data request comprises a domain name extension as at least a portion of the virtual namespace destination address.

**10**. The system of claim **9**, wherein the domain name extension is formatted as human language text.

**11**. The system of claim **8**, wherein the operations further comprise querying a server device to facilitate resolving a name for the virtual namespace destination address.

**12**. The system of claim **8**, wherein the operations further comprise querying a domain name server to facilitate the identifying the destination IP address.

8

**13**. The system of claim **8**, wherein the operations further comprise establishing a name-to-IP-address time-to-live (TTL) value that defines a time period of validity for the correlation.

**14**. The system of claim **13**, wherein the operations further comprise initiating a sending, to the forwarder device of confirmation information confirming at least one of a validity of the device or a status of the name-to-IP-address TTL value of the device.

**15**. The system of claim **8**, wherein the operations further comprise sending a data packet comprising the forwarder IP address to the device.

**16**. A non-transitory computer-readable storage device comprising computer-executable instructions that, in response to execution, cause a system to perform operations, comprising:

in response to the receiving, from a device, a data request comprising a virtual namespace destination address, selecting a destination internet protocol (IP) address from a plurality of categories for virtual names, wherein a category of the plurality of categories corresponds to the virtual namespace destination address;

establishing a correlation between the destination IP address and a forwarder IP address of a forwarder device; and

instructing the forwarder device to direct the data request to the destination IP address.

**17**. The non-transitory computer-readable storage device of claim **16**, wherein the operations further comprise establishing a variable of the device that defines a time period for which the correlation is to remain established.

**18**. The non-transitory computer-readable storage device of claim **17**, wherein the operations further comprise:

receiving, from the forwarder device, a request to confirm at least one of a validity of the device or a status of the name-to-IP-address TTL variable of the device; and

in response to the receiving the request, sending a response to the forwarder device that indicates confirmation of at least one of the validity of the device or the status of the name-to-IP-address TTL variable of the device.

**19**. The non-transitory computer-readable storage device of claim **16**, wherein the virtual namespace destination address comprises a domain name extension.

**20**. The non-transitory computer-readable storage device of claim **16**, wherein the selecting the destination IP address comprises sending a query to a server device to initiate a name resolution for the virtual namespace destination address.

*   *   *   *   *

## **EXHIBIT E**

**Letter dated April 16, 2020 from DataCloud's Licensing Agent**



*Day Building, Suite 230*
*4725 Peachtree Corners Circle,*
*Peachtree Corners, GA 30092*

*Main: (404) 962-8740*
*Fax: (404) 962-8741*
*www.ipigrp.com*

April 16, 2020

VIA EMAIL / FEDEX

Mr. Peter Lam
Director of Intellectual Property
Extreme Networks, Inc.
6480 Via Del Oro
San Jose, CA 95119

**RE:    DATACLOUD TECHNOLOGIES, LLC ("DATACLOUD") - PATENT PORTFOLIO
LICENSING PROGRAM**

Dear Mr. Lam:

**IP**investments Group has been retained to manage the monetization of an
international patent portfolio owned by DataCloud Technologies, LLC (the "Portfolio).
The Portfolio covers various aspects of technologies related to the Network Security /
User Interface / Security Authentication / Distributed Computing / Document Data /
Content Management / Database.  A summary of the Portfolio is detailed below:

- 36 issued patent assets (plus an additional 11 recently expired patent assets)
- Over 1,000 patent claims
  - Method Claims – 450+
  - Apparatus / System Claims – 550+
- Over 2,000 forward references (patent to patent via USPTO website)

The Portfolio is included in the attached Exhibit A.

While **IP**investments Group is serving as the licensing agent for the DataCloud
Portfolio, DataCloud has retained Heninger Garrison Davis to serve as outside litigation /
licensing counsel. Accordingly, you may receive communications from Heninger
Garrison Davis regarding the DataCloud portfolio, as well.  Our purpose in writing to
Extreme Networks is to acquaint you with the DataCloud Portfolio and to open a
dialogue for Extreme Networks to obtain a license under the DataCloud Portfolio prior to
any potential enforcement action being initiated. Extreme Networks may wish to have its
patent counsel examine the patents listed in Exhibit A to determine whether a non-
exclusive license is needed as to the DataCloud Portfolio. To facilitate licensing
discussions, we have attached a mutual NDA for your review and consideration.


Peter Lam
April 16, 2020
Page 2

DataCloud is prepared to grant Extreme Networks coverage under the Portfolio for past and future use to allow you to continue providing and using the technologies. Once the NDA is in place and fully executed, we can provide additional information on potential licensing terms and conditions for the Portfolio.

Over the past few years, we have had the opportunity to represent both small and large companies in their efforts to license their patent portfolios. All too often, it seems, initial licensing efforts are ignored and the burden, time and expense of needless prolonged litigation results. In that spirit, DataCloud believes that early licensing discussions could serve to benefit both parties and would be willing to offer more favorable terms to those that entertain such discussions.

If you would like to participate in discussions regarding a license to the Portfolio or if you have any questions, please contact me at (404) 962–8744 or via email at bhartselle@ipigrp.com. The DataCloud licensing team looks forward to hearing from you and working with you to resolve this matter.

Sincerely,

William A. Hartselle

cc: Jim McDonough, Heninger Garrison Davis

Enclosures

DataCloud Technologies - Exhibit A

Active Issued Patents:

| Patent Number | Application Number | Title | Country | Application Date | Grant Date |
|---|---|---|---|---|---|
| 6691109 | 09/814056 | METHOD AND APPARATUS FOR HIGH-PERFORMANCE SEQUENCE COMPARISON | US | 3/22/2001 | 2/10/2004 |
| 6732333 | 09/760562 | SYSTEM AND METHOD FOR MANAGING STATISTICAL DATA REGARDING CORRECTIONS TO WORD PROCESSING DOCUMENTS | US | 1/16/2001 | 5/4/2004 |
| 6824064 | 09/730670 | CONCURRENT COMMUNICATION WITH MULTIPLE APPLICATIONS ON A SMART CARD | US | 12/6/2000 | 11/30/2004 |
| 6879332 | 09/859343 | User interface for displaying and exploring hierarchical information | US | 5/16/2001 | 4/12/2005 |
| 6879981 | 10/042941 | SHARING LIVE DATA WITH A NON COOPERATIVE DBMS | US | 1/9/2002 | 4/12/2005 |
| 7036093 | 09/875409 | User interface for exploring a graph of information | US | 6/5/2001 | 4/25/2006 |
| 7139780 | 10/335516 | System and method for synchronizing files in multiple nodes | US | 12/30/2002 | 11/21/2006 |
| 7170979 | 09/733848 | SYSTEM FOR EMBEDDING PROGRAMMING LANGUAGE CONTENT IN VOICE XML | US | 12/8/2000 | 1/30/2007 |
| 7197537 | 10/109914 | Remote access and retrieval of electronic files | US | 3/29/2002 | 3/27/2007 |
| 7225462 | 10/179280 | Systems and methods for managing web user information | US | 6/26/2002 | 5/29/2007 |
| 7246351 | 10/081921 | Systems and methods for managing web user information | US | 2/20/2002 | 7/17/2007 |
| 7266616 | 09/925157 | METHOD AND SYSTEM FOR DIGITAL RENDERING OVER A NETWORK | US | 8/8/2001 | 9/4/2007 |
| 7290223 | 10/985644 | Interface for displaying and exploring hierarchical information | US | 11/10/2004 | 10/30/2007 |
| 7333980 | 10/700071 | SEARCHING QUERIES USING DATABASE PARTITIONING | US | 11/3/2003 | 2/19/2008 |
| 7340466 | 10/086026 | Topic identification and use thereof in information retrieval systems | US | 2/26/2002 | 3/4/2008 |
| 7398298 | 11/690803 | Remote access and retrieval of electronic files | US | 3/23/2007 | 7/8/2008 |
| 7469405 | 09/840923 | System and method for scheduling execution of cross-platform computer processes | US | 4/25/2001 | 12/23/2008 |
| 7614036 | 10/610133 | Method and system for dataflow creation and execution | US | 6/30/2003 | 11/3/2009 |
| 7634756 | 10/994871 | METHOD AND APPARATUS FOR DATAFLOW CREATION EXECUTION | US | 11/22/2004 | 12/15/2009 |
| 7689717 | 11/515371 | METHOD AND SYSTEM FOR DIGITAL RENDERING OVER A NETWORK | US | 8/31/2006 | 3/30/2010 |
| 7711672 | 10/329402 | Semantic network methods to disambiguate natural language meaning | US | 12/27/2002 | 5/4/2010 |

DataCloud Technologies - Exhibit A

| Patent Number | Application Number | Title | Country | Application Date | Grant Date |
|---|---|---|---|---|---|
| 7716060 | 09/790897 | PATENT-RELATED TOOLS AND METHODOLOGY FOR USE IN THE MERGER AND ACQUISITION PROCESS | US | 2/23/2001 | 5/11/2010 |
| 7716207 | 11/712557 | Search Engine Methods and Systems for Displaying Relevant Topics | US | 3/1/2007 | 5/11/2010 |
| 7761462 | 11/969878 | SEARCHING QUERIES USING DATABASE PARTITIONING | US | 1/4/2008 | 7/20/2010 |
| 7765521 | 10/303268 | Configuration engine | US | 11/25/2002 | 7/27/2010 |
| 8156499 | 12/331980 | METHODS, SYSTEMS, AND ARTICLES OF MANUFACTURING FOR SCHEDULING EXECUTION OF PROGRAMS ON COMPUTERS HAVING DIFFERENT OPERATING SYSTEMS | US | 12/10/2008 | 4/10/2012 |
| 8396824 | 11/806260 | Automatic data categorization with optimally spaced semantic seed terms | US | 5/30/2007 | 3/12/2013 |
| 8494139 | 11/511211 | SYSTEM FOR EMBEDDING PROGRAMMING LANGUAGE CONTENT IN XML | US | 8/29/2006 | 7/23/2013 |
| 8607139 | 10/834595 | SYSTEM AND PROCESS FOR MANAGING CONTENT ORGANIZED IN A TAG-DELIMITED TEMPLATE USING METADATA | US | 4/29/2004 | 12/10/2013 |
| 8615555 | 12/169074 | Remote access and retrieval of electronic files | US | 7/8/2008 | 12/24/2013 |
| 9092545 | 11/513420 | INTELLECTUAL PROPERTY ASSET MANAGER (IPAM) FOR CONTEXT PROCESSING OF DATA OBJECTS | US | 8/31/2006 | 7/28/2015 |
| RE44723 | 11/818544 | REGULATING FILE ACCESS RATES ACCORDING TO FILE TYPE | US | 6/14/2007 | 1/21/2014 |
| D528556 | 29/212793 | Graphical information interface for a display | US | 9/7/2004 | 9/19/2006 |
| D545323 | 29/212794 | Graphical information interface for a display | US | 9/7/2004 | 6/26/2007 |
| D545324 | 29/212795 | Graphical information interface for a display | US | 9/7/2004 | 6/26/2007 |
| TWI220713 | TW091122978 | System and method for synchronizing documents between multi-nodes | TW | 10/4/2002 | 9/1/2004 |
| Recently Expired Patents: | | | | | |
| 6560613 | 09/500212 | DISAMBIGUATING FILE DESCRIPTORS | US | 2/8/2000 | 5/6/2003 |
| 6651063 | 09/493911 | DATA ORGANIZATION AND MANAGEMENT SYSTEM AND METHOD | US | 1/28/2000 | 11/18/2003 |
| 6732331 | 09/504624 | SYSTEM AND PROCESS FOR MANAGING CONTENT ORGANIZED IN A TAG-DELIMITED TEMPLATE USING METADATA | US | 2/15/2000 | 5/4/2004 |

DataCloud Technologies - Exhibit A

| Patent Number | Application Number | Title | Country | Application Date | Grant Date |
|---|---|---|---|---|---|
| 6918086 | 09/537965 | Method and apparatus for updating database of automatic spelling corrections | US | 3/28/2000 | 7/12/2005 |
| 7209959 | 09/542858 | APPARATUS, SYSTEM AND METHOD FOR COMMUNICATING TO A NETWORK THROUGH VIRTUAL DOMAIN PROVIDING ANONYMITY TO A CLIENT COMMUNICATING ON THE NETWORK | US | 4/4/2000 | 4/24/2007 |
| 8370457 | 11/717911 | Network communication through a virtual domain | US | 3/13/2007 | 2/5/2013 |
| 8762498 | 13/731731 | APPARATUS, SYSTEM AND METHOD FOR COMMUNICATING TO A NETWORK THROUGH VIRTUAL DOMAIN PROVIDING ANONYMITY TO A CLIENT COMMUNICATING ON THE NETWORK | US | 12/31/2012 | 6/24/2014 |
| RE41451 | 11/324117 | Electronic note taking from network web pages | US | 1/3/2006 | 7/20/2010 |
| RE43375 | 11/858878 | SYSTEM AND METHOD FOR COMMUNICATIONS IN A DISTRIBUTED COMPUTING ENVIRONMENT | US | 9/20/2007 | 5/8/2012 |
| D513511 | 29/212796 | Graphical information interface for a display | US | 9/7/2004 | 1/10/2006 |
| JP5143980 | JP2000-609919 | PROTOCOL FOR DEFINING DATA EXCHANGE RULES AND FORMATES FOR UNIVERSAL INTELLECTUAL ASSET DOCUMENTS (AS AMENDED) | JP | 4/10/2000 | 11/30/2012 |

## MUTUAL NONDISCLOSURE AGREEMENT

This MUTUAL NONDISCLOSURE AGREEMENT is made and entered into as of _____, 2020 between DataCloud Technologies, LLC, a Georgia company, and _____ _____, a _____.

1. <u>Purpose</u>.  The parties wish to explore a business opportunity of mutual interest, and in connection with this opportunity, each party (the "disclosing party") may disclose to the other (the "receiving party") certain confidential technical and business information which the disclosing party desires the receiving party to treat as confidential.

2. "<u>Confidential Information</u>" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects (including without limitation documents, prototypes, samples, plant and equipment), which is designated as "Confidential," "Proprietary" or some similar designation at or prior to the time of disclosure. Confidential Information shall include without limitation technical data, trade secrets and know-how, including, but not limited to, research, product plans, products, services, suppliers, customer lists and customer information, prices and costs, markets, software, developments, inventions, laboratory notebooks, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, licenses, finances, budgets and other business information.  Confidential Information may also include information disclosed to a disclosing party by third parties.  Confidential Information shall not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party in violation of this Agreement; (iii) is already in the possession of the receiving party at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; (iv) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; or (v) is independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information, as shown by the receiving party's documents or other competent evidence in the receiving party's possession.

3. <u>Non-use and Non-disclosure</u>.  Each party agrees not to use any Confidential Information of the other party for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the parties.  Each party agrees not to disclose any Confidential Information of the other party to third parties or to such party's employees, except to those employees of the receiving party who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship or to agents of a party retained to participate in licensing discussions between the parties.

4. <u>Maintenance of Confidentiality</u>.  Each party shall ensure that its employees who have access to Confidential Information of the other party have signed a non-use and non-disclosure agreement in content substantially similar to the provisions hereof, prior to any disclosure of Confidential Information to such employees.  Neither party shall make any copies of the Confidential Information of the other party unless the same are previously approved in writing by the other party.  Each party shall reproduce the other party's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original.  If any material non-public information is disclosed, the recipient of such information agrees that it will comply with SEC Regulation FD (Fair Disclosure), and refrain from trading in the disclosing party's stock until that material non-public information is publicly disseminated. Notwithstanding anything to the contrary set forth herein, a receiving party shall be permitted to disclose Confidential Information to the extent (and only to the extent) the receiving party is required by law or upon advice of counsel to disclose such Confidential Information, provided that the receiving party gives the disclosing party prompt written notice of such requirement and upon the request of the disclosing party, the receiving party cooperates in good faith and at the expense of the disclosing party in any reasonable and lawful actions which the disclosing party takes to resist such disclosure or limit the information to be disclosed.

5. <u>No Obligation</u>.  Nothing herein shall obligate either party to proceed with any transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity.

6. <u>No Warranty</u>.  ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS".  EACH PARTY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

7. <u>Return of Materials</u>.  All documents and other tangible objects containing or representing Confidential Information which have been disclosed by either party to the other party, and all copies thereof which are in the possession of the other party, shall be and remain the property of the disclosing party and shall be promptly returned to the disclosing party or destroyed upon the termination of this Agreement or the disclosing party's written request.  At the request of the disclosing party, the recipient will furnish a certificate, signed by an officer of the recipient, certifying that any Confidential Information not returned to the disclosing party has been destroyed.

8. <u>No License</u>.  Nothing in this Agreement is intended to grant any rights to either party under any intellectual property rights of the other party, nor shall this Agreement grant any party any rights in or to the Confidential Information of the other party except as expressly set forth herein.

9. <u>Term</u>.  The obligations of each receiving party hereunder shall survive for a period of five (5) years from the date of disclosure.  Notwithstanding the expiration of the term, the obligations of Section 3 shall continue forever and shall terminate only at such time, and then only to the extent, the disclosing party's Confidential Information no longer constitutes Confidential Information.

10. <u>Remedies</u>.  Each party agrees that any violation or threatened violation of this Agreement may cause irreparable injury to the other party, entitling the other party to seek injunctive relief in addition to all legal remedies.

11. <u>Export.</u> The parties acknowledge that the export of Confidential Information may be subject to regulations which may prohibit the export of such information to certain foreign countries or the disclosure of such information to certain foreign nationals. The parties, therefore, agree to comply strictly with all applicable export laws, regulations, executive orders and the like.

12. <u>Miscellaneous</u>.  This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns.  This Agreement shall be governed by the laws of the State of Georgia, without reference to conflict of laws principles.  This document contains the entire agreement between the parties with respect to the subject matter hereof, and neither party shall have any obligation, express or implied by law, with respect to trade secret or proprietary information of the other party except as set forth herein.  Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision.  This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto. This Agreement may be signed in counterparts, and delivered by facsimile, and such facsimile counterparts shall be valid and binding on the parties hereto with the same effect as if original signatures had been exchanged.

**DataCloud Technologies, LLC**                    _____

By: _____        By: _____

Name: _____         Name: _____

Title: _____        Title: _____

- 2 -

## **EXHIBIT F**

**Webpage Describing Products Offered**

5/28/2020                                    IT Infrastructure & Networking Products - Extreme Networks

## One Hyper-Connected World. One Simple Product Line.

We've streamlined our products so it's never been easier to build the most flexible software-driven networking solutions imaginable.

## Gain actionable insights and automated control over your network





close [x]

We use cookies for traffic analytics and ad and content personalization. By clicking on any of the content or interacting with any section of this website, you are agreeing to this use of cookies in the manner described in our Privacy and Cookies Policy.

DataCloud Technologies, LLC v. Extreme Networks, Inc.                                    Page | F-1

5/28/2020                                    IT Infrastructure & Networking Products - Extreme Networks





# Boost your scalability and unleash business agility



We use cookies for traffic analytics and ad and content personalization. By
clicking on any of the content or interacting with any section of this website, you
are agreeing to this use of cookies in the manner described in our Privacy and
Cookies Policy.

close [x]

https://www.extremenetworks.com/products/                                                              2/6

# Powering the NFL on Game Day and Your Business Every Day



close [x]

We use cookies for traffic analytics and ad and content personalization. By clicking on any of the content or interacting with any section of this website, you are agreeing to this use of cookies in the manner described in our Privacy and Cookies Policy.



When it comes to the experience economy, the Patriots are right in the middle of it; from the moment a fan c
begins.

**Fred Kirsch**
VP of Content, Kraft Sports Group & The New England Patriots

# EXTREME NETWORKS POSITIONED AS A
# LEADER

In Gartner's 2019 Magic Quadrant for the Wired and Wireless LAN Access Infrastructure

**READ THE REPORT**

close [x]

We use cookies for traffic analytics and ad and content personalization. By
clicking on any of the content or interacting with any section of this website, you
are agreeing to this use of cookies in the manner described in our Privacy and
Cookies Policy.

Figure 1. Magic Quadrant for the Wired and Wireless LAN Access Infrastructure



As of April 2019     © Gartner, Inc

// Home › P

Infrastructure

ExtremeSwitchin
ExtremeRouting

We use cookies for traffic analytics and ad and content personalization. By
clicking on any of the content or interacting with any section of this website, you
are agreeing to this use of cookies in the manner described in our Privacy and
Cookies Policy.                                                          close [x]

DataCloud Technologies, LLC v. Extreme Networks, Inc.                    Page | F-5

5/28/2020                                    IT Infrastructure & Networking Products - Extreme Networks

ExtremeCloud™ IQ                                              Newsroom
ExtremeCloud™                                                Blog
                                                             Events
MyHive
Support Portal
Partner Portal
Developer Portal

**Company**                                                  **Contact**

About Extreme                                                Sales
Leadership                                                   Support
                                                             Office Locations
Investor Relations
Careers
Extreme Elements™

**NASDAQ: EXTR**

© 2020 Extreme Networks

 Facebook   Twitter   LinkedIn   YouTube   Instagram

Privacy Policy
Legal Notices
                                                             **Global**

close [x]

We use cookies for traffic analytics and ad and content personalization. By
clicking on any of the content or interacting with any section of this website, you
are agreeing to this use of cookies in the manner described in our Privacy and
Cookies Policy.

DataCloud Technologies, LLC v. Extreme Networks, Inc.                          Page | F-6

## EXHIBIT G

**Webpage Describing Support for Products**

5/29/2020                                      Support - Extreme Networks

# #1 in Industry Support

Extreme backs every solution with the industry's only 100% in-sourced support team, a passionate user community - The Hub, and a deep Knowledge Base. Whether you are looking for technical expertise, friendly advice, or a simple answer to your question, we're just a click away.

| Search Support... | 🔍 |

# Product Information

Find the documents and information you need right here. You'll find everything from product documentation to release notes.



Product Documentation



Release Notes

close [x]

We use cookies for traffic analytics and ad and content personalization. By clicking on any of the content or interacting with any section of this website, you are agreeing to this use of cookies in the manner described in our Privacy and Cookies Policy.



## Policies & Warranties



## Service Contracts



## Service Notifications



## GetPlugged Into"The Hub"

Join our                                                                                                      uestions

close [x]

We use cookies for traffic analytics and ad and content personalization. By clicking on any of the content or interacting with any section of this website, you are agreeing to this use of cookies in the manner described in our Privacy and Cookies Policy.

5/29/2020                                    Support - Extreme Networks



## Search the KnowledgeBase

Access the collective technical expertise of our entire GTAC team. Search the GTAC KnowledgeBase for known solutions to your most challenging issues.

**VIEW KNOWLEDGE BASE**



### Need More Help?
Visit our Support Portal

**VISIT SUPPORT PORTAL**

You'll becom                                                                              g for specific

close [x]

We use cookies for traffic analytics and ad and content personalization. By clicking on any of the content or interacting with any section of this website, you are agreeing to this use of cookies in the manner described in our Privacy and Cookies Policy.

DataCloud Technologies, LLC v. Extreme Networks, Inc.                    Page | G-3



**Certifications**



**Authorized Training Partners**



**Policies**

**VIEW ALL OFFERINGS › ›**

// **Home** › Support

**Infrastructure**

ExtremeSwitching
ExtremeRouting
ExtremeWireless

**Applications**

Cloud
Analytics & Visibility
Orchestration
Security

**Log In**

ExtremeCloud™
ExtremeCloud™
MyHive
Support Portal

close [x]

We use cookies for traffic analytics and ad and content personalization. By clicking on any of the content or interacting with any section of this website, you are agreeing to this use of cookies in the manner described in our Privacy and Cookies Policy.

DataCloud Technologies, LLC v. Extreme Networks, Inc.                    Page | G-4

5/29/2020                                    Support - Extreme Networks

About Extreme                              Sales
Leadership                                 Support
Investor Relations                         Office Locations
Careers
Extreme Elements™

NASDAQ: EXTR

© 2020 Extreme Networks



Privacy Policy
Legal Notices

Global

close [x]

We use cookies for traffic analytics and ad and content personalization. By
clicking on any of the content or interacting with any section of this website, you
are agreeing to this use of cookies in the manner described in our Privacy and
Cookies Policy.

## **EXHIBIT H**

**SLX Insight Architecture**



At-A-Glance

## Highlights

- Improve network operations and reduce operational costs through pervasive, granular, real-time network monitoring and troubleshooting with dynamic flow identification, intelligent preprocessing and flexible data streaming via the Extreme SLX Insight Architecture embedded in every Extreme SLX device

- Extreme SLX Insight Architecture helps improve operational efficiency and troubleshooting by providing an open guest VM in a KVM environment to run third-party monitoring and analytics applications on the switch or router coupled with an internal analytics path and high-performance data streaming options

- Extreme SLX Visibility Services enables organizations to collect physical and virtual network traffic data from multiple network layers to provide overlay and workload visibility across the network

- Gain visibility into highly distributed multi-tier applications with Extreme SLX Visibility Services and its support for rich classification and workload matching with network-wide scale

- Apply rule-based actions automatically to incoming network traffic while delivering context-rich data to Extreme Insight Architecture, Extreme Workflow Composer, or third-party analytics and monitoring applications with Extreme SLX Visibility Services



# Embedded Network Visibility for Pervasive Real-Time Monitoring and Automated Actions

As organizations continue to transform their business and adapt to new digital workloads, IT operations teams struggle to keep pace with the volume and variety of data going across their networks. In order to meet customer and end-user service and application expectations and remain competitive, organizations need to provide service and application assurance, improve operational efficiencies, and in some cases, enable new monetization opportunities. To accomplish this, they need comprehensive visibility into the operational state of the network and into the traffic that is transiting the network.

## The Visibility Challenge

Network devices such as routers and switches that are not designed to provide clear and comprehensive network visibility can limit the ability to quickly, flexibly, and cost-effectively extract the data organizations requirement to meet SLAs, improve monetization, and increase operational efficiency as they digitally transform and need to support increasingly diverse applications and services and streamline operations.

Existing approaches to network visibility often suffer from limited comprehensiveness, which in turn limits the ability of operators of modern data centers to effectively address application and service requirements and in an operationally efficient manner.

Key challenges include:

- **Limited in scope:** Addresses only device state and without providing a comprehensive, real-time, and holistic understanding of underlying network traffic nor the ability to take an action on it, making it challenging to easily address diverse operational needs

- **Inadequate ability:** Does not support increasingly complex workloads, distributed application architectures, scale or virtual network overlays, creating blind spots where organizations cannot glean context

- **Static:** Lacks the ability to be dynamically and programmatically controlled via software based on a given policy, environment or network situation, thus limiting the overall IT agility of the organization

- **Finite capabilities:** Constrained to only the capabilities of the switch or router vendor and embedded in the device, limiting the ability to tailor visibility to a specific environment or operational model while also potentially causing a tradeoff between visibility and day-to-day forwarding requirements of the network

- **Complex and costly:** Requires separate devices connected via physical taps or span ports to monitor the router or switch via software tools deployed on devices that are manually connected to a router or switch being monitored, increasing cost and operational complexity while limiting ability to gain real-time insight

## Comprehensive Visibility in the Digital Era

In the digital era, the expanded environment of the modern infrastructure demands greater visibility. This includes dynamic, rich, and scalable classification and actions at multiple layers from network to workloads as well as highly flexible, granular real-time visibility of specific flows. Additionally, this visibility approach must be able to be deployed on an organization's own terms with capabilities tuned to the needs of their business. The visibility solution must also provide this capability pervasively and in real-time to deliver the pertinent data where and when it is needed. And finally, the visibility solution must do so with minimal additional cost, operational complexity, or impact to the performance and primary function of the network. Embedding a purpose-built, dedicated visibility architecture within the switch or router that combines both software and hardware innovation produces a superior solution to these needs.



*Figure 1* The Extreme SLX Insight Architecture in Extreme SLX Switches and Routers delivers open visibility capability in every device for customized pervasive insight into network traffic.

## Embedded Visibility Solution

Extreme® SLX™ Insight Architecture™ and Extreme SLX Visibility Services deliver a new approach to network monitoring and troubleshooting that makes it faster, easier, and more cost-effective to get the comprehensive, real-time visibility needed for network operations and automation. This innovative approach provides comprehensive visibility from the network to the workload including the ability to address end-user application or service needs, analyze, automate, and generate reports on context-rich data, and provide the fine-grain targeted visibility needed to tune the network for specific device or service needs.

## Extreme SLX Insight Architecture

Extreme Insight Architecture provides a unique pervasive visibility architecture designed from the ground up and leveraging an innovative combination of Extreme SLX-OS software and Extreme SLX platform hardware features to provide organizations unparalleled network visibility without impacting normal network operation or performance. This flexible and open solution enables organizations to deploy their choice of third-party or custom monitoring and troubleshooting applications, tools, and utilities directly in the network, providing real-time visibility and tuned to meet their specific business and operational needs pervasively across the network. With tools that better enable them to monitor and troubleshoot the network, organizations can improve service and application assurance, as well as dramatically reduce operational impact and cost.

DataCloud Technologies, LLC v. Extreme Networks, Inc.                    Page | H-2

The Extreme SLX Insight Architecture is designed to enable organizations to deploy high-performance and flexible visibility applications pervasively throughout their network for improved monitoring and troubleshooting. By providing dedicated resources on the router or switch, organizations can gain unparalleled insight into the network through pervasive low-latency capture of real-time visibility traffic without impacting the normal control and forwarding of the network (see Figure 1).

### Insight Without Compromise

Gain unparalleled insight into the network through pervasive low-latency capture of real-time visibility traffic with no impact to performance or reliability of the network data plane or control plane.

### Extreme SLX Insight Architecture Benefits

A key benefit of the Extreme SLX Insight Architecture is to enable organizations to deploy high-performance and flexible visibility applications via dedicated resources on the platform, including:

- Dedicated internal and external bandwidth that allows applications running in the open KVM environment to extract data without disrupting forwarding or control plane traffic and to deliver the captured data to analytics applications off the platform

- Industry-standard x86 CPUs with open KVM environment

- Dedicated flash memory

### Flexible Packet Filtering

The Extreme SLX Insight Architecture begins with flexible packet filtering in the packet processors for each interface. This provides a rich set of filters to select the exact type of traffic an organization wants to capture for visibility processing.

### Open Guest VM

The architecture supports an open kernel-based virtual machine (KVM) environment to accommodate third-party and customer-specific applications that can consume the network traffic captured from the router or switch interfaces. Enabled by the Extreme SLX-OS, this pre-configured KVM environment leverages high performance x86 CPUs to host these applications on every router or switch, extending visibility customized to the business and operational needs of the organization across the entire network. While the KVM environment is open and can host any application, it is designed and ideally suited for networking applications, tools, and utilities.

The Extreme SLX Insight Architecture open KVM environment supports several pretested and well-known packet capture applications, including Wireshark and tcpdump, and can be accessed via pretested RESTful utilities such as Chrome and Curl. There are a wide variety of additional applications, tools, and utilities that organizations are able to run in this environment, such as data analytics applications, packet generators, monitoring tools, troubleshooting utilities, and many others.

### Internal Analytics Path

The architecture provides an innovative internal analytics path for the transport of captured data packets between the packet processors on the Extreme SLX interfaces and the Extreme SLX Insight Architecture guest VM open KVM environment. This link provides applications running in the guest VM a dedicated resource for high-performance packet capture without disrupting normal forwarding or control plane traffic of the network device.

### Flexible Streaming

The Extreme SLX Insight Architecture provides flexible streaming options, enabling captured data to be delivered to applications off the platform for additional analysis, visualization, and reporting, or logging and archiving.

### Local Analytics Storage

The Extreme SLX Insight Architecture includes a provision for on-device storage dedicated to visibility applications running in the guest VM environment, providing real-time local capture for easy and fast access.

# Extreme SLX Visibility Services

Extreme SLX Visibility Services delivers a unique highly scalable, dynamic, API-controlled visibility at the entry and exit points to the data center network as close to the source and destination of the service as possible. This approach provides multilayer visibility including overlay and workload visibility across the network and leverages programmable ASIC-based capabilities for rich classification and diverse actions including the ability to drop, shape, or mirror context-rich traffic for additional analysis.

Extreme SLX Visibility Services is designed to help simplify network operations with embedded visibility from physical network to application workload. As network complexity increases, isolated data points at the physical or virtual network layer give little guidance as to the criticality of an issue. For example, bursty storage backup traffic slowing down an internal Web site is a lower priority than a slowdown for a revenue-generating application. Network

DataCloud Technologies, LLC v. Extreme Networks, Inc.                    Page | H-3



*Figure 2* Extreme SLX Visibility Services in Extreme SLX Switches enables automated, rule-based actions across multiple layers of the network.

administrators need workload context across the network to ensure the appropriate action is taken in each case. By combining physical and virtual network traffic data with overlay and workload information across multiple network layers, Extreme SLX Visibility Services enables diverse, rule-based actions to maintain performance and mitigate risk.

- Rich classification (e.g. IP and MAC addresses, port numbers, VNIs) and Workload matching with network-wide scale

- Automated application of rule-based actions (e.g. count, drop, mirror, sFlow) to incoming network traffic

- Further actions outside the switch including push of context-rich data to Extreme Insight Architecture, Extreme Workflow Composer, or to third-party analytics and monitoring applications

Extreme SLX Visibility Services are embedded into Extreme SLX Switches, reducing the operational complexity of managing network visibility at scale (see Figure 2).

## Extreme SLX Insight Architecture Use Cases

Key use cases for the Extreme SLX Insight Architecture fall into the general areas of monitoring and troubleshooting the network, and analyzing data.

### Monitoring the Network
- SLA monitoring for network parameters

### Troubleshooting the Network
- Customized tools, apps, and scripts for troubleshooting

- Debugging for congestion, latency, and network performance issues

- Faster time-to-recovery

### Analyzing Data
- All Packets (sniffer), for example, Splunk, Wireshark, Tcpdump

- Sampled Packets, for example, sFlow-RT

- DDoS attack detection and debugging

## Visibility from Wire to Workload

Gain essential workload context across the network, ensuring appropriate actions are taken, by combining physical and virtual network traffic data with overlay and workload information across multiple network layers.

### Extreme SLX Visibility Services
- A key benefit of Extreme SLX Visibility Services is to empower network administrators to easily enable diverse, rule-based actions to maintain application or service performance while reducing operational complexity and risk, including:

- Pervasive visibility at scale across the network for seamless support of highly distributed multi-tier application workloads

- Rich multilayer classification capabilities including network parameter filters such as IP and MAC addresses, port numbers, VNIs, and workload matching

- Diverse automated rule-based actions such as count, drop, and mirror for incoming network traffic with push of context-rich data to Extreme Insight Architecture, Extreme Workflow Composer, or third-party analytics and monitoring applications

For more information, see the Extreme SLX product page on www.extremenetworks.com and the product data sheets for the Extreme SLX 9850 Router, the Extreme SLX 9540 Switch, the Extreme SLX 9240 Switch, and the Extreme SLX 9140 Switch.



http://www.extremenetworks.com/contact  /  Phone +1-408-579-2800

©2017 Extreme Networks, Inc. All rights reserved. Extreme Networks and the Extreme Networks logo are trademarks or registered trademarks of Extreme Networks, Inc. in the United States and/or other countries. All other names are the property of their respective owners. For additional information on Extreme Networks Trademarks please see http://www.extremenetworks.com/company/legal/trademarks. Specifications and product availability are subject to change without notice. 11786-0817-17 GA-AG-5895-01

**WWW.EXTREMENETWORKS.COM**

## <u>EXHIBIT I</u>

**Data Sheet: Extreme Management Center**



Data Sheet

## Highlights

**Automation From Edge to Data Center in One Single-Pane-of-Glass**

- Manage your network with automation from a single pane of glass across virtalized and cloud enviroments

- Bring new service online fast and reduce human error through built-in fabric provisioning

- Free up IT time to drive innovation with integrated cross domain workflow automation and automated device onboarding

**Deep Visibility for Data-Driven Decisions and Fast Issue Resolution**

- Get in depth visibility of users, end-devices, and applications across physical and virtual machine (VM) traffic through our Virtual Application

- Get business insights into the performance of applications and the network through streaming application telemetry and deep packet inspection

- Mitigate shadow IT and malicious applications with detailed views of workloads in physical and virtual environments

**Granular Control to Strengthen Security and Compliance**

- Automatically roll-out consistent policies and automated configuration and compliance monitoring for users and devices

- Enables secure IoT access with real-time policies based on the security posture of IoT devices.

- Integrate with existing security applications such as firewalls, MDMs, endpoint security, for rapid and automated mitigation actions



ExtremeControl



ExtremeAnalytics



ExtremeManagement



ExtremeCompliance

# Extreme Management Center™

A better way to manage your complex network from the network edge to the data center.

The network edge is where your organization engages customers and where IoT devices connect. We integrated Extreme Management Center with our Smart OmniEdge solution, so you can deliver customer-driven experiences.

The enterprise campus has become one of the most vexing environments in which to manage IT. You need to rapidly onboard BYOD users and Internet connected devices, quickly deploy the new digital technology that your organization requires, prevent cyber-attacks at every entry point, and do it all while delivering a consistent and personalized user experience. Our Automated Campus solution makes it all possible with simplicity, security, and intelligence that are second to none.

High levels of virtualization, containerization and cloud environments, combined with enormous traffic, limit visibility in the modern data center. In addition, most data centers face challenges adapting to rapid business changes and virtual environments. Most customers have also grown tired of vendor lock-in and want an open flexible environment.

Here Extreme Management Center, part of our Agile Data Center Networking solution, provides a pragmatic path to automation based on multi-vendor architectures. It gives you the granular visibility and real-time analytics, to make data-based business decisions. Our SLX switches and routers are managed by Extreme Management Center through a single pane of glass, which reduces data center administration and offers you the full view of the network, enables embedded data center fabric automation and delivers cross domain automation with our Workflow Composer.

Our Extreme Management Center offers you all you need for data-driven insights, visibility and control with one view from the network edge to the data center. We give you the choice of hardware appliance or virtual appliance, to meet your IT infrastructure needs. Our Professional Services can help you design, deploy and optimize your network, and provide customized technical training and support tailored to your specific needs.

Extreme Management Center gives you the choice of hardware appliance or virtual appliance, to meet your IT infrastructure needs.

Our Professional Services can help you design, deploy and optimize your network, and provide customized technical training and support tailored to your specific needs.

The Extreme Management Center comprises the following applications:

## Extreme Management Center

| ExtremeControl | ExtremeAnalytics | ExtremeManagement | ExtremeCompliance | ExtremeConnect |
|---|---|---|---|---|
| Granular policy control | Actionable business insights | Orchestration and automation | Automated configuration compliance | Integration with VMware, GCP, MS Azure, AWS, OpenStack, Security, etc. |
| Secure access for users and IoT devices | Network and application performance | Security with hyper-segments | Automate compliance reporting | Open API – Build your own integrations |
| Easy, secure onboarding | Security and forensics | Integrated workflows | GDPR, HIPAA, PCI | |

## ExtremeManagement™

### Unified View of Users, Devices and Applications

ExtremeMangement offers a single pane of glass for your wired and wireless network - edge to data center. Zero touch provisioning (ZTP+) lets you quickly bring new infrastructure online. Together with our ExtremeControl it lets you unify the security of your wired and wireless networks with in-depth visibility and control. A granular view of users, devices and applications with an easy to understand dashboard lets you manage inventory and network topology efficiently. Policies and new services such as BYOD can be enabled through the integrated interface of ExtremeManagement and enforced at the network point of entry through ExtremeControl.

Extreme Management Center extends automation from the wireless edge to the datacenter and across devices of different vendors, so that you don't need to rip out any hardware when deploying our applications. To enhance managing these 3rd party devices, our dashboard shows their topology and discovery.

We help you decrease your time to service with powerful fabric provisioning built right in. To free up IT time and avoid human error we are offering cross domain workflow

automation.

Canned workflows for our SLX and VDX switching and routing platforms automate onboarding these devices in your datacenter. Through the entire network, our applications help you stay compliant with industry standards through automated configuration and compliance monitoring.

Our EXOS switches can be set up as a stack with ZTP+ which enables easy deployment and reduces deployment time.

With Fabric Assist in ExtremeManagement, Fabric Connect can be extended to certified non-fabric devices.

## ExtremeControl™

### Security Through Visibility and Control

Unify the security of your wired and wireless networks with in-depth visibility and control over users, devices and applications. ExtremeControl delivers granular policy controls that enable you to comply to policies and compliance obligations including heterogeneous endpoint environments. Locate, authenticate and apply targeted policies to users and devices as they can easily onboard to the network for secure BYOD, guest access and IoT, all

DataCloud Technologies, LLC v. Extreme Networks, Inc.                                                    Page | I-2

through a single integrated user interface.

Learn more about ExtremeControl.

## ExtremeAnalytics™

### Insights into Network and Application Performance

Get actionable business insights from your end-to-end network with granular details into the performance of applications and the network through application telemetry and deep packet inspection (DPI). This application speeds up troubleshooting by separating network from application performance so you can quickly identify root-causes. It monitors shadow IT, identifies and reports malicious or unwanted applications, and helps with security compliance.

Our ExtremeAnalytics Virtual Analytics Sensor extends application visibility from physical to virtual environments. It eliminates virtualization blind spots with visibility and application performance measurements between VMs on the same host or across hosts on a VMWare virtualized data center. With deep packet inspection, you can see and analyze network traffic across multiple layers for real-time accurate information analysis.

Additionally, integration with AWS, MS Azure and GCP provides a unique capability of a single analytics toolset that covers campus, data center and cloud instances.

Learn more about ExtremeAnalytics.

## ExtremeConnect™

### Ecosystem Integration Platform

Management Center is integrated with key enterprise platforms to streamline your business processes, enable more robust data analysis and deliver seamless user experiences. ExtremeConnect offers integration with major enterprise platforms for network security, mobile management, analytics, cloud and data center solutions. Extreme Management Center is integrated into the datacenter with SLX end-point tracking and integration with VMware vCenter and vSwitch, as well as Distributed Virtual Switches.  It offers visiblity and policy provisioning for AWS, MS Azure and GCP.

In addition, we offer a comprehensive suite of open APIs

from our network infrastructure portfolio of switches and wireless APs. This includes the classic integration methods like SNMP, Syslog and more efficient integration methods like REST-based APIs (currently under development).

Customers that are using our Extreme Management Center can take advantage of ExtremeConnect to automate day-to-day operations with integrations with third party services like security, mobile device management, analytics, etc. See a list of our Extreme Technology Partners.

## ExtremeCompliance™

### (formerly Information Governance Engine)

Reduce risk and ensure your network configurations comply to HIPAA, PCI and GDPR with our fully automated ExtremeCompliance product, which analyses and assesses network configurations to help determine your compliance readiness across your wired and wireless network.

## Appliance Options

### Hardware Appliance Options

The following versions of Extreme Management Center Appliances are designed and tested end-to-end to ensure compatibility and performance for different size requirements:

- NMS-A-25 version supporting up to 5,000 managed devices.
- NMS-A-305 version supporting up to 10,000 managed devices.

### Virtual Appliance Options

The Extreme Management Center virtual appliances must be deployed on a VMWare or Hyper-V server with a disk format of VHDX.

- The VMWare Management Center virtual engines are packaged in the .OVA file format (defined by VMware).
- The Hyper-V Management Center virtual engines are packaged in the .ZIP file format. Refer to the Release Notes for information on Virtual Appliance scalability.

*Note:* For ExtremeControl and ExtremeAnalytics Hardware and Virtual Appliance requirements, please refer to respective data sheets.

# Hardware Appliance Specifications

| Category | NMS-A-25 (86100) | NMS-A-305 (86101) |
|---|---|---|
| **Appliance Specifications** | | |
| Storage | 480GB Enterprise SSD | 960GB Enterprise SSD |
| Networking | 2 x 1GbE | 2 x 1GbE |
| Graphic Ports | Front VGA, Rear VGA | Front VGA, Rear VGA |
| Serial | RJ45 | RJ45 |
| USB | 2 x Front, 3 x Rear | 2 x Front, 3 x Rear |
| TPM Version 2.0 | Yes | Yes |
| Appliance Scale Number | Unrestricted | NMS-ADV-U |
| Maximum APs | 12,500 | 25,000 |
| Maximum Wireless MUs | 50,000 | 100,000 |
| Maximum Managed Devices | 5,000 | 10,000 |
| Access Control End-System | 100,000 | 200,000 |
| Statistics Retention (Days) | 180 | 180 |
| **Power Specifications** | | |
| Power | 750W 80+ Platinum Hot Pluggable | 750W 80+ Platinum Hot Pluggable |
| Power Supply Type | AC Redundant | AC Redundant |
| AC Input Voltage | 90V to 132V and 180V to 264V | 90V to 132V and 180V to 264V |
| AC Input Frequency | 47Hz to 63Hz | 47Hz to 63Hz |
| **Physical** | | |
| Rackmount | 1U Rack | 1U Rack |
| Dimensions (WxDxH) | 16.93"x27.95"x1.72" | 16.93"x27.95"x1.72" |
| Weight | 29 lb. (13.15kg) Max. | 29 lb. (13.15kg) Max. |
| Shipping | -40°C to 70°C (-40°F to 158°F) | -40°C to 70°C (-40°F to 158°F) |
| Humidity (Shipping) | 50% to 90%, non-condensing with a maximum wet bulb of 28°C (at temperatures from 25°C to 35°C) | 50% to 90%, non-condensing with a maximum wet bulb of 28°C (at temperatures from 25°C to 35°C) |
| Vibration (Unpackaged) | 5Hz to 500Hz 2.20 g RMS Random | 5Hz to 500Hz 2.20 g RMS Random |
| **Warranty** | | |
| Hardware | 1 Year Parts and Labor | 1 Year Parts and Labor |

# System Requirements

## Operating Systems

- Windows 64-bit (qualified on the English version of the operating systems)
- Windows Server® 2008 Enterprise (64-bit only) and 2008 R2
- Windows Server® 2012 Enterprise (64-bit only) and 2012 R2 Windows® 8 and 8.1 (64-bit only)
- Linux 64-bit
- Red Hat Enterprise Linux WS and ES v6 and v7 SuSE Linux versions 10, 11, and 12.3 (64-bit only)
- Ubuntu 11.10, 12.04, and 13.04 (64-bit only)
- VMware® (64-bit Management Center Virtual Appliance) VMware ESXi™ 5.1, 5.5, 6.0 or 6.5 server
- Hyper-V (64-bit Management Center Virtual Appliance) Hyper-V virtual appliances are supported on Windows Server
- 2012 R2 running Hyper-V Server 2012, 2016

## Supported Web Browsers

- Microsoft Edge and Internet Explorer version 11
- Mozilla Firefox 34 and later
- Google Chrome 33.0 and later

## Standards Compliance: Regulatory/Safety

- UL60950-1 – 2nd edition  - CSA C22.2 No.60950-1-07 + A1:2011 (USA/Canada)
- EN60950-1: 2006 + A1: 2010 + A11: 2009 + A12: 2011 (Europe)
- IEC60950-1 2nd edition (International)
- CE - Low Voltage Directive 2014/35/EU (Europe)

## Emissions/Immunity

- CE EMC Directive 2014/30/EU (Europe) (International)
- FCC, 47 CFR Part 15/ICES-003 - Emissions (USA/Canada)
- CISPR 32: 2012 +AC: 2013 - Emissions (International)
- EN55022: 2010 +AC: 2011 - Emissions (Europe)

**Emissions/Immunity (cont.)**

- EN55024: 2010 - Immunity (Europe) (International)
- EN61000-3-2 - Harmonics (Europe) (International)
- EN61000-3-3 - Voltage Flicker (Europe) (International)
- VCCI Emissions (Japan)
- AS/NZS 3548 Emissions (Australia/New Zealand)
- BSMI CNS13438 CNS14266 Class A  (Taiwan)
- KCC Class A KN-22/KN-24 Certification (Korea)

# Ordering Information

Extreme Management Center provides cost-efficient choices enabling enterprises to address their priorities, optimize their budget and demonstrate quick time-to-value. Management Center models range from a cost-efficient entry level solution to full functionality for device intensive enterprises as well as a subscription-based licensing model for full functionality scaled to the size of your network. Flexible upgrade options support business growth.

Extreme Management Center can be ordered on a per device basis. To simplify ordering for customers that use third-party network management software we offer per-user pricing for ExtremeControl and ExtremeAnalytics.

# Per-User Subscription Pricing

### ExtremeControl (97207-27001)

Includes unlimited number of end-system licenses up to performance limit and ExtremeWorks for these licenses, priced per user per year.

### ExtremeAnalytics (97208-27001)

Includes unlimited number of end-system and flows per minute licenses up to performance limit and ExtremeWorks for these licenses, priced per user per year.

*Note:* Per-user subscription pricing does not include sensor and any other hardware appliance

# Per-Device Pricing

**Extreme Management Center**

A subscription model including all of NMS-ADV- XX, unrestricted ExtremeControl end-system licenses up to performance limits, unrestricted ExtremeAnalytics flow licenses up to performance limits, ExtremeWireless RADAR, ExtremeWireless AP capacity upgrades for controllers up to performance limits, and ExtremeWorks for these products. This part requires the associated per device service parts 97201-27001, 97202-27001 and/or 97203-27001.

| Part Number | Description |
|---|---|
| 86100 | Extreme Management Appliance -NMS-A-25, manages up to 5K devices. |
| 86101 | Extreme Management Appliance -NMS-A-305, manages up to 10K devices. |

### NMS-BASE-XX

Includes basic wired/wireless management features as well as inventory management policy management, and basic user interface. 3 remote client connections are included.

### NMS-XX

Includes basic wired and wireless management features as well as inventory management, policy management, access control management and virtual appliances (requires ES licenses), and the full featured user interface. 50 end-systems are included.

### NMS-ADV-XX

Includes basic wired and wireless management features as well as inventory management, policy management, access control management, and the full featured interface.

In addition, Management Center Advanced includes advanced wireless management, with triangulated location, location tracking, wireless coverage maps and other advanced mapping functionality, the Connect API, ability to install on a primary server, redundant server and lab server, a 500 end-system license for Access Control, and virtual Access Control appliances for full Access Control deployment flexibility (require end-system licenses if needed in addition to the 500 included), 3000 flows per Minute Application Analytics license and Application Analytics virtual engines, 100 remote clients are included.

## Warranty

As a customer-centric company, Extreme Networks is committed to providing quality products and solutions. In the event that one of our products fails due to a defect, we have developed a comprehensive warranty that protects you and provides a simple way to get your product repaired or media replaced as soon as possible.

The Management Center appliance comes with a one year warranty against manufacturing defects. Software warranties are ninety (90) days and cover defects in media only. For full warranty terms and conditions please go to: http://www.extremenetworks.com/support/policies

## Service and Support

Extreme Networks provides comprehensive service offerings that range from Professional Services to design, deploy and optimize customer networks, customized technical training, to service and support tailored to individual customer needs. Please contact your Extreme Networks account executive for more information about Extreme Networks Service and Support.

## Additional Information

For additional technical information on Management Center, visit the Extreme Management Center page.



Extreme™
Customer-Driven Networking

http://www.extremenetworks.com/contact

©2019 Extreme Networks, Inc. All rights reserved. Extreme Networks and the Extreme Networks logo are trademarks or registered trademarks of Extreme Networks, Inc. in the United States and/or other countries. All other names are the property of their respective owners. For additional information on Extreme Networks Trademarks please see http://www.extremenetworks.com/company/legal/trademarks. Specifications and product availability are subject to change without notice. 2364-0120-17